## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL DYMTROW,    ) | |
|    ) | |
|    Plaintiff,    ) | |
|    ) | Civil Action No. 07 CV 11277 (RJS) |
|    ) | |
|    v.    ) | |
|    ) | |
| TAYLOR SWIFT, SCOTT SWIFT and    ) | |
| ANDREA SWIFT,    ) | |
|    ) | |
|    Defendants.    ) | |

### TRANSMITTAL DECLARATION OF PAUL V. LiCALSI
### IN SUPPORT OF DEFENDANTS TAYLOR SWIFT, SCOTT SWIFT
### AND ANDREA SWIFT'S MOTION TO DISMISS THE COMPLAINT

Paul V. LiCalsi declares under the penalty of perjury as follows:

1.    I am a partner of Mitchell Silberberg & Knupp LLP, counsel to Defendants

Taylor Swift, Scott Swift and Andrea Swift ("Defendants") in the above-captioned action.  I

make this declaration in support of Defendants' motion to dismiss the Complaint herein pursuant

to Fed. R. Civ. P. 12(b)(6).

2.    Attached hereto as Exhibit 1 is a true and correct copy of Plaintiff Daniel

Dymtrow's Complaint, dated December 14, 2007.

DATED:  March 20, 2008

Paul V. LiCalsi (PL6622)

**NORRIS, McLAUGHLIN & MARCUS**
Fernando M. Pinguelo, Esq. (FP6328)
875 Third Avenue
18th Floor
New York, NY 10022
Phone: (212) 808-0700
Fax: (212) 808-0844

**GUPTA LEGAL, PLLC**
Vivek Gupta, Esq. (VG-9794)
14 East 4th Street, Suite 803
New York, New York 10012
Phone: (917) 686-4954
Fax: (646) 356-6901

Attorneys for Plaintiff
Daniel Dymtrow



JUDGE SULLIVAN

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **DANIEL DYMTROW,** | : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : | HON.                    , U.S.D.J. |
| | : | |
| -against- | : | CIVIL ACTION NO. __07 CV 11277__ (RJS) |
| | : | |
| **TAYLOR SWIFT, SCOTT SWIFT,** and | : | **PLAINTIFF'S ORIGINAL COMPLAINT** |
| **ANDREA SWIFT,** | : | **AND JURY DEMAND** |
| | : | |
| Defendants. | | |

DANIEL DYMTROW, by his attorneys, Norris, McLaughlin & Marcus, P.A. and Gupta

Legal, PLLC, for his Complaint against TAYLOR SWIFT, SCOTT SWIFT, and ANDREA

SWIFT, alleges as follows:

## NATURE OF THE ACTION

1.      Daniel Dymtrow, a music industry personal manager, makes a living by identifying, developing, and creating opportunities for artists to succeed in the music industry. Mr. Dymtrow agreed to manage then thirteen-year-old Taylor Swift when her parents and she persuaded him to represent Taylor.  The parties entered into agreements.  During the course of Mr. Dymtrow and defendants' two-and-a-half-year management relationship, Mr. Dymtrow devoted a significant amount of time towards planning Taylor Swift's career, helping to sharpen her talent and skills, exposing her to career-building opportunities, and identifying and negotiating lucrative contracts, including without limitation, a music development/recording contract, music publishing contract, endorsement contract, talent contract, magazine notoriety and publicity, live performances with established and famous singers, and a recording contract. Defendants agreed to work with Mr. Dymtrow to obtain court approval of his contract with Taylor Swift, a minor at the time.  However, defendants repudiated their agreements with Mr. Dymtrow weeks before signing a record contract and talent representation agreement, in an attempt to deny him his bargained-for compensation for payment of the reasonable value of his services.  In fact, Mr. Dymtrow has been paid less than $10,000 for the entirety of what he did in helping build and launch Taylor Swift's career.

2.      In this action for unjust enrichment, breach of contract and implied covenant of good faith and fair dealing, promissory estoppel and estoppel in pais, and tortious interference with prospective economic opportunity, Mr. Dymtrow seeks simply to recover payment for his services.  Mr. Dymtrow's claims against the defendants stem, in part, from two written contracts, one of which is the Exclusive Personal Management Agreement ("EPMA") between defendant Taylor Swift and Mr. Dymtrow.  Taylor's parents, defendants Scott Swift and Andrea Swift

(collectively, "Parents"), executed a second, separate agreement with Mr. Dymtrow wherein the Parents guaranteed and/or assumed the performance of all of Taylor's services and obligations set forth in the EPMA (hereinafter referred to as the "Guarantee"). Defendants' conduct has led Mr. Dymtrow to file this action against Taylor Swift and her Parents to recover monies promised and owed to him, but never paid.

### JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between Mr. Dymtrow and Defendants, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and is based on contractual agreements that were negotiated and agreed to in New York, signed by at least one party in New York, and a substantial part of the events giving rise to Mr. Dymtrow's claims having occurred in this judicial district. Moreover, all parties agreed that any action or other proceeding arising out of the contracts would be brought in courts located within the State of New York.

