Exhibit A

Exhibit A

**ORIGINAL**

Dan Dymtrow
155 East 23rd Street, #510
New York, NY 10010

March 25, 2003

Taylor Swift
78 Grand View Blvd.
Wyomissing, PA 19609

Re: Exclusive Personal Management Agreement

Dear Taylor:

The following, when signed by you (referred to herein as "Artist") and I ("Manager"), will constitute a complete and binding agreement between Artist and Manager with respect to Artist's engagement of Manager as Artist's exclusive personal manager on the terms and conditions contained herein:

1.  **Territory:**     The World

2.  **Scope of Manager's Activities:**

(a)     Manager shall be Artist's exclusive personal manager in the "Entertainment Industry" (as defined below) and Manager shall confer with, counsel and advise Artist in all matters and activities pertaining to Artist's career in the Entertainment Industry.

(b)     Artist shall promptly advise Manager of all viable offers of employment, and of all inquiries concerning Artist's career, so that Manager may consult with and advise Artist whether same are compatible with Artist's career. Notwithstanding the foregoing, but except as specifically provided for hereinbelow, Manager shall not commit Artist or accept any such employment offers on Artist's behalf, without Artist's prior written approval.

3.  **Term:**

(a)     The term of this Agreement (the "Term") shall be for a period commencing upon the date hereof, and ending upon the expiration of the "Second Album Cycle", which for purposes of this Agreement shall be deemed to be the later of (x) sixty (60) days after the completion of all personal appearances and concerts performed by Artist in connection with her second album recorded following the date hereof (the "Second Album"), and (y) the date that Artist commences pre-production activities for the next succeeding album embodying newly recorded studio performances of Artist to be delivered to Artist's record company after the delivery of the Second Album (such album is referred to herein as the "Third Album").

(b)     Notwithstanding anything to the contrary contained herein, Artist shall have the right to terminate the Term by notice to Manager if within eighteen (18) months from the commencement date hereof (the "18 Month Period"), Artist has not entered into an agreement for Artist's services as a

recording artist with a major U.S. record company or with a record label distributed by a major record company (the major record companies as of the date hereof being Sony Music, Inc., the record companies comprising the WEA Group, BMG Records, EMI, and the record companies comprising the Universal Music Group). Such notice of termination, in order to be effective, must be sent by Artist to Manager not later than sixty (60) days following the end of the 18 Month Period.

4.    **Manager's Commission:**

(a)    (1)    During the Term, Manager shall be entitled to receive from Artist, twenty (20%) percent (the "Fee") of Artist's "Gross Income" as a result of or in connection with Artist's activities in the Entertainment Industry during the Term.

(2)    Notwithstanding anything to the contrary above, Manager's participation in Artist's Gross Income earned, received or credited after the Term in connection with Artist's services and activities rendered or products created during or after the Term pursuant to contracts or agreements (oral or written) entered into or substantially negotiated during the Term, including any and all renewals, extensions modifications, substitutions, and additions thereto, shall continue for a period of four (4) years following the expiration or termination of the Term hereof (the "Post Term Period"), and shall be as follows:

| Post-Term Years | Fee |
| --- | --- |
| 1 & 2 | 10% of the Gross Income |
| 3 | 7.5% of the Gross Income |
| 4 | 5% of the Gross Income |

(b)    As used in this Agreement,

(1)    "Entertainment Industry" includes, without limitation, all services and activities in such fields of endeavor as phonograph records (including but not limited to recording and production), transcriptions, musical and/or dramatic performances, singing, radio, television, motion pictures, music, publishing, personal appearances, concerts, road shows, tours, café and cabaret performing, hotel, restaurant and private function performing, literary and theatrical engagements, radio and television commercials, commercial merchandising endorsements and tie-ins and for all and any other media of entertainment for which Artist may be or become qualified; and the sale, lease or other disposition of musical, literary, dramatic or other artistic material which Artist may create, compose, write or collaborate, directly or indirectly, in whole or in part, in any and all fields; and any act, unit or package show of which Artist may be the owner or part owner, directly or indirectly; and

(2)    "Gross Income" shall mean all forms of income, payments, consideration, compensation, sums, emoluments or any other thing of monetary value, including, salaries, advances, fees, royalties, bonuses, gifts, shares of receipt, stock and stock options paid to credited to, or received by Artist (or any corporation, partnership, or other entity in which Artist has an interest, regardless of by whom procured) as a result of Artist's activities in and throughout the "Entertainment Industry". Notwithstanding the foregoing, Gross Income shall not include (such excluded monies are sometimes referred to herein as the "Excluded Portion of Gross Income"):

(i)    monies paid to Artist under a recording agreement used to pay actual recording and production costs (including monies paid to third party producers and third party mixers) of Artist's master recordings and audiovisual works;

(ii)    any monies paid to Artist as reimbursement for so-called "sound and lights" in connection with live engagements;

(iii)    commissions paid to booking agents (not to exceed ten (10%) percent);

(iv)    in the event Artist independently manufactures merchandise related to Artist's activities within the Entertainment Industry, any direct and actual out-of-pocket expenses directly incurred by Artist and/or paid to third parties (excluding, however, third-party commissions) in connection with merchandise directly manufactured by Artist;

(v)    any income derived by Artist from any business investment entrepreneurial activities or other non-entertainment related activities provided, however, that income derived from the writing or co-writing of books or other publications shall be considered Gross Income hereunder;

(vi)    income derived from agreements substantially negotiated and entered into after the expiration or termination of the Term. In this connection, all agreements substantially negotiated during the Term and consummated within three (3) months thereafter shall be deemed entered into during the Term;

(vii)    all music publishing income earned by Artist but retained by or paid to third parties, including, without limitation, songwriter royalties payable to co-writers and publishing company administration fees;

(viii)    payments to Artist under a recording agreement in the nature of recoupable deficit tour support payments to the extent that such payments are actually used by Artist for such purpose; and

(ix)    in connection with live performances where monies payable to Artist include monies payable to a so-called "opening act" (provided that Artist is not the opening act), such monies as Artist pays to such opening act.

(c)    All Gross Income shall be paid to and collected by an accountant, accounting firm or business manager (the "Accountant") selected by Artist in consultation with Manager.  Artist will cause the Accountant to account for and pay to Manager all monies payable to Manager herein. Manager shall have the right to reasonable inspection of the Artist's and Accountant's books and records in order to verify the accuracy of such accountings. Manager's Fee shall be paid to Manager within fourteen (14) days following Accountant's (or Artist's) receipt of the Gross Income to which such Fee relates.

5.    **Manager's Power of Attorney:**

Artist hereby irrevocably authorizes and appoints Manager as Artist's true and lawful agent and attorney-in-fact solely for the purposes of approving and permitting the use of Artist's name (actual and professional), photographs, likenesses, and the like which have been previously approved by Artist for purposes of advertising and promotion of any and all of Artist's products and services & to sign documents on Artist's behalf for Artist's live musical performance services of no longer than two (2) nights.

6.    **Manager's Outside Activities:**

(a)    The parties hereby acknowledge that from time to time during the Term hereof,

Manager or other persons or entities (i)that are owned and/or controlled by Manager, or (ii) that, own and/or control Manager, or (iii) that are in common ownership and/or control with Manager ("Manager's Affiliates"), may package an entertainment program in which Artist is engaged or may act as the entrepreneur or promoter of an entertainment program in which Artist is engaged, or may engage Artist in connection with the recording and/or production of phonograph records, or as a songwriter, composer, arranger or otherwise in connection with the creation of literary or musical works. Any such activity on the part of Manager or Manager's Affiliates shall not (A) constitute a breach of this Agreement or of Manager's fiduciary obligations and duties to Artist, or (B) in any way affect Manager's right to its fee hereunder except as set forth in paragraph 6(b).

   (b)  Manager shall not be entitled to its fee from Artist in connection with any monies or other consideration derived by Artist  (i) from any employment or agreement whereunder Artist is employed by Manager (or by Manager's Affiliates) in which Manager (or Manager's Affiliates) is acting as (A) the packager of the entertainment program in which Artist is so employed, or (B) Artist's music or literary publisher, or (C) Artist's record company; or (ii) from the sale, license or grant of any literary or musical rights to Manager (or to Manager's Affiliates).

   (c)  Solely with respect to subparagraph 6(b) hereinabove, Artist understands and agrees that Manager shall not render, nor shall Manager be obligated to render, the personal management services contemplated in this Agreement with respect to the aforesaid non-commissionable activities, and in connection therewith, Artist shall have the right to seek and retain independent advice.

 7.  __Management Expenses:__

   Artist will reimburse Manager for any and all expenses incurred by Manager on Artist's behalf in connection with the activities referred to in paragraph 1 hereof, provided that:

   (1)  Artist will not be responsible for any portion of Manager's overhead expenses;

   (2)  Manager shall not incur any single expense in excess of Five Hundred ($500.00) Dollars without Artist's prior written consent; and

   (3)  Manager shall not incur aggregate monthly expenses in excess of Two Thousand Five Hundred ($2,500.00) Dollars without Artist's prior written consent.

 8.  __Warranties and Representations:__

  (a)  Artist warrants, represents and agrees that:

   (1)  Artist is not under any disability, restriction or prohibition, either contractual or otherwise, with respect to Artist's right to execute this agreement or to fully perform its terms and conditions; and

   (2)  Manager's activities on Artist's behalf under this agreement will not infringe upon, violate or interfere with the rights, whether statutory, or otherwise, of any one or more third parties.

  (b)  Manager warrants, represents and agrees that Manager is not under any disability, restriction or prohibition, either contractual or otherwise, with respect to Manager's right to execute this agreement or to fully perform its terms and conditions.