### PARTIES

5.    Daniel Dymtrow resides in Los Angeles, California and is a citizen of that state. At the time Mr. Dymtrow entered into agreements with defendants, he resided and operated an office in New York City.

6.    Upon information and belief, defendant Taylor Swift ("Artist") resides in Hendersonville, Tennessee and is a citizen of that state.

3

7.     Upon information and belief, defendant Scott Swift resides in Hendersonville, Tennessee and is a citizen of that state.  Scott Swift is Taylor Swift's father and thereby was her legal guardian prior to her reaching the age of majority.

8.     Upon information and belief, defendant Andrea Swift resides in Hendersonville, Tennessee and is a citizen of that state.  Andrea Swift is Taylor Swift's mother and thereby was her legal guardian prior to her reaching the age of majority.

## STATEMENT OF FACTS

### A.     Background

9.     Mr. Dymtrow is a music industry personal manager who specializes in managing new artistic talent. He has worked in the music business for over ten years and has managed some of the biggest names in the music business, including Britney Spears.

10.     In or about September 2002, Mr. Dymtrow met Kelly Foster ("Foster"), Entertainment Director of the U.S. Tennis Open, while attending the U.S. Tennis Open.  In or about October 2002, Foster called Mr. Dymtrow and asked him whether she could send Mr. Dymtrow a demo music CD of an aspiring, thirteen-year-old singer named Taylor Swift.  Mr. Dymtrow agreed, and after listening to the demo CD of "cover songs," arranged to meet with the Artist and her Parents at his office in New York City.

11.     In or about January 2003, Artist and her Parents met Mr. Dymtrow in New York in the hopes of convincing Mr. Dymtrow to sign Artist as one of his represented clients.   At the time, Mr. Dymtrow worked almost exclusively for Britney Spears.

12.     Mr. Dymtrow interviewed Artist, heard her sing and play guitar, discussed with her Parents their financial and moral commitment to Artist's music career, and concluded that Artist had the potential to become a young star in the country music world with the proper guidance and management.

13.     Artist's Parents knew that Artist needed an experienced manager in order to give Artist access to record companies in Nashville, the home of country music in the United States. In fact, Artist and her Parents attempted previously to manage Artist's career themselves. Artist's Parents told Mr. Dymtrow that they had sent her demo music CD of cover songs to various recording labels and attempted to visit them on their own in the hopes of securing a meeting with some executives. Artist's Parents told Mr. Dymtrow that Artist was rejected by every music label she and her Parents pursued on their own, and they were told they needed to hire a respected manager if they expected Artist to advance in the music business.

14.     As a result, defendants actively pursued Mr. Dymtrow and sought his services. Defendants assured Mr. Dymtrow on multiple occasions that if he were to sign Artist to an exclusive management contract, they would pay Mr. Dymtrow his fee for services to provide Artist with opportunities, exposure, and contracts. Defendants also promised Mr. Dymtrow that they would reward him for his efforts, treat him fairly, and protect his economic interests in Artist. Mr. Dymtrow relied upon these promises and performed his obligations per the EPMA based on those promises.

**B.     Exclusive Personal Management Agreement & Contract Between Mr. Dymtrow and Artist's Parents Guaranteeing Artist's Performance.**

15.     In or about early March 2003, Mr. Dymtrow, Artist and her Parents met in New York to discuss the basic terms and parameters of an exclusive personal management agreement, and a separate contract with Artist's Parents guaranteeing Artist's performance as detailed in the contract.

16.     Defendants retained the services of entertainment attorney Vivien Lewit, Esq. ("Lewit") who reviewed and negotiated the EPMA on behalf of defendants over the course of more than a year.

5

17.     The EPMA was signed by Mr. Dymtrow, Artist, and Artists' Parents as her legal guardian on or about April 5, 2004, but the EPMA was made effective as of March 25, 2003. Annexed as **EXHIBIT "A"** is a true and correct copy of the EPMA.

18.     The EPMA provided, in pertinent part, that Mr. Dymtrow would receive a 20% commission on Artist's gross income as a result of or in connection with Artist's activities in the entertainment industry during the term of the agreement. It also provided that he would receive between 10% and 5% commission for his participation in Artist's gross income earned, received, or credited after the term of the contract in connection with Artist's services and activities rendered or products created during, or after the term pursuant to contracts (oral or written) entered into or "substantially negotiated" during the term, including all renewals and extensions.

19.     In addition to and separate and distinct from the EPMA, Artist's Parents also negotiated and signed an agreement with Mr. Dymtrow whereby Artist's Parents agreed to guarantee, absolutely and unconditionally, the performance by Artist of all of Artist's obligations and services detailed in the EPMA. Annexed as **EXHIBIT "B"** is a true and correct copy of the Parents' Guarantee.