9.   **Indemnification:**

Artist and Manager agree to and do hereby indemnify, save and hold the other harmless from all loss, damage and expenses (including reasonable outside attorney's fees) arising out of or connected with any third party claim which shall be inconsistent with any agreement, warranty or representation made by Artist or Manager in this agreement, provided same is reduced to final judgment or settled with the consent (which consent shall not be unreasonably withheld) of the other. Artist and Manager agree to reimburse the other, on demand, for any payment made at any time after the date hereof with respect to any liability to which the foregoing indemnity applies. The indemnifying party shall be notified of any such third-party claim, action or demand and shall have the right, at it's own expense, to participate in the defense thereof with counsel of it's own choosing; provided, however, the other party's decision in connection with the defense of any such claim, action or demand shall be final.

10.   **Cure:**

The failure by either party to perform any of its material obligations hereunder shall not be deemed a breach of this agreement (and neither party shall have the right to terminate this agreement) unless the party alleged to be in default is given written notice of such failure to perform and such failure is not corrected within 30 days from and after receipt of such notice.

11.   **Notices:**

All notices pursuant to this agreement shall be in writing and shall be given either by personal delivery, registered or certified mail (return receipt requested), or facsimile (with written confirmation via first class mail) at the respective addresses herein above set forth or such other address or addresses as may designated by either party. All such notices shall be deemed given hereunder on the date delivered or faxed, except that a notice of change of address shall be effective only from the date of its receipt. Copies of all notices to Artist shall be sent to Vivien Lewit, Esq., c/o Davis, Shapiro, Lewitt, Montone & Hayes, LLP, 689 Fifth Avenue, 5th Floor, New York, New York 10022, and copies of all notices to Manager shall be sent to Kristi N. Gamble, Esq., c/o Kaplan & Gamble, LLP, 432 Park Avenue South, 2nd Floor, New York, New York 10016.

12.   **Additional Provisions:**

(a)     Artist and Manager hereby acknowledge and agree that Manager is not an employment agent, theatrical agent, or licensed artist's manager, and that Manager has not promised to procure employment or engagements for Artist, and that Manager shall not be obligated to procure or to attempt to procure any employment or engagements for Artist hereunder. Artist shall be solely responsible for payment of all necessary commissions to booking or similar agencies.

(b)     This agreement has been entered into in the State of New York, and the validity, interpretation and legal affect of this agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. The New York courts, only, will have jurisdiction of any controversies regarding this Agreement, and any action or other proceeding which involves such a controversy will be brought in the courts located within the State of New York, and not elsewhere. Any process in any action or proceeding commenced in the courts of the State of New York arising out of any such claim, dispute or disagreement, may, among other methods, be served upon the parties of this Agreement by delivering or mailing the same, via registered or certified mail, addressed to the applicable party at the address first above written or such other address as Artist or Manager may

designate pursuant to paragraph 13 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York.

(c)    Notwithstanding anything contained herein to the contrary, Artist has advised Manager that Artist is under eighteen (18) years of age. Artist shall cooperate with reasonable requests by Manager in connection with any proceedings Manager may institute to obtain judicial approval of this Agreement. In that regard, Artist hereby consents to the establishment of any trust fund or savings plan for Artist's benefit as the court to which such petition for approval is submitted deems just and proper. At any time after Artist reaches the age of eighteen (18) years (or such other age as may be deemed the age of majority for purposes hereof), Artist shall, upon Manager's request, reaffirm in writing the validity and enforceability of this Agreement. If Manager is unable to obtain judicial approval of this Agreement, or if Artist fails to so reaffirm this Agreement within ten (10) days after Manager's request therefor, Manager shall have the right (but not the obligation, and without limiting Manager's other rights and remedies) to terminate the Term hereof, in which event Manager shall have no further obligations to Artist hereunder (other than the obligation to pay royalties due, if any). Artist hereby agree to cause Artist's legal guardian(s) to sign the inducement letters/parental agreement attached hereto as Exhibit "A".

(d)    ARTIST HEREBY ACKNOWLEDGES THAT SHE HAS BEEN ADVISED BY MANAGER OF HER RIGHT TO RETAIN INDEPENDENT LEGAL COUNSEL TO ADVISE HER IN CONNECTION WITH THIS AGREEMENT, AND THAT ARTIST HAS AVAILED HERSELF OF SUCH RIGHT OR HAS KNOWINGLY WAIVED SUCH RIGHTS. ARTIST ACKNOWLEDGES THAT SHE HAS NOT BEEN INFLUENCED TO ANY EXTENT WHATSOEVER IN EXECUTING THIS AGREEMENT BY ANY REPRESENTATIONS OR STATEMENTS WITH RESPECT TO ANY MATTERS MADE BY MANAGER OR BY ANY OF MANAGER'S PRINCIPALS OR EMPLOYEES.

Very truly yours,

DAN DYMTROW

By

ACCEPTED AND AGREED TO:

TAYLOR SWIFT

Candace R Shaeffer

Notarial Seal
Candace R. Shaeffer, Notary Public
Wyomissing Boro, Berks County
My Commission Expires Sept. 26, 2006
Member, Pennsylvania Association of Notaries
April 5, 2004

EXHIBIT "A"

Scott and Andrea Swift
78 Grand View Blvd.
Wyomissing, PA 19609

March 25, 2003

Dan Dymtrow
155 East 23rd Street, #510
New York, NY 10010

Dear Dan:

    I have been advised that Taylor Swift (hereinafter referred to as "Artist") has entered into a management agreement dated as of March 25, 2003 with you (the "Agreement"). I acknowledge that I have read and am familiar with the Agreement.

    In consideration of your entering into the Agreement with Artist, and as further inducement to you to do so (it being to my benefit that you enter into same), I hereby agree as follows:

    1.    I am Artist's legal guardian;

    2.    Artist is presently a minor;

    3.    I will cooperate with you and shall sign such documents as you may reasonably request in connection with any proceeding to obtain judicial approval of the Agreement;

    4.    I guarantee, absolutely and unconditionally, the performance by Artist of all of Artist's obligations pursuant to the Agreement, and shall indemnify and hold you harmless from any act, error or omission of Artist in the performance of Artist's services and obligations under the Agreement.

Very truly yours,

Scott Swift

Andrea Swift

Sworn to before me this _5_ day of April 2004

Candace R. Shaeffer
Notary

Notarial Seal
Candace R. Shaeffer, Notary Public
Wyomissing Boro, Berks County
My Commission Expires Sept. 26, 2005
Member, Pennsylvania Association of Notaries

H:\Data\Office\DAN\TaylorSwift\tayformanagement4.wpd    7

Exhibit B

Exhibit B

**EXHIBIT "A"**

Scott and Andrea Swift
78 Grand View-Blvd,
Wyomissing, PA 19609

March 25, 2003

Dan Dymtrow :
155 East 23rd Street, #510
New York, NY 10010

Dear Dan:

I have been advised that Taylor Swift (hereinafter referred to as "Artist") has entered into a management agreement dated as of March 25, 2003 with you (the "Agreement"). I acknowledge that I have read and am familiar with the Agreement.

In consideration of your entering into the Agreement with Artist, and as further inducement to you to do so (it being to my benefit that you enter into same), I hereby agree as follows:

1.   I am Artist's legal guardian;

2.   Artist is presently a minor;

3.   I will cooperate with you and shall sign such documents as you may reasonably request in connection with any proceeding to obtain judicial approval of the Agreement;

4.   I guarantee, absolutely and unconditionally, the performance by Artist of all of Artist's obligations pursuant to the Agreement, and shall indemnify and hold you harmless from any act, error or omission of Artist in the performance of Artist's services and obligations under the Agreement.

Very truly yours,

Scott Swift

Andrea Swift

Sworn to before me this _5_ day of April 2004

Candace R Shaeffer
Notary

Notarial Seal
Candace R. Shaeffer, Notary Public
Wyomissing Boro, Berks County
My Commission Expires Sept. 26, 2006
Member, Pennsylvania Association of Notaries

H:\Data\Office\DAN\TaylorSwift\taylormanagement4.wpd          7

Exhibit C

Exhibit C

## EXCLUSIVE SONGWRITER AGREEMENT

SONY/ATV SONGS LLC, doing business as
TREE PUBLISHING CO.
8 Music Square West
Nashville, Tennessee 37203

Dated: November 1, 2004

Ms. Taylor Swift
173 Inlet Drive
Hendersonville, Tennessee 37075

Dear Ms. Swift:

When you sign below under the words "CONSENTED AND AGREED TO," and we sign below under the words "Very truly yours," the following will constitute a binding agreement between you and us:

### 1.  GRANT OF RIGHTS

1.1    You hereby grant, transfer and assign to us, throughout the world, in perpetuity, but subject to paragraphs 14 and 15 below, an undivided ninety percent (90%) interest in and to (i) all of the musical works heretofore created by you, alone or in collaboration with others including, but not limited to, the musical works identified on Exhibit 1.1 annexed hereto and made a part hereof, and (ii) all of the musical works created by you, alone or in collaboration with others, during the term of this agreement (all musical works encompassed within clauses (i) and (ii) of this sentence being hereinafter referred to collectively, to the extent of your authorship interest therein, as "Said Works,") all copyrights at any and all times secured or existing therein, all rights and interests under copyright of whatsoever nature or description therein and thereto, whether now or hereafter known or in existence, and all renewals, extensions and reversions of all copyrights therein. Without limiting the generality of the preceding sentence, it is specifically understood that the rights granted by you to us in respect of Said Works include, but are not limited to, the sole and exclusive rights, throughout the world, in perpetuity, but subject to paragraph 15 below, to exercise, license and administer all rights and interests of whatsoever kind or nature in respect of Said Works, and to collect any and all monies, royalties and fees derived from the exercise of all rights and interests therein, excluding only the so-called "writer's share" of royalties payable and becoming payable by performing rights societies on account of public performances of Said Works and, if applicable, other royalties then customarily paid directly to composers by performing rights societies ("Writer Performance Royalties").