**C.     Mr. Dymtrow's Significant Efforts to Sharpen Artist's Talent, Manage Her Career, and Procure Opportunities and Contracts That Furthered Her Success.**

20.     Immediately after verbally agreeing to enter into the EPMA with Artist and the Guarantee with her Parents (about a year before the agreements were executed), Mr. Dymtrow began performing his services as agreed. He focused Artist's attention on improving her skills, worked to create a unique image of Artist that the public would accept, and procured opportunities and contracts that furthered Artist's career, including a music development/recording contract with RCA records which was entered into even before the EPMA and the Guarantee were signed by the parties.

6

21.    At the time, and throughout the relationship, defendant Scott Swift gave his "word" on a "handshake" to Mr. Dymtrow that he would protect Mr. Dymtrow and ensure his financial stability with Artist, and that Mr. Dymtrow would be paid.  Scott Swift's promises were made verbally and confirmed in writing to Mr. Dymtrow on several occasions.  Scott Swift assured Mr. Dymtrow that there would be no reason to doubt the defendants' commitments. Andrea Swift also made similar promises.

22.    Relying on defendants' contractual agreement to obtain court approval of Artist's contract and defendants' assurances, plaintiff became focused and consumed by his efforts on Artist's behalf instead of pressuring defendants to apply to the court immediately.

23.    Mr. Dymtrow arranged for consultants to help Artist improve her skills (singing/vocal training, stage performance, branding/imaging/marketing, styling, etc.), encouraged Artist to write her own songs, educated Artist and her family about marketing, branding, and imaging to help develop a satisfactory press kit to present to music industry executives and for press/media coverage, arranged for media coverage, identified and negotiated a national marketing and advertising campaign with Abercrombie & Fitch, and scheduled meetings with recording companies in New York and Nashville (including Arista Records Nashville, BNA Records Label, Capitol Records Nashville, Dreamworks Nashville, Jive Records, RCA Records Label, Warner Brothers Records, and Warner Brothers Nashville).

24.    Through Mr. Dymtrow's reputation in the music business and access to top-level music executives, he was able to secure many opportunities for Artist.  In fact, due in significant part to her young age, not one major record label would even meet with Artist before Mr. Dymtrow agreed to represent her.  Mr. Dymtrow initiated meetings with prominent members of the entertainment industry on behalf of Artist in order to promote her career.

7

25.     By way of example, Mr. Dymtrow's effort, vision, reputation, and contacts in the music, fashion, recording, television, and film industries enabled him to secure the following opportunities for Artist:

a.     In or about April 2003, Mr. Dymtrow secured a performance for Artist at the Florida Musical Festival. Mr. Dymtrow arranged for Artist to perform on the single VIP stage alongside established artists and before major record label executives who attended the musical festival.

b.     Within just a few months of entering into the EPMA, Mr. Dymtrow scheduled several showcase performances for Artist in New York City venues and exposed her to several record label executives.

c.     Within six months of meeting Mr. Dymtrow, he arranged meetings with executives from Warner Brother Records and Jive Records in New York, and introduced Artist to these executives and arranged for her to showcase her talent and perform for them in person.

d.     In or about June 2003, Mr. Dymtrow scheduled meetings for Artist with executives of record labels, agents, and music publishers in Nashville, Tennessee and accompanied Artist during a pre-arranged week-long showcase of Artist's talent.

e.     As a direct result of Mr. Dymtrow's efforts, persistence, and follow-up conversations and emails with various executives at RCA on behalf of Artist, RCA offered Artist an artist development recording contract. After extensive negotiations between RCA and Mr. Dymtrow and Artist's attorneys, Artist entered into a contract with RCA.

f.    Mr. Dymtrow contacted RCA's A&R Department and requested a list of all of the publishers with whom RCA planned on having Artist meet. Mr. Dymtrow requested this information so that he could personally conduct research on all of the publishers to find out which company best suited Artist and met the goals and expectations Mr. Dymtrow and Artist had set for Artist.

g.    On or about July 21, 2003, Mr. Dymtrow and Artist met with the President of EMI Music Publishing to evaluate and review potential publishing opportunities for Artist.

h.    Mr. Dymtrow arranged for Artist to perform at many venues including "America's Camp" (also known as "Rudy Giuliani's Camp"), and "Britney Spears' Camp for the Performing Arts" for two consecutive years. These venues enabled Artist to perform alongside recognized performers and exposed Artist to these performers' fan bases.

i.    In or about October 2004, Mr. Dymtrow secured and negotiated The Exclusive Songwriter Agreement between Sony/ATV Publishing and Artist ("Publishing Agreement") which secured publishing rights to Artist's music compositions. The Publishing Agreement was made effective November 1, 2004, but signed by Artist and her Parents on January 20, 2005. Annexed as **EXHIBIT "C"** is a true and correct copy of the Publishing Agreement.