1.2    You covenant to make and deliver to us completed manuscripts or recordings of each of Said Works created (i) during the Term of this agreement,



promptly after the creation thereof, and (ii) prior to the execution of this agreement, when you sign this agreement, and to simultaneously execute and deliver to us an assignment thereof in the form of <u>Exhibit 1.2</u> annexed hereto and made a part hereof.

1.3    Notwithstanding the foregoing, we shall not, nor shall we authorize anyone else to (i) change the basic melody or fundamental character of Said Works (but we always shall have the right to authorize the translation of the lyrics of Said Works into languages other than English), (ii) synchronize a recording of Said Works with the visual images of "unrated" motion pictures or motion pictures rated "X" or "NC-17," (iii) use Said Works in advertisements for political candidates or causes, religious causes, or alcohol, tobacco or sensitive personal hygiene products, (iv) create dramatic works based upon the lyrics of Said Works, or (v) authorize the mechanical reproduction of any of Said Works on phonorecords in the United States in consideration of a royalty less than we customarily receive under the applicable circumstances, without your prior consent unless (x) we shall have been unable to communicate with you for the purpose of obtaining such consent after making a good faith effort to do so (such effort to include, but not be limited to, communication by written notice as provided in paragraph 13.7 below); or (y) we are able to communicate with you for such purpose, but we shall not have received your written response within ten (10) days after the day such communication shall have occurred.

1.4    Upon your request, we shall accede to the terms of a so-called "controlled composition" clause authorizing a phonorecord manufacturer to mechanically reproduce phonorecords of your recorded performances of Said Works in the United States for a royalty equal to seventy-five percent (75%) of the then current so-called "compulsory mechanical royalty" provided under regulations promulgated pursuant to the United States Copyright Law, and otherwise promote and exploit such phonorecords, provided that the terms of that clause are consistent with then current industry practices as they apply to a <u>recording</u> artist of your stature.

2.    TERM

2.1    The term of this agreement (the "<u>Term</u>") shall be for an initial contract period which shall commence on the date of this agreement (the "<u>Initial Contract Period</u>").

2.2    You hereby grant us two (2) separate consecutive options to extend the Term for successive contract periods (each, an "<u>Optional Contract Period</u>"; in chronological order (if the corresponding option is exercised), the "<u>First Optional Contract Period</u>" and the "<u>Second Optional Contract Period</u>", each such option to be deemed to have been automatically exercised unless we send you written notice to the contrary not less than one (1) month prior to the last day of the then current contract period. Each Optional Contract Period shall commence, if at all, immediately upon the expiration of the preceding contract period.

2.3    Subject to paragraph 5.1 below, the Initial Contract Period and, if applicable, each Optional Contract Period, shall be for a duration of one (1) year.

3.    COMPENSATION

3.1    You shall not be entitled to receive any compensation or remuneration from us other than as specifically provided in this agreement.

3.2    Conditioned upon your full and continuing compliance with all of the material terms, covenants and conditions on your part set forth in this agreement, and in reliance upon all of your warranties and representations set forth in this agreement, we shall pay or cause to be paid to you the following sums, all of which shall be in advance and on account of, and fully recoupable from, all royalties credited and to be credited to your account hereunder:

(a)    $50,000. during the Initial Contract Period; and

(b)    During each Optional Contract Period (but only if we exercise our option to extend the Term for the applicable Optional Contract Period), a sum equal to two-thirds (66-2/3%) of an amount computed by adding  (x) the royalties credited to your account hereunder during the immediately preceding two (2) regular royalty accounting periods, and (y) our reasonable estimate of so-called "pipeline" monies; provided, however, that the amount payable to you pursuant to this paragraph during the First Optional Contract Period shall not be more than $100,000. nor less than $60,000.; and the amount payable to you during the Second Optional Contract Period shall not be more than $150,000. nor less than $70,000.  As used herein, "pipeline monies" are monies that have accrued to Said Works but not yet been paid to us by foreign publishers (including our affiliates), collection societies and organizations, or record companies.

Save as otherwise expressly provided in this agreement, all payments (i) pursuant to clause (a) of this paragraph 3.2 shall be made in twelve (12) equal installments, on the first day of the first twelve (12) months of the applicable contract period; provided, however, that any such installment that shall have accrued prior to the Court Approval Date (as hereinafter defined) shall be paid promptly following the Court Approval Date; (ii) during the First Optional Contract Period shall be made in four (4) equal installments, on the first day of the first, fourth, seventh and tenth months of the First Optional Contract Period; and (iii) during the Second Optional Contract Period, shall be made in two (2) equal installments on the first day of the first and seventh months of the Second Optional Contract Period.

3.3    Conditioned upon your full and continuing compliance with all of the
material terms, covenants and conditions on your part set forth in this agreement, and in
reliance upon all of your warranties and representations set forth in this agreement, we
shall credit to your account hereunder, as your interest shall appear, the following
royalties in respect of Said Works:

      (a)    75% of all net monies received by us, or credited to our
account in recoupment of prior advances, from the sale of
printed copies thereof, and from the recording thereof for
phonorecords and audiovisual works, in the United States;

      (b)    75% of all net monies received by us, or credited to
our account in recoupment of prior advances, from the sale
of printed copies thereof and from the recording thereof for
phonorecords and audiovisual works, from publishers
authorized by us outside the United States including, but
not limited to, our affiliates;

      (c)    50% of royalties paid to us on account of public
performances of Said Works by performing rights societies
that pay Writer Performance Royalties directly to writers and
composers (it being understood that you shall collect Writer
Performance Royalties directly); and

      (d)    75% of all net monies received by us, or credited to
our account in recoupment of prior advances, as a result of
the exercise of rights in Said Works, from all other sources.

3.4    In the event we or any of our successors or assigns manufacture, sell and
distribute, for our or their own account, printed copies of Said Works then, in lieu and
instead of the royalty otherwise provided for such usage in paragraph 3.3 above, the
royalty payable in respect thereof shall be fifteen percent (15%) of the wholesale selling
price of each orchestration and other printed arrangement sold, paid for and not
returned, and for the use thereof in songbooks, songsheets, folios or other similar
publications, that proportion of fifteen percent (15%) of the wholesale selling price
thereof as the number of uses of Said Works therein bears to the total number of royalty
bearing musical works contained therein, plus an additional five percent (5%) of that
price in respect of folios bearing on the cover your name and likeness, or the name and
likeness of any recording group of which you are a member.

3.5    For the avoidance of doubt, it is specifically understood that for all Said
Works created by you in collaboration with one or more other authors to whom we are
obligated to account for royalties in respect of those Said Works, all royalties payable
and becoming payable hereunder shall be apportioned between you and all such other
authors, and you shall be paid your proportionate share thereof as your authorship
interest shall appear.

3.6    As used herein, the words "net monies" shall mean all monies, royalties and fees received by us in the United States for our own use and benefit, or credited to our account in recoupment of prior advances, specifically allocated to Said Works, as a result of the exercise of rights therein, less the following:

(i)    The amount of all monies paid and payable as royalties to all writers, publishers and other parties having an interest therein, excluding you; and

(ii)    The amount of all reasonable and customary out-of-pocket costs and charges incurred or paid by us with respect to Said Works or which may be allocated (entirely or proportionately, as applicable) thereto including, but not limited to, for musical arrangements, fees of the Register of Copyrights, customary fees and charges of licensing and collection representatives and agencies and, subject to paragraph 11 below, monies retained by music publishers authorized by us to exercise rights in Said Works outside the United States including, but not limited to, our affiliates.

## 4.    ROYALTY ACCOUNTING

4.1    Within ninety (90) days after the last day of each of our regular semi-annual accounting periods in which we receive in the United States monies, royalties or fees from the exercise of rights or interests in Said Works, or monies, royalties or fees derived from the exercise of rights or interests in Said Works are credited to our account in recoupment of prior advances, we shall render statements to you and make payment to you of any and all royalties shown to be due hereunder. Royalties payable to you for an accounting period, if any, shall not be applied in recoupment of advances paid after the last day of the applicable accounting period. All statements rendered hereunder shall be binding upon you, and all objections thereto shall be irrevocably waived, unless (i) we receive, within three (3) years after the date the applicable statement shall have been rendered (the "Objection Period,") written notice setting forth in detail the nature of your objections(s) to any such statement; and (ii) suit is instituted with respect to any statement within the applicable Objection Period. Accordingly, any applicable Statute of Limitations providing for a longer time period in which to institute suit hereby is irrevocably waived by you.

4.2    You shall have the right to appoint, at your sole expense, a Certified Public Accountant ("Your Accountant") to inspect only those of our books and records relating to Said Works, provided that such inspection occurs only once during any calendar year, only once with respect to any statement or accounting period, and upon not less than thirty (30) days prior written notice. All such inspections shall take place at our offices where such books and records are regularly kept, during regular business hours. For the avoidance of doubt, it is specifically understood that you have no right

to inspect any books and records (i) of our affiliates located outside the United States, or (ii) relating to any statement (or corresponding accounting period) for which the Objection Period has expired.