26.    In most of the public performances that Mr. Dymtrow arranged for Artist, Artist was usually the only featured "rising star." In other words, Mr. Dymtrow secured for Artist the

opportunity to perform alongside established artists who were already recognized in the music business. This enabled Artist to establish herself as a serious musician and credible songwriter, and to be exposed to the audiences of established talent; thereby accelerating Artist's ability to develop her own fan base.

27.    Mr. Dymtrow's efforts transcended the music industry and included exposing Artist to the fashion, television, and film industries, and created opportunities for Artist that contributed to her success. By way of example, Mr. Dymtrow's effort, vision, reputation, and contacts in the entertainment industry enabled him to secure the following opportunities for the Artist:

a.    On or about April 4, 2004, Mr. Dymtrow secured for Artist her appearance in the national Abercrombie & Fitch advertising campaign entitled "Rising Stars." Mr. Dymtrow's efforts enabled Artist to participate in the Abercrombie and Fitch ("A&F") campaign without an audition. Mr. Dymtrow negotiated Artist's involvement with the campaign in a way that showcased Artist as a singer/songwriter/musician. Artist's photograph and biography appeared in A&F's Fall 2004 magazine. In addition, Artist's photograph hung as a mural on A&F store walls across the country.

b.    Artist's participation in the A&F Rising Stars advertising campaign was secured and negotiated by Mr. Dymtrow, and memorialized in the Talent Services Agreement with Abercrombie and Fitch Merchandising & Design Co. ("A&F Agreement"). The A&F Agreement was executed by Artist

10

and Andrea Swift in or about April 24, 2004. Annexed as **EXHIBIT "D"**

is a true and correct copy of the A&F Agreement.

c.    In or about June 2004, Mr. Dymtrow negotiated a contract for Artist with

Maybelline Cosmetics for their "Chicks With Attitude" music compilation

CD.  Artist was the only country music artist featured on the CD.  Mr.

Dymtrow was able to negotiate with Maybelline for the CD to contain one

of Artist's original songs and her photograph.

d.    Mr. Dymtrow scheduled two screen tests for Artist-one with Nickelodeon

television, and one for 20th Century Fox's film <u>Flicka</u>, staring Tim

McGraw.

e.    In August and in October 2004, Artist appeared in <u>Vanity Fair</u> magazine.

Her career was highlighted in other magazine and newspaper articles

about her.

**D.    Mr. Dymtrows' Significant Efforts to Procure a Recording Contract with Big
Machine Records and a Talent Representation Contract with Creative
Artists Agency for Artist.**

28.    Mr. Dymtrow "shopped" Artist to major record labels including, but not limited to

Capitol Records, Universal Music Group, Curb Records, and Warner Brother Records, and

invited executives from these labels, as well as other entertainment executives and professionals,

to attend Artist's showcase at the Blue Bird Café.

29.    In or about October 2004, Mr. Dymtrow had a "press-package" sent to Artist's

current record label owner, Scott Borchetta ("Borchetta").  Mr. Dymtrow called and also invited

Borchetta, who was an executive with Universal Music Group at the time, to Artist's Blue Bird

Café showcase, and arranged to set up a meeting with Borchetta before the showcase. Upon

11

information and belief, Borchetta heard Artist's music for the first time after Mr. Dymtrow had a demo sent to him.

30.     Upon information and belief, Borchetta was the Executive Vice-President for Universal Music Group at the time.

31.     On or about November 1, 2004, Mr. Dymtrow traveled to Nashville to visit major record labels and attended Artist's showcase at the Blue Bird Café.  Mr. Dymtrow met with executives at Warner Brother Records and Capitol Records, and with Borchetta, and others to update them on Artist's career, discuss Artist's potential and marketability, and the prospect of a record contract.

32.     In or about late 2004/early 2005, Borchetta told Mr. Dymtrow he was leaving his position at Universal Music Group to start his own independent record label, and that Borchetta wanted Artist and Mr. Dymtrow to be part of his plans.

33.     On or about January 26, 2005, Mr. Dymtrow again met with Borchetta to discuss Borchetta's continuing interest in Artist and Mr. Dymtrow's ideas and plans for making Artist a big star and signing her to a second record contract.

34.     On or about March 7, 2005, Borchetta issued a press release that he was leaving Universal Music Group to start his own record label.

35.     At or about that time, Mr. Dymtrow began negotiating terms and conditions of a record contract with Borchetta who, based on Mr. Dymtrow's efforts on behalf of Artist, expressed the desire to sign Artist to his new record label and offer her a lucrative record contract with Borchetta's new label Big Machine Records.  These contract negotiations between Mr. Dymtrow and Borchetta continued over the course of the next several months.

36.    Mr. Dymtrow worked closely with Borchetta to ensure that Artist would get the most favorable record contract terms.  In fact, on several occasions Mr. Dymtrow and Borchetta discussed the contract terms and conditions in detail.