4.3    Your Accountant may not inspect our books and records pursuant to paragraph 4.2 above if she, he, or the firm of which she or he is a member, partner or employee then is conducting an inspection of our books and records, or the books and records of our affiliated music publishing entities, which inspection is not then closed (the "Open Audit"). As used herein, "closed" means that the inspection has been completed, a report setting forth the results of that inspection has been delivered to us, and each claim made in such report, if any, has been resolved to our satisfaction and to the satisfaction of the party or parties on whose behalf the inspection was made. If we notify you that Your Accountant is precluded from inspecting our books and records as a result of the application of the first sentence of this paragraph, then you may, if so disposed, by written notice to us, elect to "toll" the time period in which an inspection may be conducted pursuant to paragraph 4.2 above. The "tolling period" shall commence on the date we receive such notice from you, and shall end on the date we notify you that the Open Audit has been closed.

5.    **MINIMUM SONG DELIVERY**

5.1    You covenant that during each contract period of the Term you will create and deliver to us a minimum of ten (10) original musical works suitable, in the good faith opinion of our professional staff, for commercial exploitation ("Your Minimum Delivery Requirement"). A musical work of which you are not the sole author shall be applied in satisfaction of Your Minimum Delivery Requirement as a fraction of one musical work, the numerator of which is the percentage of your authorship interest therein and the denominator of which is one hundred (100). Upon your failure to fulfill Your Minimum Delivery Requirement during any contract period of the Term, that contract period automatically shall be extended for a period of time that will commence on the date Your Minimum Song Delivery should have been fulfilled and will expire on the last day of the month immediately following the month during which Your Minimum Delivery Requirement shall have been fulfilled (an "Extension Period") without, however, affecting or limiting any other rights or remedies we may have. Notwithstanding anything to the contrary herein contained, we shall have no obligation to pay you any sums pursuant to paragraph 3.2 above during an Extension Period. As used in this paragraph and in paragraph 9 below, "your authorship interest" means the percentage of monies, royalties or fees you (and we, through you) are entitled to receive from the exploitation of the applicable Said Work through (i) public performances, (ii) mechanical reproduction on phonorecords, (iii) "synchronization" with the visual images of audiovisual works, and (iv) reproduction of printed copies; provided, however, that if such percentage shall be different for any of the means of exploitation specified in clauses (i) through (iv) inclusive of this sentence, then your authorship interest shall mean the lowest such percentage.

6.    **USE OF YOUR NAME AND LIKENESS**



6.1    We and our each and every successor, assign and licensee shall have the non-exclusive right, throughout the world, in perpetuity, to use and authorize others to use your name, photographs and likenesses of you, and biographical material relating to you in publicizing, advertising, exploiting, distributing and selling Said Works and our catalog of musical works.

6.2    Upon the condition that you supply us, at your expense, with photographs and likenesses of you and biographical material relating to you promptly following our request from time to time, we shall only use those photographs and likenesses of you and biographical material relating to you previously approved by you.

7.    <u>YOUR OBLIGATIONS AND RESTRICTIONS; POWER OF ATTORNEY</u>

7.1    During the Term, but subject to paragraph 7.3 below, you shall not (a) create, acquire or dispose of any musical works or any rights or interests therein whatsoever ("Musical Material"), other than for and to us, or (b) engage in music publishing, directly or indirectly.  Any purported assignment by you of any Musical Material created by you during the Term to anyone other than us, or any agreement entered into by you for the creation of Musical Material during the Term on a "work for hire" basis, or any purported acquisition by you of Musical Material during the Term, shall be void from inception.

7.2    You covenant to execute and deliver to us, promptly upon our request, any and all further documents for the purpose of perfecting and confirming in us, our successors, assigns and licensees, any and all rights and interests in and to Said Works and any and all copyrights therein, and you hereby nominate and appoint us, and our each and every successor, assign and licensee, and the officers and designees of each, your true and lawful attorney to make, execute and deliver any and all such documents in your name and on your behalf, this power being coupled with an interest and irrevocable for any cause or in any event; provided, however, that we shall not exercise the foregoing power of attorney unless we shall have sent the document to be executed to you and the same shall not have been returned to us, duly executed, within ten (10) days after the same shall have been sent by us.  We shall promptly send you a copy of each document signed by us on your behalf pursuant to the foregoing power of attorney.

7.3    Notwithstanding anything to the contrary herein contained, we shall, upon your request, during the Term, authorize you to create musical works on a "for hire" basis solely for use in motion pictures and television programs, subject to the conditions that you and we jointly own not less than an undivided fifty percent (50%) interest in all copyrights in such musical works, together with the right to receive and retain all monies, royalties and fees derived from the commercial exploitation thereof, excluding only an amount of not more than fifty percent (50%) of the so-called "net publisher's share" of such monies, royalties and fees, and we have the exclusive right to administer our and your interest respective interests therein.

8.    <u>YOUR WARRANTIES AND INDEMNIFICATION OBLIGATION</u>

8.1    You warrant and represent that, subject to paragraph 16 below, you have the full right, power and authority to enter into this agreement and to grant, transfer and assign to us all rights in Said Works as herein provided, free and clear of any and all adverse rights, interests, claims and encumbrances; that Said Works are and will be original and do not and will not violate, infringe, or unfairly compete with any common law or statutory rights of others; and that we will not be obligated for any payment or incur any liability in respect of Said Works, other than for the payments specified in this agreement.

8.2    You shall indemnify us and our each and every successor, assign and licensee, and our and their respective officers, directors, parents, affiliates, subsidiaries, agents and representatives (collectively, the "<u>Indemnified Parties</u>"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature (including, but not limited to, Litigation Costs, as hereinafter defined) whatsoever which may be imposed on, incurred by, or asserted against the Indemnified Parties by a third party in any way relating to or arising out of (i) your breach or alleged breach of this agreement, (ii) any claim inconsistent with any of your warranties and representations contained in this agreement, or (iii) Said Works.

8.3    In the event that any claim or demand is made by a third party in respect of which the Indemnified Parties are entitled to be indemnified by you pursuant to paragraph 8.2 above (an "<u>Adverse Claim</u>") then, notwithstanding anything to the contrary herein contained, the Indemnified Parties shall have the right to withhold from any monies credited and to be credited to your account under this agreement an amount reasonably related to the value of the Adverse Claim including, but not limited to, Litigation Costs and, if your account is in a recouped position, deposit such amount in an interest bearing account until either an action shall have been brought by such claimant and the Adverse Claim shall have been finally adjudicated by a court of competent jurisdiction, or until a period of one (1) year shall have expired from the date we shall have received notice of the Adverse Claim if no action shall have been brought thereon during such one (1) year period and if no further communication shall have been received during such one (1) year period reasserting the applicable Adverse Claim, at which time the amount so withheld and deposited, and all accrued interest, if any, shall be credited to your account hereunder. We will (i) send you notice of any Adverse Claim and (ii) endeavor reasonably to afford you and your attorneys the opportunity to consult with the Indemnified Parties or their attorneys in connection with the conduct of the defense of any Adverse Claim or any action instituted with respect thereto, but any failure or alleged failure by the Indemnified Parties to fulfill their obligations pursuant to clause (ii) of this sentence shall not in any way limit your obligation to indemnify the Indemnified Parties or the rights of the Indemnified Parties hereunder. The Indemnified Parties shall have the right, in their sole and absolute discretion, to employ counsel in respect of any and all Adverse

Claims and to defend any and all actions and proceedings arising from or relating to any and all Adverse Claims as they, in their sole and absolute discretion, may deem advisable, and to compromise and settle all Adverse Claims before or after suit for such amounts and upon such terms as they, in their sole and absolute discretion, deem advisable, and be fully indemnified therefor by you. You may, if so disposed, participate in the defense of any and all Adverse Claims at your sole cost or expense, but by doing so you shall not limit in any way your obligation to indemnify the Indemnified Parties or the rights of the Indemnified Parties hereunder.

8.4    Upon the condition that, within thirty (30) days following the day the Indemnified Parties send you notice of an Adverse Claim, you post a bond in an amount reasonably related to the value of the Adverse Claim including, but not limited to, Litigation Costs, in a form and issued by a surety reasonably satisfactory to the Indemnified Parties, and such bond remains in full force and effect for so long as the applicable Adverse Claim is effect pending, then, notwithstanding anything to the contrary contained in paragraph 8.2 above, we shall not withhold any amount due you and you shall have twenty (20) days following the posting of such bond to retain counsel to represent the Indemnified Parties, but such counsel must be approved by us.  Such approval shall not be unreasonably withheld.  If the Indemnified Parties notify you that they do not approve the counsel you shall have retained to represent them, you shall have ten (10) days following the date such notice shall have been sent to retain different counsel to represent the Indemnified Parties.  If you retain such counsel within that ten (10) or twenty (20) day period, as applicable, then you shall be solely responsible for all costs and fees incurred by such counsel, and for the defense or settlement of such Adverse Claim, but the Indemnified Parties shall have the right to retain different counsel, at their expense.  If you do not retain such counsel within that ten (10) or twenty (20) day period, as applicable, and make all payments to such counsel as invoiced for so long as the applicable Adverse Claim is pending, the Indemnified Parties shall have the right to retain counsel to represent them in the action or proceeding at your expense.  You shall not settle any Adverse Claim without the Indemnified Parties' prior consent, which shall not be unreasonably withheld.

8.5    "Litigation Costs" means the reasonable costs actually incurred by the Indemnified Parties, or which the Indemnified Parties reasonably anticipate will be incurred, in the defense of an Adverse Claim including, but not limited to, attorneys' fees, witness fees, deposition fees, travel expenses and court costs.