37.    On or about July 12, 2005 Scott Swift told Mr. Dymtrow that Scott Swift was terminating his professional relationship with Mr. Dymtrow.  It was not until on or about August 1, 2005 that Artist, through her lawyer, sent a letter purporting to disaffirm the EPMA with Mr. Dymtrow.

38.    Upon information and belief, Scott Swift held up the signing of the Big Machine Records record contract until after Artist disaffirmed the EPMA with Mr. Dymtrow in order to deprive Mr. Dymtrow of his just compensation.

39.    Upon information and belief, Artist signed her record contract with Big Machine Records within a few weeks after Artist disaffirmed the EPMA with Mr. Dymtrow.

40.    In addition (and before the EPMA was disaffirmed), Mr. Dymtrow pursued talent agency opportunities for Artist, including opportunities with Creative Artists Agency's ("CAA") Nashville and Los Angeles offices.

41.    In particular, Mr. Dymtrow explored opportunities to convince CAA to represent Artist.  To that end, Mr. Dymtrow met with CAA executives on several occasions; and with defendants' knowledge and encouragement, discussed CAA's representation of Artist. These negotiations occurred at or about the same time that Mr. Dymtrow was negotiating Artist's record contract with Borchetta and Big Machine Records.

42.    Mr. Dymtrow worked closely with CAA to ensure that CAA would agree to represent Artist, and that Artist would get the most favorable talent contract terms possible with

13

CAA. In fact, on several occasions Mr. Dymtrow and CAA executives discussed the contract terms and conditions.

43.     In addition, Mr. Dymtrow arranged for CAA to give Artist the exclusive <u>Nancy Drew</u> film script for Artist to read for a possible role in the film.

44.     In June 2005, CAA offered to sign Artist as their client.

45.     Upon information and belief, Scott Swift held up the signing of the CAA contract until after the EPMA was disaffirmed in order to deprive Mr. Dymtrow of his just compensation.

46.     Upon information and belief, Artist signed her talent contract with CAA within a few weeks after Artist disaffirmed the EPMA with Mr. Dymtrow.

47.     During the period of negotiations with Big Machine Records and CAA (and prior to the disaffirmation), defendants encouraged Mr. Dymtrow to continue to be in contact with Borchetta and CAA and to negotiate the best contract terms for Artist. Defendants constantly assured Mr. Dymtrow (both verbally and in writing) that they recognized and appreciated his efforts on behalf of Artist and that they would continue to support him and his efforts to maximize Artist's potential and manage her career. Defendants assured Mr. Dymtrow they would protect his interests and reward his efforts in accordance with the EPMA.

48.     In fact, Scott Swift exemplified his promise of a long-term relationship with Mr. Dymtrow in several ways, including by seeking to procure an insurance policy on the life of Mr. Dymtrow for the benefit of defendants.

**E.     Defendant Scott Swift's Interference With the EPMA and Its Resultant Disaffirmance.**

49.     Upon information and belief, in or about May 2005, Scott Swift began to systematically and wrongfully discredit Mr. Dymtrow's efforts on behalf of Artist, and interfere

with Mr. Dymtrow's management of Artist, including threatening Artist to disaffirm her EPMA with Mr. Dymtrow, or else lose all economic support from him for her career.

50.    Scott Swift engaged in a concerted effort to create a division between Mr. Dymtrow and Artist so as to deprive Mr. Dymtrow of the benefits of the EPMA and of oral and written promises made to him by defendants, with the intent to deprive Mr. Dymtrow of the compensation to which he was justly and equitably entitled.

51.    Prior to inducing his daughter to terminate Mr. Dymtrow's management, Scott Swift requested of Mr. Dymtrow and obtained Mr. Dymtrow's plans and goals for Artist and contacts he was relying on to continue Artist's success. Scott Swift did this to obtain leads from plaintiff without compensating him for same.

52.    For example, on or about July 5, 2005 (and prior to disaffirmation), Scott Swift demanded that Mr. Dymtrow immediately draft approximately nine (9) different business plans to chart the course of Artist's career for the next five (5) years. Mr. Dymtrow provided that information as requested.

53.    The following day, Mr. Dymtrow was asked by Scott Swift about who owned Artist's master recordings. While not known to Mr. Dymtrow at the time, this request was done to begin usurping control from Mr. Dymtrow.

54.    On or about July 8, 2005, Mr. Dymtrow gave Scott Swift an outline of expected occurrences for Artist over the next few months in response to Scott Swift's July 5 demand. That same day and at Scott Swift's insistence, Mr. Dymtrow also gave Scott Swift a brief breakdown of the deal points and expectations that were recently negotiated with Borchetta.

55.     At or around that time, Scott Swift, insisted that Mr. Dymtrow put together a list of record contract demands in case Borchetta was willing to give Artist "any" contract terms she demanded.