## 9.    DEMO COSTS AND PROMOTION COSTS

9.1    Seventy-five percent (75%) of all costs incurred by us (i) in connection with the production of so-called "demonstration" recordings ("Demos," or a "Demo") of any of Said Works (including, but without limitation, the fair value of all studio facilities and personnel provided by us) and (ii) for the promotion of recordings of any of Said Works, (it being specifically understood that we have no obligation whatsoever to incur any of the costs identified in clauses (i) and (ii) of this sentence or reimburse you for such costs) shall be in advance and on account of all royalties credited and to be

credited to your account under this agreement; provided, however, that if the costs incurred by us in connection the production of any Demo of a Said Work created solely by you exceed our then current maximum cost therefor (or, with respect to any Said Works created by you in collaboration with one or more other authors, that portion of our then current maximum cost therefor corresponding to your authorship interest in the Said Work recorded on the applicable Demo; "Our Maximum Demo Cost") then, unless such excess costs shall have been incurred by those acting under our authority, or with our prior written consent, one hundred percent (100%) of such excess costs shall be in advance and on account of all royalties credited and to be credited to your account under this agreement; and, provided further, that we shall in no event be responsible for recording studio costs incurred in the production of Demos of Said Works unless (x) the studio is located on our premises, or (y) the use of a studio located outside our premises is approved in writing, in advance, by one of our officers duly authorized to approve the same on our behalf. Our Maximum Demo Cost for the production of one (1) Demo of a musical work created by you alone is $600. as of the date of this agreement. All Demos shall be deemed to be derivative works based upon Said Works, shall be owned by you and by us, jointly, as our respective interests in applicable Said Works shall appear, and may be exploited by us in any manner and upon any terms we believe to be suitable, subject to your written consent in each instance, which you shall not unreasonably withhold; save that, if your featured vocal performance is contained thereon, you may withhold your consent for any reason and, save further, that we shall not exploit any Demos of Said Works in a manner contrary to the terms contained in any exclusive recording agreement you may enter into, so long as you notify us of the applicable terms. Seventy-five percent (75%) of any net monies received by us from the commercial exploitation of any Demo shall be credited as royalties to your account hereunder.

10.    RIGHT OF ASSIGNMENT

        10.1    We shall have the right to assign Said Works, this agreement and any and all rights acquired by us hereunder to any subsidiary, affiliate or controlling corporation, to any person, firm or entity owning or acquiring a substantial portion of our stock or assets, or to any partnership or other venture in which we participate, and such rights may be assigned by any assignee, subject to the same limitations.

11.    FOREIGN PUBLISHING

        11.1    We shall have the right to authorize music publishers, including our affiliates, to exercise any and all rights and interests in Said Works in one or more countries outside the United States (the country or countries in which a music publisher is so authorized being hereinafter referred to as the "Authorized Territory"); provided, however, that no such music publisher shall retain more than the following amounts: (i) twenty percent (20%) of the so-called "publisher's share" of royalties paid on account of public performances of Said Works in the Authorized Territory, (ii) fifteen (15%) of the so-called "mechanical" copyright royalties paid for the manufacture and distribution in the Authorized Territory of phonorecords containing recordings of Said Works produced



outside the Authorized Territory; or (iii) twenty percent (20%) of all other monies, royalties and fees paid for the exercise of rights in Said Works in the Authorized Territory.

## 12.    CHOICE OF LAW AND VENUE

12.1    This agreement shall be deemed to have been made in the State of Tennessee and shall be construed under the laws of the State of Tennessee applicable to agreements made and wholly performed therein.  Any legal action or proceeding arising from or relating to this agreement must be brought in the federal or state courts located in Davidson County, Tennessee (the "Nashville Courts") and not in any other court or jurisdiction.  You irrevocably waive any objection that you may now or hereafter have to the venue of any such action or proceeding in the Nashville Courts or that such action or proceeding was brought in an inconvenient court and covenant not to plead or claim the same.  Service of process in any such action or proceeding may be made in the manner specified in this agreement for notices hereunder, or in any other manner permitted by law.

## 13.    MISCELLANEOUS

13.1    It is specifically understood and agreed that Said Works and your services as a creator of musical works are unique, exceptional and extraordinary and cannot be replaced, and that in the event of the violation by you of any of the material terms, covenants or conditions of this agreement, we and all other parties in interest through us shall be entitled to injunctive relief in addition to all other rights and remedies.  (The preceding sentence will not be construed to preclude you from opposing any application for such relief based upon the contest of other facts alleged by us in support of the application.)

13.2    The waiver by you or us, or by any other party in interest through you or us, of any of the terms or provisions of this agreement in any one or more instances shall not thereafter be deemed a waiver thereof, the same to thereafter remain and continue in full force and effect.

13.3    We shall have the right, but not the obligation, to enforce all claims and to commence and prosecute legal proceedings against third parties based upon alleged infringements or other violations by third parties of any rights in Said Works.  You and we shall jointly be entitled to a share of the net sums, if any, actually received by us for our own use and benefit from the resolution of any such claims and legal proceedings in an amount equal to your and our proportionate royalty interests, and your share thereof shall be credited to your account as royalties hereunder.  "Net sums" shall mean the monies actually received by us, less our actual out-of-pocket costs including, but not limited to, Litigation Costs.  If we elect not to commence legal proceedings on any such claims, you may do so, at your sole cost and expense, and retain all sums recovered thereby, provided that you indemnify us from any and all loss or damage we may suffer (including, but not limited to, Litigation Costs) by reason thereof.

13.4    Descriptive headings used in this agreement are for convenience only and shall not control or affect the meaning or construction of any provision of this agreement.

13.5    This agreement constitutes the entire agreement between you and us and may not be amended or modified except in a writing executed by you and by an officer duly authorized to execute such writing on our behalf.

13.6    Neither party shall be entitled to terminate the Term or recover damages by reason of any material breach or any claimed material breach of this agreement by the other party unless the party seeking such relief shall first have delivered written notice to the other party, specifying in detail the nature of the breach or claimed breach, and the party receiving that notice shall have failed to remedy the breach within thirty (30) days following its or his receipt of that notice; save that the preceding clause shall not apply to your obligations under paragraphs 5.1 and 7.1 above. You hereby irrevocably waive your right to seek the rescission of this agreement.

13.7    All notices hereunder shall be in writing and shall be given by registered or certified mail or overnight courier (such as Federal Express), at the addresses shown above, or such other address or addresses as may be designated by either party. Notices to us must be addressed to our President, and a copy of each such notice must be sent to Stuart Prager, Esq., Clark and Prager, 10 East 40th Street, Suite 3100, New York, New York 10016. Notices shall be deemed given when mailed, except that notice of change of address shall be effective only from the date of its receipt. We shall endeavor to give copies of all notices to your attorney, Vivien Lewitt, Esq., but our inadvertent failure to do so in any instance shall not constitute a breach of this agreement nor invalidate or limit the effectiveness of this notice

13.8    YOU ACKNOWLEDGE AND CONFIRM THAT WE HAVE ADVISED YOU TO RETAIN INDEPENDENT COUNSEL, SELECTED BY YOU, TO REPRESENT YOU IN CONNECTION WITH YOUR EXECUTION OF THIS AGREEMENT.

13.9    This agreement shall not be binding upon us unless and until it shall have been executed by you and by an officer duly authorized to execute this agreement on our behalf.

13.10    In the event that you die or become permanently disabled before the date the Term otherwise would expire, the Term shall be deemed to have expired on the date of your death or disability.

13.11    Upon the expiration of the Term, all of the terms and conditions of this agreement shall remain in full force and effect for the duration of copyright in Said Works, and all renewals and extensions thereof, excluding only (i) your and our respective obligations under paragraphs 1.2, 3.2 and 5.1 above; and (ii) as otherwise provided by operation of law.



13.12 When you sign this agreement, and as a condition hereof, you shall execute and deliver to us an assignment in the form of <u>Exhibit 13.12</u> annexed hereto and made a part of hereof, and a letter of direction in the form of <u>Exhibit 13.12A</u> annexed hereto and made a part of hereof.

## 14.    CO-PUBLISHING

14.1    Upon the expiration of the Term, an undivided forty percent (40%) interest (the "<u>Forty Percent Interest</u>") in and to Said Works shall automatically and immediately revert to and be fully vested in you. Notwithstanding the preceding sentence, at any time following the expiration of the Term, we shall, upon receipt of your written request, promptly execute and record in the United States Copyright Office a document, substantially in the form of Exhibit 1.2 hereto, assigning to you the Forty Percent (40%) Interest.

14.2    It is specifically understood that the royalties payable and becoming payable to you pursuant to paragraphs 3 above shall not change as a result of the operation of paragraph 14.1 above, and that we shall retain the sole and exclusive right, throughout the world and in perpetuity, to exercise and license all rights and interests of whatsoever nature in respect of Said Works and to collect any and all income derived therefrom or accruing thereto, subject only to paragraph 15 below.

## 15.    CO-ADMINISTRATION UPON POST-TERM RECOUPMENT

15.1    If at any time after the expiration of the Term we render a royalty accounting statement to you reflecting our recoupment of all advances paid to you or on your behalf pursuant to this agreement ("<u>Advances</u>"), or you repay to us the entire unrecouped balance of all Advances (either such event being referred to as "<u>Post-Term Recoupment</u>"), you shall have the option to administer your interest in Said Works in the manner described in paragraph 15.2 below, and collect directly, for your own account, fifty percent (50%) of the so-called "publisher's share" of royalties paid on account of public performances of Said Works occurring after the Effective Date (as hereinafter defined) and seventy-five percent (75%) of all other monies, royalties and fees first accruing to Said Works after the Effective Date. This option may be exercised after your right matures, by delivering written notice thereof to us. As used herein, the "<u>Effective Date</u>" shall mean the first day of our next succeeding regular royalty accounting period following our receipt of such written notice, provided that such notice shall have been received by us at least sixty (60) days before the last day of our then current semi-annual royalty accounting period.