56.     Upon information and belief, Scott Swift requested the information provided by Mr. Dymtrow intending that Mr. Dymtrow would be terminated as manager and denied the benefits of his agreements with defendants. Moreover, Scott Swift took the information and used it to further negotiate on behalf of Artist opportunities procured by Mr. Dymtrow.

57.     Upon information and belief, defendant Scott Swift designated himself Artist's manager after the EPMA was disaffirmed and used all of the information provided by Mr. Dymtrow to defendants' economic advantage.

58.     On or about July 11, 2005, Mr. Dymtrow and Borchetta scheduled meeting times for Mr. Dymtrow's trip to Nashville the following day in anticipation of further negotiating the terms of the Big Machine Records record contract. In fact, arrangements had been made to schedule a photo shoot for Artist to promote and market her as the new artist signed to Big Machine Records. The photos to be taken were intended to be used for Big Machine's website, Artist's official website, images for the first music single cover, music album artwork, and merchandise artwork.

59.     Mr. Dymtrow arrived in Nashville the following day and drove to defendants' home as was typical. Mr. Dymtrow had several meetings scheduled during the trip, including one with Borchetta and one with representatives of Sony/ATV.

60.     Shortly before Mr. Dymtrow's meeting with Sony/ATV, Scott Swift informed Mr. Dymtrow that Mr. Dymtrow was not permitted to attend the Sony/ATV meeting. After Mr. Dymtrow questioned Scott Swift as to why he was not permitted to attend the meeting that he

had scheduled, Scott Swift, in the presence of Andrea Swift (Artist was in her bedroom at the time), told Mr. Dymtrow that Scott Swift was terminating their professional relationship with Mr. Dymtrow.

61.     Upon information and belief, Scott Swift prevented Artist from attending the meeting between Mr. Dymtrow and defendants Scott Swift and Andrea Swift.

62.     Scott Swift said the termination would be "temporary for the next few months." Scott Swift explained to Mr. Dymtrow that Scott Swift would assume the role of manager of Artist from that point on and handle the management duties for Artist, and that Artist would seek Mr. Dymtrow's services in the future as needed.

63.     Scott Swift explained that the reason for the termination was because defendants expected that Mr. Dymtrow would move to Nashville to be close to Artist, and since Mr. Dymtrow would not do that, Scott Swift needed to terminate his services.

64.     After his termination, Andrea Swift and Artist asked Mr. Dymtrow to have dinner with them so that they could explain what had just happened. During the drive to the restaurant, Artist informed Mr. Dymtrow that she did not want to terminate her relationship with Mr. Dymtrow but that her father threatened her and that that she would have to "choose between [her] father and [Mr. Dymtrow]."

65.     Artist continued to explain to Mr. Dymtrow that her father threatened to cut-off any economic support related to her career advancement if Artist did not agree to disaffirm the EPMA with Mr. Dymtrow. Andrea Swift confirmed what Artist told Mr. Dymtrow. Both Artist and Andrea Swift blamed Scott Swift for forcing the termination of Mr. Dymtrow upon them.

66.     It was not until on or about August 1, 2005 that Artist, through her lawyer, sent a letter purporting to disaffirm the EPMA with Mr. Dymtrow.

67.    Upon information and belief, defendants intended to gain the benefit of Mr. Dymtrow's services without compensating him in accordance with the EPMA.

68.    At no time did defendants offer to compensate Mr. Dymtrow for unpaid services he rendered to Artist, despite demands for same made by Mr. Dymtrow.

69.    Scott Swift wrongfully interfered with Artist's professional relationship with Mr. Dymtrow.

70.    Although Big Machine Records has assigned a "manager" to Artist, upon information and belief, defendant Scott Swift remains Artist's *de facto* exclusive personal manager to this day.

71.    Upon information and belief, Artist does not pay an industry-standard 20% exclusive personal manager commission to a personal manager.

## AS FOR THE FIRST CAUSE OF ACTION
### (Taylor Swift, Scott Swift, and Andrea Swift)
### (Unjust Enrichment – Quasi Contract – Quantum Meruit Claims)

72.    Mr. Dymtrow incorporates by reference all paragraphs of this Complaint, as if fully set forth herein.

73.    A professional relationship existed between Artist and Mr. Dymtrow and Parents and Mr. Dymtrow, whereby Mr. Dymtrow was to perform managerial services for Artist and Parents in exchange for compensation.

74.    From in or about early 2003 to in or about July 2005, Mr. Dymtrow performed managerial services for Artist and Parents, for their benefit, with the mutual understanding that Mr. Dymtrow would be compensated for his work. At the time that all the services were being performed and provided by Mr. Dymtrow, defendants knew that Mr. Dymtrow was performing such services and encouraged such performance, and that he expected to be paid for same.

18

75.     Over the course of a two-and-one-half-year period, defendants encouraged Mr. Dymtrow to continue to engage in significant efforts to further the career and reputation of Artist and repeatedly told him that he would be justly compensated per the terms of the EPMA and the Parents' Guarantee for those efforts and that his interests under the EPMA and the Parents' Guarantee would be protected.