15.2    If you exercise your option pursuant to paragraph 15.1 above then, commencing on the Effective Date, all rights and interests in Said Works, including under all copyrights therein throughout the world, shall be administered in the following manner:



(i)     You and we each shall have the right to administer and retain third party administrators to administer our respective rights in Said Works throughout the world.  Each such administrator shall be notified by the party retaining such administrator of your and our respective rights Said Works.

(ii)    Neither you nor we shall enter into licenses and agreements for the exploitation, performance, recording, synchronization, printing, publication or other use of the interest of the other party in Said Works, save upon first obtaining the prior written consent of the other party, which consent shall not be unreasonably withheld.  Any license or agreement entered into contrary to the preceding sentence shall be void from inception.

(iii)   If any party shall receive any monies, royalties or fees in respect of Said Works properly payable to the other party, the recipient shall promptly remit such monies, royalties or fees to the other party, and deliver to the other party copies of any accounting statements, licenses or other documents that accompanied the funds received.

(iv)    You and we shall each bear our own costs of copyright registration and the preparation of manuscripts and promotional material, unless otherwise agreed in advance, in writing.

(v)     You and we each shall have the right to inspect each other's books and records relating to Said Works, such inspection to be made during regular business hours upon at least thirty (30) days prior written notice, and in no event more than once during any calendar year.  Any such inspection by you shall be subject to paragraphs 4.2 and 4.3 above.

(vi)    Should you or we commence any action or proceeding against an unrelated third party or parties for the infringement of copyright or other violation of your or our rights in Said Works, then the party commencing such action or proceeding shall promptly notify the other party. In such event, the party so notified (the "Notified Party") shall have the right, but not the obligation, to participate in such action or proceeding.  In the event that the Notified Party elects to participate in such action or proceeding, the Notified Party shall pay the costs thereof (including attorneys' fees) in proportion to the Notified Party's



financial interest in Said Works at issue, and receive that same proportion of any sums recovered in such action or proceeding. In the event that the Notified Party elects not to participate in such action or proceeding, the Notified Party shall have no obligation to pay any costs thereof and no right or interest whatsoever in any sum recovered therein.

(vii)    Subject to paragraph 15.4 below, you and we each shall have the right to assign our respective rights in Said Works, provided that the assignee consents in writing to be bound by all of the terms of this paragraph 15.2, and any assignment to an assignee by you without such written consent shall be void from inception.

15.3    If you exercise your option pursuant to paragraph 15.2 above, then we shall have no obligation to make any payment to you whatsoever in respect of any royalties or fees accruing Said Works on or after the Effective Date, subject to paragraph 15.2(iv) above.

15.4    During the Term, and for a period of three (3) years following the expiration of the Term, you shall not grant, transfer, or assign any of your contingent or vested rights in any Said Works including, but not limited to, rights of administration anywhere in the world, unless you shall have first delivered to us a written statement setting forth your intention to do so and you shall have negotiated with us in good faith, for a period of 30 days following our receipt of such statement (the "Negotiation Period"), the terms and conditions pursuant to which we may acquire such rights; save that the preceding clause shall not apply to any membership, affiliation or representation agreement with a performing or mechanical rights society, to any transfer of rights by operation of law, or to any mortgage of your rights in Said Works.   If no agreement shall be reached by you and us as to such terms and conditions within the Negotiation Period, then you may, within 30 days following the expiration of the Negotiation Period, present us with a written statement offering to sell, transfer or assign such rights on financial terms and conditions specified therein, provided that such terms and conditions may be performed by us in the same manner as other music publishers.  If we do not notify you within 15 days following our receipt of such offer (the "Offer Response Date") of our acceptance thereof, then, and only then, you may grant, transfer and assign such rights to another upon those terms and conditions, or more valuable terms and conditions; provided that such sale, transfer or assignment is completed within 120 days following the Offer Response Date, and a true and complete copy of the agreement of sale, transfer or assignment is promptly delivered to us within said 120 day period.  Upon your failure to fulfill both of the conditions set forth in the preceding sentence, your right to grant, transfer or assign such rights shall terminate, but may be revived if you re-submit the terms and conditions to us for our acceptance or rejection as provided herein.  If we notify you of our acceptance of any such offer prior to the Offer Response Date, you and we shall expeditiously prepare and execute an appropriate agreement.  In the event



that you and we are unable to agree on the contents of an appropriate agreement, the matter shall be submitted to a single arbitrator selected by you and us (or, if you and we cannot agree on an arbitrator, to a single arbitrator selected by the American Arbitration Association in Nashville) to determine and, if necessary, draft the contents of such an agreement. You and we shall each be responsible for one-half (50%) of the fee of such arbitrator. We shall have the right to obtain an injunction or an order of specific performance enforcing the provisions of this paragraph. Any purported grant, transfer, or assignment of any of your contingent or vested rights in any Said Works, other than in accordance with this paragraph, shall be void from inception.

16.    COURT APPROVAL

    16.1    You warrant and represent that you are a minor under the laws of the State of Tennessee. Immediately upon the execution of this agreement by all parties, we shall cause an application to be filed pursuant to the provisions of Tennessee Code Annotated, Section 29-31-101, et seq. (the "Application") seeking to have your legal disabilities as a minor removed for the limited purpose of entering into and approving this agreement and performing hereunder. Our obligations to perform under this agreement are contingent upon receipt of a valid order of the appropriate court granting such Application and your ratifying this agreement pursuant to such order (the date on which we receive such order and ratification being referred to in this agreement as the "Court Approval Date"). We shall be solely responsible for employing an attorney to prosecute the Application. Seventy-five percent (75%) of the reasonable costs and legal fees incurred by us in connection with the prosecution of the Application shall be deemed to be Advances hereunder.

17.    UNEXPLOITED EXHIBIT 1.1 SAID WORKS

    17.1    As used herein, the "Exhibit 1.1 Said Works" shall mean only the Said Works identified on Exhibit 1.1 hereto.

    17.2    At any time following the last day of the Term we shall, upon your written request ("Your Reassignment Request"), reassign to you all of our rights in only those Exhibit 1.1 Said Works ("Unexploited Exhibit 1.1 Said Works") which shall not have theretofore been recorded and commercially released on phonorecords in the United States by a major record label ("Released"); provided, however, that if, at the time Your Reassignment Request shall be made, any of the Unexploited Exhibit 1.1 Said Works shall have been placed "on hold," as that term is customarily understood in the music publishing industry in Nashville by or on behalf of a recording artist who records for a major record company (a "Recording Artist"), then, with respect to such Unexploited Exhibit 1.1 Said Works only (the "Unexploited Exhibit 1.1 Said Works On Hold"), Your Reassignment Request shall not be effective until one (1) year following our receipt of Your Reassignment Request (the "On Hold Reassignment Date"), and shall not be valid with respect to those of the Unexploited Exhibit 1.1 Said Works On Hold that shall have been Released prior to the On Hold Reassignment Date; subject, however, to paragraph 17.3 below.



17.3   As used herein, "Recorded But Unreleased Exhibit 1.1 Said Works" shall mean those Unexploited Exhibit A Said Works which, on the day we shall receive Your Reassignment Request, (i) have been recorded by a Recording Artist ("Recorded") but have not yet been Released, or (ii) have not yet been Recorded, then are Recorded before the On Hold Reassignment Date, but have not yet been Released before the On Hold Reassignment Date.

17.4   With respect to those Recorded But Unreleased Exhibit 1.1 Said Works referred to in clause (i) of paragraph 17.3 above, Your Reassignment Request shall not be effective until one (1) year after the On Hold Reassignment Date, and shall not be valid with respect to those of the Recorded But Unreleased Exhibit 1.1 Said Works that shall have been Released prior to the On Hold Reassignment Date.

17.5   With respect to those Recorded But Unreleased Exhibit 1.1 Said Works referred to in clause (ii) of paragraph 17.3 above, Your Reassignment Request shall not be effective until one (1) year after the On Hold Reassignment Date (the "Extended On Hold Reassignment Date"), and shall not be valid with respect to those of the Recorded But Unreleased Exhibit 1.1 Said Works that shall have been Released prior to the Extended On Hold Reassignment Date.

Very truly yours,

SONY/ATV SONGS LLC, doing business as TREE PUBLISHING CO.

By: _____

CONSENTED AND AGREED TO:

_____
TAYLOR SWIFT

Taylor Swift - revised 1-11-05

17

<u>ACKNOWLEDGMENT</u>

STATE OF *TENNESSEE* )
                          ) ss.:
COUNTY OF *SUMNER* )


On the __17th__ day of __JANUARY__, 2005, before me personally came Taylor Swift to me known, who, by me duly sworn, did depose and say that she is the party described in and who executed the foregoing instrument.

_Sue McCall_
(Notary Public


My taxpayer identification number (social security number or employer identification number) is _____. Under the penalties of perjury, I certify that this information is true, correct, and complete.

_Taylor Swift_
TAYLOR SWIFT


<u>INDUCEMENT</u>


The undersigned parents of the Taylor Swift (the "<u>Writer's Parents</u>") hereby execute this inducement for the purpose of approving and consenting to the Taylor Swift entering into this agreement, and agree to act consistently with the provisions and purposes of this agreement. Writer's Parents further agree to join in and support the application to be filed pursuant to the provisions of Tennessee Code Annotated, Section 29-31-101, et seq. (the "<u>Application</u>") seeking to have Taylor Swift's legal disabilities as a minor removed for the limited purpose of entering into and approving this agreement and performing thereunder, and to cooperate with the prosecution of the Application.