76.     Defendants have benefited and been enriched from Mr. Dymtrow's efforts in furtherance of Artist's career and fame, and the circumstances make it unjust, in equity and in good conscience, for the defendants to profit from the use of Mr. Dymtrow's efforts without just compensation.

77.     Mr. Dymtrow was the efficient producing cause of Artist's  various agreements.

78.     While Artist may have had a right to disaffirm the EPMA, Mr. Dymtrow is entitled to the benefit of his efforts, and Artist can not be unjustly enriched.   Mr. Dymtrow is entitled to the reasonable value of services which, for all intent and purposes, is the same as that which was provided in the EPMA.  Mr. Dymtrow is entitled to quantum meruit.

79.     Mr. Dymtrow fully performed any and all of his obligations under various oral and written agreements and was the efficient producing cause of Artist's various agreements.

80.     Defendants have failed to compensate Mr. Dymtrow for the reasonable value of his services, despite demand for payment of same.

81.     Had Mr. Dymtrow not been occupied with efforts to promote and advance Artist and her Parents, he would have directed those efforts, time, and energy profitably on behalf of other clients.

82.     As a direct and proximate result of Defendants' failure, Mr. Dymtrow has been damaged and he is entitled to quantum meruit reasonably due for his services.

19

## AS FOR THE SECOND CAUSE OF ACTION
### (Andrea Swift and Scott Swift)
### (Breach of Contract)

83.     Mr. Dymtrow incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

84.     Defendants Andrea Swift and Scott Swift negotiated and entered into a valid and binding contract with Mr. Dymtrow wherein they agreed to guarantee, absolutely and unconditionally, the performance by Artist of all of Artist's services as expected and as set forth in the EPMA, and to indemnify and hold Mr. Dymtrow harmless from any act, error, or omission of Artist in the performance of Artist's services under the EPMA.

85.     In exchange for defendants Andrea Swift and Scott Swift agreement to guarantee that Artist would perform as expected and set forth in the EPMA, Mr. Dymtrow agreed to act as Artist's manager and engage in efforts to advance Artist's career, including the use of Mr. Dymtrow's proprietary business contacts and connections to secure for Artist the many opportunities to promote her image and music.

86.     The Parents' Guarantee constituted a binding contract supported by good and valuable consideration.

87.     Upon information and belief, within a few weeks of disaffirming the EPMA, Artist executed a record contract with Big Machine Records, a contract with CAA, and other contracts each of which were initiated by and negotiated through Mr. Dymtrow, with materially similar terms.

88.     Despite Mr. Dymtrow demands, Defendants thereafter failed and refused to pay Mr. Dymtrow his percentage gross income of these contracts.

89.     In addition, Mr. Dymtrow is entitled to other fees related to other opportunities and contracts entered into during the term or related to contracts substantially negotiated during

the term, including the Sony/ATV publishing contract, the CAA Agency Agreement, the Big

Machine Records record contract, and other agreements entered into during the EPMA term or

substantially negotiated during the term. These fees are due and owing to Mr. Dymtrow by

defendants.

90.    In 2005, defendants purported to terminate the EPMA and Parents' Guarantee

without paying Mr. Dymtrow his percentage of other monies due and owing to him. Defendants'

purported termination constituted a separate material breach of the parties' agreements.

91.    Mr. Dymtrow has complied with his obligations under the EPMA and Parents'

Guarantee.

92.    As a result of Defendants Andrea Swift and Scott Swift's breaches of the Parent's

Guarantee, Mr. Dymtrow has been damaged in an amount to be determined at trial, plus interest.

### AS FOR THE THIRD CAUSE OF ACTION
**(Andrea Swift and Scott Swift)**
**(Promissory Estoppel and Estoppel in Pais)**

93.    Mr. Dymtrow incorporates by reference all paragraphs of this Complaint as if

fully set forth herein.

94.    Defendants Andrea Swift and Scott Swift clearly and unambiguously promised, in

words and in action, to guarantee that Artist would perform as expected and as set forth in the

EPMA; and never to engage in any course of conduct that would encourage and/or suggest to

Artist that she should disaffirm the EPMA.

95.    Defendants Andrea Swift and Scott Swift promised Mr. Dymtrow that they would

protect Mr. Dymtrow's economic interests and guarantee that Artist would perform as expected

and set forth in the EPMA.

96.     Defendants Andrea Swift and Scott Swift reemphasized their promises to guarantee that Artist would perform as expected and set forth in the EPMA; and promised to never engage in any course of conduct that would encourage and/or suggest to Artist that she should disaffirm the EPMA.

97.     The Defendants Andrea Swift and Scott Swift's statements and actions, including the foregoing statements and actions, have led Mr. Dymtrow to believe that they promised to guarantee that Artist would perform as expected and set forth in the EPMA; and to never engage in any course of conduct that would encourage and/or suggest to Artist that she should disaffirm the EPMA, and led Mr. Dymtrow to conduct his business and efforts on the basis of such belief.