<u>Exhibit 1.1</u>

## Taylor Swift Schedule A Songs

1. I'm Only Me When I'm with You (T. Swift, Angelo, Orrall)
2. Lucky You ( T. Swift)
3. American Boy (T. Swift)
4. Closest To A Cowboy (T. Swift, S. Vaughn)
5. Crazier (T. Swift, Orrall)
6. Cross My Heart (T. Swift)
7. Didn't They (T. Swift)
8. Don't Hate Me for Loving You (T. Swift)
9. Firefly (T. Swift, C. Harrington, M. Pierce)
10. I Don't Want to Lose Your Face (T. Swift)
11. Honey Baby (T. Swift)
12. In the Pouring Rain (T. Swift)
13. Mandolin (T. Swift)
14. Invisible (T. Swift, R. E Orrall)
15. Bein With My Baby (T. Swift, B. Beavers)
16. A Place In This World (T. Swift, Orrall, Angelo)
17. What Do You Say? (T. Swift, Orrall, Angelo)
18. Beautiful Eyes (T. Swift)
19. Brand New World (T. Swift)
20. Angelina (T. Swift)
21. For You (T. Swift)
22. Someone Loves You (T. Swift)
23. I Heart ? (T. Swift)
24. Live for the Little Things (T. Swift)
25. Me & Britney (T. Swift, S. Vaughn)
26. Teardrops On My Guitar (T. Swift, L. Rose)
27. Songs About You (T. Swift, V. Shaw, S. Buxton)

## Exhibit 1.2

## A S S I G N M E N T:

For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby grants, transfers and assigns to Sony/ATV Songs LLC, doing business as Tree Publishing Co., and its successors and assigns, throughout the world, in perpetuity, the authorship interest of the undersigned in the musical work entitled _____, all copyrights therein, all renewals, extensions and reversions thereof, and all rights under copyright therein of whatsoever kind or nature including, but not limited to, the sole and exclusive rights to exercise, license and administer all rights therein and thereto, and to collect all monies, royalties and fees of whatsoever kind or nature derived from the exercise of rights therein, excluding only the so-called "writer's share" of royalties paid by performing rights societies on account of public performances thereof.

IN WITNESS WHEREOF, the undersigned has executed this instrument this _20th_ day of _January_, 20_05_.

_____
TAYLOR SWIFT

## ACKNOWLEDGMENT

STATE OF _Tennessee_ )
                      ) ss.:
COUNTY OF _Sumner_ )

On the _20th_ day of _Jan_, 20_05_, before me personally came Taylor Swift, who, by me duly sworn, did depose and say that she is the party described in and who executed the foregoing instrument.

_____
Notary Public

my Commi
expini 25/07
March 25/07

**Exhibit 13.12**

**A S S I G N M E N T :**

For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby grants, transfers and assigns Sony/ATV Songs LLC, doing business as Tree Publishing Co. ("**Assignee**",) and its successors and assigns, throughout the world, in perpetuity, an undivided ninety percent (90%) interest in and to (i) all of the musical works heretofore created by the undersigned, alone or in collaboration with others including, but not limited to, the musical works identified on Schedule A annexed hereto, and (ii) all of the musical works created by the undersigned, alone or in collaboration with others, during the term of the Exclusive Songwriter Agreement between the undersigned and Assignee dated November 1, 2004 (all of the musical works encompassed within clause (i) and (ii) of this sentence being hereinafter referred to, collectively, as "**Said Works**"), all copyrights in Said Works, all renewals, extensions and reversions of all copyrights in Said Works, and all rights under copyright in Said Works of whatsoever kind or nature including, but not limited to, the sole and exclusive rights to exercise, license and administer all rights in and to Said Works, and to collect all monies, royalties and fees of whatsoever kind or nature derived from the exercise of rights therein, excluding only the so-called "writer's share" of royalties paid by performing rights societies on account of public performances thereof.

IN WITNESS WHEREOF, the undersigned has executed this instrument this _20th_ day of ___January___, 2005.

_____
TAYLOR SWIFT

**ACKNOWLEDGMENT**

STATE OF _Tennessee_ )
COUNTY OF _Sumner_ ) ss.:

On the _20th_ day of _January_, 2005, before me personally came Taylor Swift, to me known, who, by me duly sworn, did depose and say that she is the party described in and who executed the foregoing instrument.

_____
Notary Public

_my commission expire March 27/05_

• Taylor Swift – revised 1-11-05

20

**Exhibit 13.12A**

November 1, 2004

Publisher Relations Department
BMI
10 Music Square East
Nashville, Tennessee 37203

To Whom It May Concern:

This is to advise BMI that we have entered into an agreement with another BMI publisher for the administration of our catalog, and that BMI's records should be marked to reflect the agreement as follows:

1.    Name of BMI publisher acting as our Administrator:

Sony/ATV Songs LLC, doing business as Tree Publishing Co.

2.    Effective date of agreement:

Immediately, including all royalties now payable or which hereafter become payable, regardless of when performance took place.

3.    Checks for all our BMI royalties, both domestic and foreign, should be made payable to this Administrator and should be sent together with statements and all other correspondence to the Administrator at its address on BMI's records.

We understand that BMI cannot mark its records at this time so as to indicate the termination date of the administration agreement and that, therefore, the above information will continue to be reflected on BMI's records until such time as we or the Administrator notifies BMI that the administration agreement is about to terminate.

Very truly yours,

Taylor Swift, an Officer

Taylor Swift – revised 1-11-05

21 

Exhibit D

Exhibit D

## TALENT SERVICES AGREEMENT

This Talent Services Agreement (the "Agreement") is made and entered into as of this ___ day of _____April, 2004, by and between Abercrombie & Fitch Merchandising & Design Co., an Ohio corporation ("A&F"), and _____Taylor Swift, an individual ("Talent"). For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### Background Information

A.      Talent is in the business of posing for photographic images.

B.      A&F desires to photograph Talent and, at A&F's sole discretion, incorporate the resulting photographic images (or portions thereof) into various media in connection with the advertising and promotion of A&F stores and A&F's apparel products.

### Agreement

1.      Talent's Duties and Grants of Rights.  The Talent hereby agrees as follows:

a.  to attend an eight (8) hour (not including any required fitting and/or planning sessions) photographic session on April 5 or April 6, 2004 (date to be mutually agreed by the parties) in the Los Angeles, California area at a time and location to be identified by A&F (the "Shoot").  Talent further agrees to attend all fitting and/or planning sessions related to the Shoot at mutually agreed dates and times;

b.  to grant, and does hereby grant, A&F the right and license to take, or have taken, an unlimited number of photographs of Talent during the Shoot through the use of professional still photography equipment or equivalent (hereinafter referred to as the "Images");

c.  to grant, and does hereby grant, A&F, and its successors, assigns, licensees, legal representatives and other designees, the limited right and license to use, distribute, reproduce, publish, display, transmit and perform publicly Talent's name and likeness as embodied in the Images, solely in connection with the Permitted Uses described in Section 2 below and only during the Use Period (as defined below).  Talent further acknowledges and agrees that the foregoing right and license to use Talent's likeness as embodied in the Images includes the right to use all portions, composites, distortions or alterations thereof;

d.  that Talent expressly authorizes and grants to A&F all permissions, licenses, waivers and rights of any kind required in order for A&F to sublicense all rights and licenses granted in clause (c) immediately above which A&F deems necessary for purposes of producing and manufacturing the advertising and promotional materials contemplated by Section 2 of this Agreement;

e.  that Talent waives any right to inspect or otherwise approve the media into which the Images and/or Talent's name are incorporated (including any accompanying written copy) or the uses to which such media is put, provided that such media and uses are in compliance with all other terms, conditions and restrictions hereof that relate thereto; and

f.  that any use of Talent's name or likeness which is not contemplated herein shall be conditioned on the express written approval of Talent's then-current authorized agent.

2.      Permitted Use of Images.

04/02/2004  17:21 FAX   614 464 8286          VSSP                                   ☒010/015

2.1    Use Period.  For the purposes of this Agreement, the term "Use Period" shall mean the twelve (12) month period commencing upon the earlier of (i) the date of A&F's first commercial use of any Image or (ii) July 1, 2004.  During the Use Period, A&F may, in its sole discretion, use any or all of the Images in connection with the advertising and promotion of A&F stores and A&F's apparel products, whether branded or unbranded, through any one or more of the following means (collectively, the "Permitted Uses"):

a.  print media, including without limitation all print advertisements and collateral extensions;

b.  outdoor and related indoor advertising media, including without limitation, airport and transit advertising, billboards and projections onto outdoor and indoor walls;

c.  point of sale/point of purchase media, including, without limitation, consumer brochures, counter cards, tent cards, fixture header visuals, in-store signage, posters and banners, and other collateral point of sale uses;

d.  promotional and marketing media, including, without limitation, catalogs and magalogs, direct marketing materials, materials for sales meetings, including trade brochures;

e.  public relations uses including, without limitation, press releases;

f.  Internet uses, including, without limitation, display on A&F's Website(s); and

g.  editorial content contained within direct marketing materials or displayed on the World Wide Web, including, without limitation, on A&F's Website(s).

A&F shall notify Talent in writing of the date of commencement of the Use Period.  A&F's use of the Images shall be limited to North America; provided, however, that to the extent that access to A&F's Website(s) may be obtained from outside of North America, A&F shall have a worldwide right and license to use the Images in accordance with the terms of this Agreement solely with respect to the pPermitted uUses identified in clauses (f) and (g) immediately above.  Talent acknowledges and agrees that A&F shall have no obligation to use any of the Images for any of the Permitted Uses or in any other manner.

2.2    Continuing Rights.  Notwithstanding the foregoing limitations, A&F shall have a continuing right to use all materials produced under this Agreement that incorporate any Image for (i) A&F's internal archival and historical purposes, and (ii) for incorporation into A&F's Securities and Exchange Commission and/or shareholder reports.

2.3    Additional Restrictions on Permitted Use.  A&F shall not use Talent's name or likeness in a manner that is libelous or defamatory.