98.     Mr. Dymtrow reasonably relied in good faith on defendants Andrea Swift and Scott Swift's promises and conduct; and in such a manner as to change his position for the worse, including by expending substantial efforts over nearly two-and-one-half years in building, managing, and maintaining Artist's career and success.

99.     The application and attendant consequences of the preclusion do not cause detriment to a wholly innocent person.

100.    The Parents are thereby precluded from asserting rights which might have otherwise existed at law and in equity.

101.    The Parents' breach of their promises while obtaining the benefits of Mr. Dymtrow's efforts should equitably estop them from denying to Mr. Dymtrow the benefit of his efforts.  Mr. Dymtrow is entitled to the benefit of his bargain based on estoppel theories.

## AS FOR THE FOURTH CAUSE OF ACTION
### (Scott Swift)
### (Tortious Interference with Prospective Economic Opportunity)

102.    Mr. Dymtrow incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

103.    Mr. Dymtrow had an ongoing business relationship with Artist and solicited and obtained opportunities for Artist related to her success as a singer/songwriter and teen country music artist. Defendants Andrea Swift and Scott Swift are well aware of such relationships and opportunities.

104.    Defendant Scott Swift's activity and inducement of Artist to disaffirm her EPMA has been undertaken intentionally and willfully. These actions, including threats ending all economic support of Artist, are illegal and have wrongfully interfered and continue to interfere with Mr. Dymtrow's business relationships and opportunities related to Artist.

105.    Defendant Scott Swift was well aware that harm to Mr. Dymtrow would proximately result from their actions.

106.    Defendant Scott Swift intentionally procured Artist's breach of the EPMA by encouraging and inducing Artist's refusal to perform under the EPMA, or otherwise breaching the EPMA.

107.    Defendant Scott Swift's actions were done solely to harm Mr. Dymtrow or were done by dishonest or unfair means. His actions were willful, malicious and/or fraudulent.

108.    Mr. Dymtrow has been damaged as a direct result of Defendant Scott Swift's tortious conduct in an amount to be proved at trial, exclusive of interest and punitive damages.

109.    Artist would not have disaffirmed the EPMA were it not for her Scott Swift's willful and wrongful interference.

23

### AS FOR THE FIFTH CAUSE OF ACTION
#### (Breach of Implied Covenant of Good Faith and Fair Dealing)
#### (Andrea Swift and Scott Swift)

110.    Mr. Dymtrow incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

111.    The covenant of good faith and fair dealing is implied in every contract.

112.    The covenant of good faith and fair dealing inherent in the Parents' Guarantee barred Andrea and Scott Swift from threatening, encouraging, and/or inducing Artist's refusal to work with Mr. Dymtrow and disaffirmation of the EPMA. By reason of Parents wrongful acts and conduct, including encouraging and inducing that refusal by Artist, Andrea and Scott Swift breached that covenant, and therefore committed a material breach of the Parents' Guarantee.

113.    Andrea and Scott Swift breached the covenant of good faith and fair dealing and unfairly frustrated the agreed common purpose of the EPMA and the Parents' Guarantee, disappointed Mr. Dymtrow's reasonable expectations, and thereby deprived Mr. Dymtrow of the benefits of the EPMA and the Parents' Guarantee.

114.    As a result of Defendant's breaches of the implied covenant of good faith and fair dealing, Mr. Dymtrow has been damaged in an amount to be determined at trial, plus interest.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff DANIEL DYMTROW demands judgment against defendants TAYLOR SWIFT, ANDREA SWIFT, and SCOTT SWIFT, jointly and severally, as follows:

1.    For compensatory, consequential, and incidental damages against all defendants according to proofs at trial and interest;

2.    For punitive damages against Scott Swift in an amount to be determined at trial;

24

3.    For an accounting of any and all Taylor Swift's past and future gross income from any and all contracts entered into or substantially negotiated during the term of Mr. Dymtrow's Exclusive Personal Management Agreement with Taylor Swift;

4.    For reasonable attorneys' fees and costs of suit incurred in connection with this commencement and prosecution of this action; and

5.    Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Mr. Dymtrow hereby respectfully requests that this action be tried before a jury.

Dated:    New York, New York
          December 14, 2007

NORRIS, McLAUGHLIN & MARCUS

By _____
Fernando M. Pinguelo, Esq. (FP6328)
875 Third Avenue
18th Floor
New York, NY 10022
Telephone: (212) 808-0700
Facsimile: (212) 808-0844

Vivek V. Gupta, Esq. (VG-9794)
GUPTA LEGAL, PLLC
14 E. 4th Street, Suite 803
New York, New York 10012
Telephone: (917) 686-4954
Facsimile: (646) 356-6901
Attorneys for Plaintiff
Daniel Dymtrow

Dated: December 14, 2007
       New York, New York