2.4    No Endorsement.  Each party understands and agrees that, by entering into this Agreement, Talent has in no way committed to endorse A&F or any of A&F's products, and nothing herein obligates Talent to provide Talent's opinion regarding A&F or any of A&F's products.

2.5    No Nudity.  A&F shall not cause Talent to pose nude, partially nude (revealing a private part of Talent's body typically covered when wearing a bathing suit), or in a compromising, indecent or sexually suggestive position.

3.    Compensation.  In full consideration for the Talent's services rendered and all usage and other rights granted to A&F under this Agreement, A&F agrees to pay the Talent, and the Talent agrees to accept, compensation as follows:

for Talent's services at the Shoot and all Permitted Use during the Use Period, a one-time fee of $————10,000 payable not later than forty-five (45) days after the Shoot.

A&F will not pay to any other individual, for services that are the same as the services provided by Talent under this Agreement, fees that are higher than the fees to be paid to Talent pursuant to this Section 3.

4.    Representations and Warranties.

4.1   Warranties of Talent. Talent hereby represents and warrants to A&F that:

   a.  Talent has full authority and approval to enter into and undertake all of the duties and obligations placed on Talent by this Agreement and that the person signing has the requisite authority and legal capacity to sign on behalf of and bind Talent;

   b.  Talent has entered into no other agreements with any party that would conflict with or prohibit Talent from undertaking any of the material duties or obligations set forth herein, that would prohibit A&F from exercising any of the material rights granted to it herein or that require the permission or approval of any third party prior to undertaking any of the duties or obligations set forth herein;

   c.  Talent is the sole owner of Talent's likeness and rights of publicity licensed for use to A&F hereunder; and

   d.  except for A&F's contractual obligations to the contrary, if any, A&F shall not be required to make any payments of any nature whatsoever to Talent or third parties in connection with the grants, acquisition, exercise or exploitation of rights by A&F under this Agreement, unless specifically provided herein.

4.2   Warranties of A&F. A&F hereby represents and warrants to Talent that:

   a.  it has full authority and approval to enter into and undertake all of the duties and obligations placed on it by this Agreement; and

   b.  A&F has entered into no other agreements with any party that would materially conflict with or prohibit it from undertaking any of the material duties or obligations set forth herein or that would require the permission or approval of any third party prior to undertaking any of the duties or obligations set forth herein.

5.    Confidentiality. Information exchanged between Talent and A&F (including its affiliates), designated in writing as confidential by the disclosing party at the time of disclosure to the receiving party, shall be held in confidence by the receiving party for a period of five (5) years from the date of receipt, except that no party will be required to hold in confidence:

   a.  information that is generally in the public domain when disclosed by the disclosing party to the receiving party, or which subsequently generally enters the public domain through no fault of the receiving party;

   b.  information that is already lawfully known to the receiving party prior to being disclosed to it by the disclosing party;

   c.  information that is separately disclosed to the receiving party by a third party having the legal right to disclose it; or

   d.  information that is required to be disclosed pursuant to a valid government or judicial order, provided that the party to which such government or judicial order is directed gives the other party sufficient notice to enable it to seek a protective order, and provided further

3.

that the party to which such government or judicial order is directed complies with any protective order obtained by the other party.

Notwithstanding the foregoing, each party may disclose such confidential information to its legal counsel, accountant(s) and other agents.

6.    Indemnification.  Subject to any exculpatory language and provisions contained in the representations, warranties, and covenants of this Agreement, the parties agree to indemnify one another in accordance with the following:

a.  Talent shall indemnify, defend, and hold harmless A&F, its subsidiaries, parents and affiliates, and the owners, officers, directors, agents and employees of each, from and against all third party claims, damages, liabilities, costs and reasonable expenses (including, but not limited to, third party attorneys' fees) arising out of or related to (i) the use of Talent's name or likeness as expressly permitted hereunder; (ii) the exercise of any rights granted by Talent to A&F hereunder; or (iii) any breach of the representations, warranties or covenants made by Talent herein.

b.  A&F shall indemnify, defend, and hold harmless Talent from and against all third party claims, damages, liabilities, costs and reasonable expenses (including, but not limited to, attorneys' fees) arising out of or related to (i) A&F's breach of its representations and warranties as set forth above in Paragraph 4.2; or (ii) third party claims based upon A&F's use of any image (excluding any claim for which Talent is obligated to indemnify A&F pursuant to clause (a) immediately above).

7.    Reliance and Inducement.  Talent understands and acknowledges that A&F has been induced to execute this Agreement in reliance on the representations and warranties of Talent as set forth herein.

8.    Notice.  Any notice, request approval or other communication required or permitted to be given hereunder shall be in writing, effective upon receipt, and delivered by fax (with receipt acknowledged), delivered personally, delivered by nationally recognized overnight courier (with receipt acknowledged) or mailed by certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged or refused), as follows:

If to A&F, addressed to:

Abercrombie & Fitch Merchandising & Design Co.
6301 Fitch Path
New Albany, Ohio 43054
Attn: _____Mike Stevenson
Fax: _____(614) 283-6686

If to Talent, addressed to:

_____Vivien Lewit, Esq.
_____Davis Shapiro Lewit Montone & Hayes, LLP
_____689 Fifth Avenue, Fifth Floor
New York, NY 10022
Fax: _____(212) 230-5510

Notwithstanding the foregoing, for the purposes of providing notice of the commencement of the Use Period, notice provided by A&F or its agent to Talent's then-current agent shall be deemed

4.

to meet the notice requirements hereunder. Talent's agent as of the effective date of this Agreement is Dan Dymtrow, 432 Park Avenue South, New York, NY 10016.

9.    Force Majeure.  If, by reason of any occurrence beyond the control of the parties hereto (including, but not limited to: war; act of terrorism; governmental requests, restrictions or regulations; fire, flood or other casualty; accident; strike or other difficulty with employees; or any other similar occurrence), the parties are not able to meet their obligations under this Agreement, the non-performing party shall not be liable therefor and may postpone performance of its obligations for a time which is reasonable under all the circumstances.

10.    Miscellaneous.

10.1 Assignment.  Neither party shall have the right to assign its rights, or delegate its performance, under this Agreement, or any interest herein, without the prior written consent of the other party.  All covenants and agreements contained in this Agreement by or on behalf of the parties shall bind and inure to the benefit of their respective successors and permitted assigns.  Notwithstanding the foregoing, A&F shall have the right to assign this Agreement, or delegate its performance under this Agreement, without Talent's consent, to any of A&F's affiliates.

10.2 Remedies.  The remedies reserved in this Agreement are cumulative and not limited and are in addition to any other remedy provided by law or at equity.

10.3 Entire Agreement; Waiver.  Except only as otherwise specifically provided in this Agreement, the terms of this Agreement are complete and supersede any prior or contemporaneous agreement, whether written, oral or implied, and none of such terms may be added to, modified, superseded or altered, except by a written agreement or modification signed by authorized officers or representatives of each party.  No waiver of any provision of this Agreement shall be effective unless it is in writing and signed by an authorized officer or representative of the parties, as appropriate, and then such waiver shall be effective only in the specific instance and for the specific purpose given.  The failure to exercise any right or remedy under this Agreement shall not be deemed a waiver of the right to exercise such right or remedy at a later date.

10.4 Relationship of Parties.  Each of the parties hereto shall be and remain an independent contractor and nothing herein shall be deemed to create an employment relationship between the parties or constitute the parties as partners or joint venturers.  Further, the parties shall not have any authority to act, or attempt to act, or represent themselves, directly or by implication, as an agent of the others or in any manner assume or create, or attempt to assume or create, any obligation on behalf of or in the name of the others, nor shall any party be deemed the agent of the other.

10.5 Headings.  Section headings are included in this Agreement for convenience only and shall not affect the interpretation of this Agreement in any manner.

10.6 Severability.  If any provision of this Agreement is or becomes invalid or unenforceable under any law of mandatory application, it is the intent of the parties that such provision be deemed severed and omitted from the Agreement, the remaining portions of the Agreement to remain in full force and effect as written.

10.7 Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be a duplicate original, but all of which, taken together, constitute a single document.

5.

10.8 <u>Governing Law; Jurisdiction</u>. This Agreement is governed by, and shall be construed in accordance with, the laws of the State of Ohio. The parties consent to the exclusive jurisdiction and venue of the courts of proper subject matter jurisdiction located in the City of Columbus, Franklin County, Ohio for all purposes related to this Agreement. Service of any process, summons, notice, or document by means pursuant to Section 8 hereof shall be effective service of process for any action, suit, or proceeding brought against any party hereunder in any such court.

6.

IN WITNESS WHEREOF, the parties hereto, each representing and warranting that they are the duly authorized and appointed representative and signatory of the respective entities and individuals listed below, have each caused this Agreement to be executed by their respective duly authorized representative to be effective as of the date first set forth above. ~~By signing below without an accompanying valid consent, Talent represents and warrants that Talent is at least eighteen (18) years of age.~~

Talent: _____Taylor Swift          _____ A&F:

Abercrombie & Fitch Merchandising &                    Design Co.

By: _____                            By: _____

Printed Name: _Taylor Swift_                            Printed Name: _____

Title: _____                         Title: _____

Date : _4/24/04_                                        Date: _____


Consent (If Applicable)

The undersigned certifies that he/she (i) is the parent or guardian of the minor named above, (ii) has the legal authority to execute this Agreement on behalf of such minor, and (iii) approves the foregoing terms and conditions and waives any rights in the premises.

Parent/Guardian: _PARENT_

By: X _____

Printed Name: _ANDREA E. SWIFT_

Title: _MOTHER_

Date: _4/24/04_

7.