**NORRIS, McLAUGHLIN & MARCUS**
Fernando M. Pinguelo
875 Third Avenue
18th Floor
New York, NY 10022
Phone: (212) 808-0700
Fax: (212) 808-0844

**GUPTA LEGAL, PLLC**
Vivek Gupta
14 East 4th Street, Suite 803
New York, New York 10012
Phone: (917) 686-4954
Fax: (646) 356-6901
Attorneys for Plaintiff
Daniel Dymtrow

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DANIEL DYMTROW, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | THE HON. RICHARD J. SULLIVAN, U.S.D.J. |
| | : | CIVIL ACTION NO. 1:07-cv-11277 (RJS) |
| -v- | : | |
| | : | |
| TAYLOR SWIFT, SCOTT SWIFT, and | : | |
| ANDREA SWIFT, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF DANIEL DYMTROW'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS TAYLOR SWIFT, SCOTT SWIFT AND ANDREA**
**SWIFT'S MOTION TO DISMISS THE COMPLAINT**

On The Brief:

Richard J. Schachter
Fernando M. Pinguelo
Andrew Taylor

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ........................................................................................... ii

I.     PRELIMINARY STATEMENT ........................................................................ 1

II.    STATEMENT OF FACTS ............................................................................... 2

III.   STANDARD OF REVIEW ............................................................................. 8

IV.  ARGUMENT ................................................................................................... 9

A.     A CLAIM FOR UNJUST ENRICHMENT /QUASI CONTRACT/ QUANTUM MERUIT MAY LIE EVEN WHEN THERE IS A VALID WRITTEN CONTRACT. ........................ 9

B.     DYMTROW ADEQUATELY PLEADS HIS BREACH OF CONTRACT CLAIMS AND DEFENDANTS' RELIANCE ON *METROPOLITAN* IS NOT DETERMINATIVE. ........ 15

C.     DYMTROW ADEQUATELY PLEADS PROMISSORY ESTOPPEL. ............................ 18

D.     DYMTROW ADEQUATELY PLEADS ESTOPPEL IN PAIS. ........................................ 20

E.     DYMTROW ADEQUATELY PLEADS TORTIOUS INTERFERENCE. ........................ 22

F.     DYMTROW ADEQUATELY PLEADS HIS BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS. ............................................................. 24

V.    CONCLUSION .............................................................................................. 25

## TABLE OF AUTHORITIES

**Page No.**

### FEDERAL CASES

*Bell Atl. Corp. v. Twombly,*
    127 S.Ct. 1955 (2007) ................................................................. 8

*Benevento v. RJR Nabisco, Inc.,*
    No. 89 Civ. 6266, 1993 WL 126424 (S.D.N.Y. 1993) ........................... 11

*Cleveland v. Caplaw Enters.,*
    448 F.3d 518 (2d Cir. 2006) ........................................................ 8

*Cohen v. Koenig,*
    25 F.3d 1168 (2d Cir. 1994) ................................................... 8, 23

*Conley v. Gibson,*
    355 U.S. 41 (1957) ................................................................. 8

*G-I Holdings, Inc. v. Baron & Budd,*
    179 F. Supp. 2d 233 (S.D.N.Y. 2001) ........................................... 22

*Graff v. Enodis Corp.,*
    2003 WL 1702026 (S.D.N.Y. 2003) ............................................... 9

*Iqbal v. Hasty,*
    490 F.3d 143 (2d Cir. 2007) ....................................................... 8

*Seiden Assocs., Inc. v. ANC Holdings, Inc.,*
    768 F. Supp. 89 (S.D.N.Y. 1991), *rev'd on other grounds,* 959 F.2d 425 (2d Cir. 1992) ...... 11

*Shapira v. Charles Schwab & Co.,*
    225 F. Supp 2d 414 (S.D.N.Y. 2002) ............................................ 19

*Sogeti, U.S.A., L.L.C. v. Whirlwind Bldg. Sys.,*
    496 F. Supp. 2d 380 (S.D.N.Y. 2007) ........................................... 12

*Sterling v. Interlake Indus., Inc.,*
    154 F.R.D. 579 (E.D.N.Y. 1994) ................................................. 21

**STATE CASES**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.,*
98 N.Y. 2d 144 (2002) ........................................................ 25

*Bus. Networks of N.Y., Inc. v. Complete Network Solutions, Inc.,*
265 A.D. 2d 194, 696 N.Y.S. 2d 433 (1st Dep't 1999)........................ 22

*Castiglia v. City of Lockport,*
85 A.D. 2d 879, 446 N.Y.S. 2d 748 (4th Dep't 1981) ........................ 10

*Christopher S. v. Ann Marie S.,*
173 Misc. 2d 824, 662 N.Y.S. 2d 200 (Fam. Ct. 1997) ...................... 20

*Cohen v. Brunswick Record Corp.,*
31 Misc.2d 525, 221 N.Y.S. 2d 893 (NY Cty 1961)......................... 23

*Duane Jones Co. v. Burke,*
306 N.Y. 172 (1954) ........................................................ 22

*E.R. Squibb & Sons v. Ira J. Shapiro, Inc.*
64 N.Y.S. 2d 368, 369-70 (Sup. Ct. 1945) ................................ 24

*Feinstein v. Levy,*
121 A.D. 2d 499, 503 N.Y.S. 2d 821 (2d Dep't 1986) ...................... 21

*Francis v. The NY and Brooklyn Elevated RR Co.,*
108 N.Y. 93 (1887) ......................................................... 2

*Furia v. Furia,*
116 A.D. 2d 694, 498 N.Y.S. 2d 12 (2nd Dep't 1986) ...................... 18

*Swits v. New York Sys. Exch. Inc.,*
281 A.D. 2d 833, 722 N.Y.S. 2d 300 (3d Dep't 2001) ....................... 9

*Harden, S.P.A. v. Commodore Elec. Ltd.,*
90 A.D. 2d 733, 455 N.Y.S. 2d 792 (1st Dep't 1982)....................... 22

*Joseph Martin, Jr. Deli., Inc. v. Schumacher,*
52 N.Y.2d 105, 436 N.Y.S.2d 247 (1980) ................................ 18

*Joseph v Schatzkin,*
259 N.Y. 241 (1932) ....................................................... 10

*King & Son v. De Santis Construction,*
97 Misc.2d 1063, 413 N.Y.S. 2d 78 (Sup. Ct. NY Co. 1977)................ 20

*Lahr Constr. Corp. v. Kozel & Son, Inc.,*
168 Misc. 2d 759, 640 N.Y.S. 2d 957 (Sup. Ct. 1996) ..................... 20

*Lee v. Silver*,
    262 A.D. 149, 28 N.Y.S. 2d 333 (1st Dep't 1941) ................................................ 23

*Lowe v. Feldman*,
    11 Misc. 2d 8, 168 N.Y.S. 2d 674 (Sup. Ct. NY Co. 1957) .................................. 25

*Maffea v. Ippolitio*,
    247 A.D.2d 366, 668 N.Y.S.2d 653 (2nd Dep't 1998) ......................................... 18

*Martin H. Bauman Assoc., Inc. v. H & M Int'l Transp., Inc.*,
    171 A.D.2d 479, 567 N.Y.S. 2d 404 (1st Dep't 1991) .................................... 11, 12

*Matter of the Estate of Barr*,
    173 Misc. 2d 685, 658 N.Y.S. 2d 933 (Sur. Ct. 1997) .......................................... 12

*Metropolitan Model Agency USA, Inc. v. Rayder*,
    168 Misc. 2d 324, 643 N.Y.S. 2d 923 (Sup. Ct. N.Y. Co. 1996) ................... 15, 16, 24

*Pellegrino v. Almasian*,
    10 A.D. 2d 507, 201 N.Y.S. 2d 275 (3d Dep't 1960) ........................................... 11

*Podolsky v. Narnoc Corp.*,
    149 Misc. 2d 839, 572 N.Y.S. 2d 618 (Sup. Ct. 1991) ......................................... 22

*Prinze v. Jonas*,
    38 N.Y.2d 570, 345 N.E.2d 295 (N.Y. 1976) ...................................................... 14

*Production Products Co. v. Vision Corp.*
    270 A.D. 2d 922, 706 N.Y.S. 2d 289 (4th Dep't 2000) .......................................... 9

*Pub. Improvements, Inc. v. Bd. of Educ. of City of N.Y.*,
    103 Misc. 2d 713, 427 N.Y.S. 2d 156 (Sup Ct. 1980) .......................................... 22

*Reiter Sales, Inc. v. Scovill Fasteners, Inc.*,
    9 Misc.3d 1109 806 N.Y.S. 2d 448 (Sup. Ct. 2005) ............................................ 10

*Rice v. Butler*,
    160 N.Y. 578, 55 N.E. 275 (1899) ................................................................. 2, 13

*Rice v. Manley*
    31 Misc.2d 527, 221 N.Y.S. 2d 896 ..................................................................... 23

*Rothschild v. Title Guar. & Trust Co.*,
    204 N.Y. 458 (1912) ............................................................................................. 21

*Sandra S. v. Larry W.*,
    175 Misc. 2d 122, 667 N.Y.S. 2d 632 (Fam. Ct. 1997) ....................................... 21

*Scott Eden Management v. Kavovit*
    149 Misc. 2d at 263, 563 N.Y.S.2d at 1001 ..................................................... 2, 12

*Sommer v. Kaufman,*
    59 A.D. 2d 843, 399 N.Y.S. 2d 7 (1st Dep't 1977)...............................................22

*Tierney v. Capricorn Investors, L.P.,*
    189 A.D. 2d 629, 592 N.Y.S. 2d 700 (1st Dep't 1993)..........................................18

*Wieder v. Skala,*
    80 N.Y. 2d 628 (1992) .........................................................................................25

### STATE STATUTES

CPLR 3004 ....................................................................................................2, 10, 13

N.Y. Arts & Cult. Aff. Law § 35.03........................................................................15

New York General Obligations Law § 3-107 ................................15, 16, 17, 18, 19, 24

### RULES

Fed. R. Civ. P. 12 ......................................................................................................8

### OTHER AUTHORITIES

22A N.Y. Jur. 2d Contracts § 609 ...........................................................................10

57 N.Y. Jur. 2d Estoppel § 10 .................................................................................21

57 N.Y. Jur. 2d Estoppel § 20 .................................................................................21

57 N.Y. Jur. 2d Estoppel § 22 .................................................................................21

57 N.Y. Jur. 2d Estoppel § 51 .................................................................................19

57 N.Y. Jur. 2d Estoppel § 53 .................................................................................18

67 N.Y. Jur. 2d Infants § 16 ....................................................................................11

*Restatement (Second) of Contracts* § 90 ................................................................20

*Restatement (Third) of Restitution and Unjust Enrichment* ....................................10

## I.    **PRELIMINARY STATEMENT**

How does an eighteen-year-old singer from a small town in Pennsylvania make it to the cover of *Rolling Stone*'s "Best of Rock 2008"?  If you believe the version of the story being told to the world, Taylor Swift knocked on record company doors when she was just thirteen years old and used *MySpace* to expose her music to the masses, all of which resulted in her current status as a music "Superstar."  However, Dan Dymtrow –a respected manager who helped launch and manage the careers of some of the biggest names in the industry, including Britney Spears during the height of her success – tells a much different story, one that chronicles the detailed steps he took to propel Taylor Swift to the forefront of stardom.

This dispute arises from a two-and-a-half-year relationship between Dymtrow and defendants wherein Dymtrow devoted a significant amount of time towards planning Taylor Swift's career and arranging career-building opportunities.  Dymtrow found and negotiated lucrative contracts, including a music development and recording contract, music publishing contract, endorsement contract, talent contract, and a recording contract.  Today, Ms. Swift stands as one of the most successful new music artists, and her songs top the Billboard charts.

Defendants repudiated their agreements with Dymtrow just weeks before signing lucrative record and talent representation agreements with companies that Dymtrow identified, substantially negotiated with, and to which he introduced defendants.  The obvious intent was to deny Dymtrow the agreed compensation for payment of the reasonable value (20% of gross income) of his services.  Dymtrow has been paid less than $10,000 for the entirety of what he did to help Taylor's career, even though he has earned more than that.

When Dymtrow filed this action in December 2007, he fully recognized the principle of New York law that gave Taylor Swift, a minor at the time, the right to disaffirm her contract.  Dymtrow does not challenge Taylor Swift's right to disaffirm her contract with him.  Instead, Dymtrow seeks

only that to which he is entitled.  As eloquently summarized by the court in *Scott Eden Mgmt. v. Kavovit*, 149 Misc. 2d 262, 563 N.Y.S.2d 1001 (N.Y. Sup. 1990):

> After disaffirmance, the infant is not entitled to be put in a position superior to such a one as he would have occupied if he had never entered into his voidable agreement. He is not entitled to retain an advantage from a transaction which he repudiates. '**The privilege of infancy is to be used as a shield and not as a sword.**'"  (emphasis added).

149 Misc. 2d at 264, 563 N.Y.S. 2d at 1002 (citing *Rice v. Butler*, 160 N.Y. 578, 582, 55 N.E. 275, 276 (1899)).

What New York law does not allow is a minor to be put in a position superior to one she would have enjoyed had she never entered into the voidable agreement.  *See CPLR* § 3004; *Scott Eden Mgmt.*, 149 Misc.2d at 264; 563 N.Y.S. 2d at 1002; *see also Francis v. The NY and Brooklyn Elevated RR Co.*, 108 N.Y. 93, 97 (1887).  Dymtrow does not seek to contest Taylor Swift's right to disaffirm; but rather, he seeks just compensation for the benefits she reaped through his efforts.

Contrary to defendants' argument, the complaint alleges facts in support of each element of each of the causes of action and their motion to dismiss should be denied.

## II.    <u>STATEMENT OF FACTS</u>

### A. Background

Daniel Dymtrow, a music industry personal manager, makes a living by identifying, developing, and creating opportunities for artists to succeed in the music industry.  Dymtrow agreed to manage then thirteen-year-old Taylor Swift ("Taylor" or "Artist") when her parents and she persuaded him to represent her.  Complaint, ¶1.  The parties entered into agreements with each other, including an Exclusive Personal Management Agreement ("EPMA") between defendant Taylor Swift and Dymtrow, and a guarantee between Dymtrow and Taylor's parents, defendants Scott Swift and Andrea Swift (collectively, "Parents") pursuant to which the Parents guaranteed (the "Guarantee") the performance by Taylor of her obligations under the EPMA.  Complaint, ¶2.

During the course of their two-and-a-half-year management relationship,[1] Dymtrow devoted a significant amount of time towards planning Taylor Swift's career. During this period, he identified and negotiated several contracts, including a music development/recording contract with RCA Records, a music publishing contract with Sony/ATV Songs, LLC, a national advertising campaign with Abercrombie & Fitch, a talent agency agreement with Creative Artists Agency, and a recording contract with Big Machine Records ("BMR").[2] Complaint, ¶1. All except the last two contracts were signed by Swift before she disaffirmed the EPMA. Those two contracts, however, were the result of Dymtrow's efforts before he was terminated.

Dymtrow was introduced to defendants in or about January 2003. Artist and her Parents met Dymtrow in the hopes of convincing him to sign her as one of his clients. After meeting Artist, Dymtrow concluded that she had the potential to become a star in the country music world with the proper guidance and management. Complaint, ¶11-12.

Artist's Parents knew that she needed an experienced manager in order get her access to record companies. Before meeting Dymtrow, the Parents attempted to manage Artist's career themselves. She was rejected by every music label she and her Parents pursued on their own, and they were told they needed to hire a respected manager if they expected her to advance in the music business. As a result, defendants actively pursued Dymtrow and sought his services. Defendants assured Dymtrow on several occasions that if he were to take Artist on as a client, they would pay Dymtrow his fee for services to provide opportunities, exposure, and contracts. Defendants also promised Dymtrow that they would reward him for his efforts, treat him fairly, and protect his

---

[1] In their brief, defendants represent to the Court the length of the professional relationship between Dymtrow and Taylor Swift as lasting only one year. Dymtrow actually agreed to represent defendants and started to work on their behalf over the course of two-and-a-half-years.

[2] In their brief, defendants overlook the opportunities and contracts that Dymtrow procured for defendants by only acknowledging the national advertising campaign with Abercrombie & Fitch.

economic interests.  Dymtrow relied upon these promises and performed his obligations per the

EPMA and the Parents' Guarantee based on those promises.  Complaint, ¶13-14.

**B. Exclusive Personal Management Agreement & Contract Between Dymtrow and Artist's Parents Guaranteeing Artist's Performance.**

In or about early March 2003, Dymtrow, Artist and her Parents met to discuss the basic terms

and parameters of an exclusive personal management agreement, and a Guarantee from her Parents.

Defendants retained the services of an experienced entertainment lawyer who reviewed and

negotiated the EPMA on behalf of defendants over the course of more than a year.  The EPMA was

signed by Dymtrow, Artist, and Artists' Parents as her legal guardians on or about April 5, 2004, but

the EPMA was made effective as of March 25, 2003, recognizing the time when Dymtrow started

working for defendants.  Complaint, ¶15-17.

The EPMA provided, in pertinent part, that Dymtrow would receive a 20% commission on

Artist's gross income as a result of or in connection with Artist's activities in the entertainment

industry resulting from Dymtrow's efforts.  The EPMA also provided that he would receive between

10% and 5% commission for his participation in Artist's gross income earned, received, or credited

after the term of the contract in connection with Artist's services and activities rendered or products

created during, or after the term pursuant to contracts (oral or written) entered into or "substantially

negotiated" during the term, including all renewals and extensions.  Complaint, ¶18, and Exhibit A.

In addition to the EPMA, the Parents also negotiated and signed a Guarantee with Dymtrow

in which they guaranteed, absolutely and unconditionally, the performance by Artist of all of Artist's

obligations and services detailed in the EPMA.  Complaint, ¶19, and Exhibit B.

**C. Dymtrow's Efforts to Sharpen Artist's Talent, Manage Her Career, and Procure Opportunities and Contracts That Furthered Her Success.**

Immediately after agreeing to terms verbally to enter into the EPMA (about a year before the

agreements were executed), Dymtrow started performing.  He focused Artist's attention on

4

improving her skills, worked to create a unique image of Artist that the public would accept, and procured opportunities and contracts that furthered her career, including a music development/recording contract with RCA Records which was entered into even before the EPMA and the Guarantee were signed by the parties. Complaint, ¶20.

At the time, and throughout the relationship, defendants swore to Dymtrow that they would protect him and ensure his financial stability with Artist, and that Dymtrow would be paid. Defendants' promises were made verbally and confirmed in writing to Dymtrow on several occasions. They assured Dymtrow that there would be no reason to doubt the defendants' commitments. Dymtrow relied on these promises. Complaint, ¶21-22.

Dymtrow helped Artist improve her skills, encouraged Artist to write her own songs, educated Artist and her Parents about marketing, and helped establish her image. Through Dymtrow's efforts and contacts, he secured many opportunities for Artist, including:

- A national marketing and advertising campaign with Abercrombie & Fitch ("A&F"), Complaint, ¶¶1, 23;
- Live performance opportunities at many venues including "America's Camp" and "Britney Spears' Camp for the Performing Arts" for two consecutive years, enabling Artist to perform alongside recognized performers and exposing Artist to these performers' significant fan bases, Complaint, ¶¶1, 25, , 26;
- Music showcases where meetings were coordinated with recording company executives (including Arista Records Nashville, BNA Records Label, Capitol Records Nashville, Dreamworks Nashville, Jive Records, RCA Records Label, Warner Brothers Records, and Warner Brothers Nashville), Complaint, ¶¶1, 23, 24, 25(b-d), , 28, 31;
- Publicity wherein he arranged press/media coverage and arranged for Artist to appear in *Vanity Fair* magazine's October 2004 issue and in numerous other magazine and newspaper articles where her career was profiled, Complaint, ¶¶1, 23;
- An RCA recording/development contract, Complaint, ¶¶1, 20, 25(e-f);
- Sony/ATV music publishing contract, Complaint, ¶¶1, 25;
- Big Machine Records record contract, Complaint, ¶¶1, 29, 31; and
- Creative Artists Agency ("CAA") talent contract: Complaint, ¶¶40-42, 43, 44. See Declaration of Daniel Dymtrow dated May 14, 2008 in Opposition to Defendants' Motion, ¶¶7-14.

**D. Dymtrow's Efforts to Procure a Recording Contract with Big Machine Records and a Talent Representation Contract with Creative Artists Agency.**

In or about March 2005, Dymtrow began negotiating the terms and conditions of a record contract with Scott Borchetta who, based on Dymtrow's efforts on behalf of Artist, expressed the desire to sign Artist to his new record label and offer her a lucrative record contract with Borchetta's new label, Big Machine Records. Dymtrow introduced Borchetta to the Swifts and he entered into negotiations with Borchetta which continued over the course of the next several months. *See e.g.,* Complaint, ¶¶31, 32, 33, 35-36, 54.

On or about July 12, 2005, Scott Swift told Dymtrow that Scott was terminating his professional relationship with Dymtrow. Upon information and belief, Scott held up the signing of the Big Machine Records record contract until after the EPMA was disaffirmed in order to deprive Dymtrow of the compensation he would have received. Complaint, ¶37.

During the period of negotiations with Big Machine Records and CAA (and prior to the disaffirmation), defendants encouraged Dymtrow to continue to be in contact with Borchetta and CAA and to negotiate the best contract terms for Artist. Defendants assured Dymtrow that they recognized his efforts on behalf of Artist and that they would continue to support him and his efforts to maximize Artist's potential and manage her career. Defendants assured Dymtrow that they would protect his interests and reward his efforts in accordance with the EPMA. Complaint, ¶47.

**E. Defendant Scott Swift's Interference With the EPMA.**

Upon information and belief, in or about May 2005, Scott Swift began systematically and falsely to discredit Dymtrow's efforts on behalf of Artist, and interfere with Dymtrow's management of Artist, including threatening Artist to disaffirm her EPMA with Dymtrow, or else lose all economic support from him for her career. Scott Swift engaged in a concerted effort to create a division between Dymtrow and Artist so as to deprive Dymtrow of the benefits of the EPMA and of oral and written promises made to him by defendants, with the intent to deprive Dymtrow of the compensation to which he was entitled. Before the disaffirmance, but after the decision to terminate

had been made, Scott Swift requested of Dymtrow a detailed outline of his plans and goals for Artist and the contacts on which Dymtrow intended to rely to continue Artist's success. Scott Swift did this to obtain leads and information from plaintiff without compensating him. Complaint, ¶¶49-51.

For example, on or about July 5, 2005 (days prior to disaffirmation), Scott Swift demanded that Dymtrow immediately draft approximately nine different business plans to chart the course of Artist's career for the next five years. Dymtrow provided that information as requested. The following day, Dymtrow was asked by Scott Swift who owned Artist's master recordings. While not known to Dymtrow at the time, this request was done to usurp control from Dymtrow. On or about July 8, 2005, Dymtrow gave Scott Swift an outline of expected events for Artist over the next few months in response to Scott Swift's July 5 demand. That same day and at Scott Swift's request, Dymtrow also gave Scott Swift a breakdown of the deal points and expectations that had been negotiated with Borchetta. At or around that time, Scott Swift insisted that Dymtrow put together a list of record contract demands in case Borchetta was willing to give Artist "any" contract terms she demanded. Scott Swift requested the information provided by Dymtrow knowing that Dymtrow would be terminated and in an attempt to deny him the benefits of his agreements. Moreover, he took Dymtrow's information and used it himself to finalize negotiations on behalf of Artist for opportunities procured by Dymtrow. Complaint, ¶¶52-56.

When Scott Swift terminated Dymtrow's relationship, he told Dymtrow that the termination would be "temporary for the next few months." Scott Swift explained to Dymtrow that Scott Swift would assume the role of manager of Artist from that point on and handle the management duties for Artist, and that Artist would seek Dymtrow's services in the future "as needed." Scott Swift explained that the reason for the termination was because Dymtrow would not relocate to Nashville as defendants requested so as to be close to Artist. Complaint, ¶¶57-63.

Defendants gained the benefit of Dymtrow's services without compensating him in accordance with the EPMA and Guarantee. At no time did defendants offer to compensate Dymtrow for unpaid services he rendered to Artist or for compensation already earned pursuant to the EPMA, despite demands for same made by Dymtrow. Scott wrongfully interfered with Artist's professional relationship with Dymtrow. Although Big Machine Records has assigned a "manager" to Artist, Scott Swift remains Artist's *de facto* exclusive personal manager to this day and has used all of the information provided by Dymtrow to defendants' economic advantage. Upon information and belief, Artist does not pay an industry-standard 20% manager commission to a personal manager. Complaint, ¶¶67-71.

### III.    STANDARD OF REVIEW

Rule 12 of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12. The standard of review on a motion to dismiss is heavily weighted in favor of the claimant. In reviewing a motion to dismiss under Rule 12, the court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of plaintiff. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir. 2006). The plaintiff must satisfy "a flexible 'plausibility standard.'" *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir. 2007). This Court may dismiss an action pursuant to Rule 12 only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir. 1994). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1969 (2007). The rules do not require the claimant to set out in detail the facts upon which he bases a claim, but only that he give a statement of his claim that will give the opposing party "fair notice of what [the] claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 45-46, (1957)

## IV.    ARGUMENT

### A.    A CLAIM FOR Unjust Enrichment /Quasi Contract/ Quantum Meruit MAY LIE EVEN WHEN THERE IS A VALID WRITTEN CONTRACT.

#### i. Defendants' Misstatement of the Law

Defendants state in their motion to dismiss that "[a] claim for unjust enrichment, or any other quasi-contract theory, however, cannot lie when there exists-as here-a valid written contract." Def.'s Mot. Dismiss 5. Defendants misinterpret three cases to arrive at this conclusion.   First, defendants cite *Graff v. Enodis Corp.*, 2003 WL 1702026 (S.D.N.Y. 2003).   *Graff* addressed the issue of the recovery of commissions allegedly owed to a salesman after that salesman was terminated.   *Id.* at *1. In *Graff*, the contract between the salesman and his employer expressly provided a detailed method of paying commissions.   *Id.* at *1-2.   This method did not include the payment of sales commissions that were not earned prior to termination.   *Id.*   Because the court concluded that the commissions plaintiff sought were not earned prior to termination, plaintiff could not recover the commissions.   *Id.*

As in *Graff*, *Swits v. New York Sys. Exch. Inc.*, 281 A.D. 2d 833, 722 N.Y.S. 2d 300 (3d Dep't 2001) and *Production Products Co. v. Vision Corp.* 270 A.D. 2d 922, 706 N.Y.S. 2d 289 (4th Dep't 2000) dealt with the payment of sales commissions due post-termination.   *Swits* held that "[a]n at-will sales representative is entitled to post-discharge commissions only if the parties' agreement expressly provided for such compensation." *Swits*, 281 A.D. 2d at 835, 722 N.Y.S. 2d at 302 (citing *Production Products*, 270 A.D. 2d at 923, 706 N.Y.S. 2d at 291).   In *Swits* and *Production Products*, plaintiffs' claims failed because their written agreements expressly disallowed the recovery they sought through the litigation of unjust enrichment and other quasi-contract theories.   *Id.*   Thus, while the cases cited by defendants did not allow for recovery in quasi-contract due to the presence of an express written agreement, these are not holdings, as defendants represent to this Court, that establish

a *per se* rule that recovery in quasi-contract is absolutely barred if there is an express written agreement.

Contrary to defendants' position, recovery is allowed under various theories sounding in quasi-contract despite the presence of a valid written contract.  In fact, *Reiter Sales, Inc. v. Scovill Fasteners, Inc.*, 9 Misc.3d 1109 806 N.Y.S. 2d 448 (Sup. Ct. 2005), a case relied upon by defendants, reaches such a conclusion.  In *Reiter Sales*, the court held that "[a] party may not obtain recovery for unjust enrichment unless the written agreement between the parties has been rescinded, is unenforceable, or has been abrogated." *Id.* at *3.  The two contracts between Dymtrow and defendants have been avoided by defendants' own election and thus have been rendered unenforceable.  Therefore, an action in unjust enrichment will stand.

Additionally, recovery may be had in quantum meruit despite the presence of an express, written contract where the breaching party prevented complete performance.  *Castiglia v. City of Lockport*, 85 A.D. 2d 879, 879, 446 N.Y.S. 2d 748, 748 (4th Dep't 1981); *see also* 22A N.Y. Jur. 2d Contracts § 609.  After disaffirmance, an infant is not entitled to be put in a position superior to such a one as he would have occupied if he had never entered into his voidable agreement.  *Joseph v Schatzkin*, 259 N.Y. 241, 244 (1932).  He is not entitled to retain an advantage from a transaction which he repudiates.  *Id.*

These common law principles are actually codified in the New York CPLR, which states:

> A party who has received benefits by reason of a transaction that is void or voidable because of . . . infancy or incompetency, and who, in an action or by way of defense or counterclaim, seeks rescission, restitution, a declaration or judgment that such transaction is void, or other relief, . . . shall not be denied relief because of a failure to tender before judgment restoration of such benefits; but the court may make a tender of restoration a condition of its judgment, and may otherwise in its judgment so adjust the equities between the parties that unjust enrichment is avoided.

CPLR 3004;  *Accord Restatement (Third) of Restitution and Unjust Enrichment* (Tentative Draft) § 33, Incapacity of a Recipient (a person who renders a performance under an agreement that is

unenforceable by reason of the other party's lack of capacity has a claim in restitution against the recipient as necessary to prevent unjust enrichment).

Defendants' assertion that recovery in unjust enrichment is not allowed under the circumstances of this case is also contrary to leading scholarly commentary on the subject. New York Jurisprudence states:

> Where an infant's contract is not approved by a court in the manner provided, it is voidable and the infant has an absolute right to disaffirm. Notwithstanding this, upon disaffirming, the infant may still be required to reimburse an individual relying upon the contract to avoid unjust enrichment.

67 N.Y. Jur. 2d Infants § 16.

### ii. An Accurate Statement of the Elements of the Causes of Action and Their Factual Predicate.

Dymtrow's complaint states a claim for unjust enrichment and quantum meruit. Unjust enrichment and quantum meruit are usually analyzed together as "[t]hese two doctrines are related theories that are 'best addressed as a whole since the latter is merely the means by which the former is remedied.'" *Benevento v. RJR Nabisco, Inc.,* No. 89 Civ. 6266, 1993 WL 126424, at *6 (S.D.N.Y. 1993); *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 768 F. Supp. 89, 96 (S.D.N.Y. 1991), *rev'd on other grounds,* 959 F.2d 425 (2d Cir. 1992).

Quantum meruit means "as much as he deserved" and is premised upon the finding of an implied promise to pay plaintiff as much as he reasonably deserved. *Pellegrino v. Almasian*, 10 A.D. 2d 507, 509, 201 N.Y.S. 2d 275, 278 (3d Dep't 1960). In order to make out a claim in quantum meruit, a claimant must establish performance of services in good faith, acceptance of services by person to whom they are rendered, an expectation of compensation, and reasonable value of the services. *Martin H. Bauman Assoc., Inc. v. H & M Int'l Transp., Inc.*, 171 A.D. 2d 479, 484, 567 N.Y.S. 2d 404, 408 (1st Dep't 1991). Recovery is available not only where there has been an actual benefit to the other party, but also in the instance of a wrongdoing defendant where there is a need to

restore the plaintiff's former status, including compensation for expenditures made in reliance upon

defendants' representations. *Id.*

The plaintiff recovers the reasonable value of his performance whether or not the defendant,

in any economic sense, benefited from the performance. *Id.*; *Sogeti, U.S.A., L.L.C. v. Whirlwind*

*Bldg. Sys.*, 496 F. Supp. 2d 380, 383 (S.D.N.Y. 2007) (consultant held to be entitled to the reasonable

value of his services in quantum meruit); *Matter of the Estate of Barr*, 173 Misc. 2d 685, 690, 658

N.Y.S. 2d 933, 936 (Sur. Ct. 1997) (finding that proof that services were rendered raises a

presumption that they were rendered in the expectation of compensation).

*Scott Eden Management v. Kavovit* is directly on point and the facts are strikingly similar to

Dymtrow's case.  In 1984, when defendant Andrew Kavovit was twelve years old, he and his parents

entered into a contract with plaintiff Scott Eden.  149 Misc. 2d at 263, 563 N.Y.S.2d at 1001.  Under

the terms of the contract, Scott Eden became the exclusive personal manager to supervise and

promote Kavovit's career in the entertainment industry and it provided that Eden would be entitled to

a 15% commission on Kavovit's gross compensation.  *Id.*  Paragraph ten of the agreement stated:

> With respect to contracts entered into by [Kavovit]...during the term of this
> agreement...[Scott Eden] shall be entitled to [its] commission from the residuals or
> royalties of such contacts, the full term of such contracts, including all extensions or
> renewals thereof, notwithstanding the earlier termination of the agreement.  *Id.*

In 1986, Kavovit signed an agency contract with the Andreadis Agency, a licensed agent

selected by Eden pursuant to industry requirements.  *Id.*  This contract involved an additional 10%

commission.  *Id.*  Thereafter, Kavovit signed a contract which secured a role for him on "As the

World Turns."  *Id.*  In February 1989, one week before the contract with Eden was to expire,

Kavovit's attorney notified Eden that his "clients hereby disaffirm the contract on the grounds of

infancy."  149 Misc. 2d at 263, 563 N.Y.S.2d at 1002.  Up until then, the Andreadis Agency had been

forwarding Eden its commissions.  *Id.*  After the Eden contract was disaffirmed, however, Kavovit's

father advised Andreadis Agency that Kavovit's salary would go directly to Kavovit and that he

would send Andreadis its 10%. *Id.* Eden received no further commissions. *Id.* Eden's complaint

sought money damages for money due it for commissions relating to Kavovit's personal appearances

prior to the date of disaffirmance, and with respect to contracts entered into by Kavovit during the

term of his contract with plaintiff. *Id.*

The court began its analysis by recognizing the well established rule that an infant's contract

is voidable and the infant has the right to disaffirm. *Id.* The plaintiff conceded this point, and instead

argued the equally well established corollary to this rule:

> After disaffirmance, an infant is not entitled to be put in a position superior to such a
> one as he would have occupied if he had never entered into his voidable agreement.
> He is not entitled to retain an advantage from a transaction which he repudiates. The
> privilege of infancy is to be used as a shield and not as a sword.

*Id.* (citing *Rice v. Butler*, 160 N.Y. 578, 582, 55 N.E. 275, 276 (1899)).

The court continued by acknowledging the restoration of consideration requirements in CPLR

3004. 149 Misc. 2d at 265, 563 N.Y.S.2d at 1002. CPLR 3004 states that the infant need not tender

restoration of benefits received prior to disaffirmance, but the court may make a tender of restoration

a condition of its judgment, and may otherwise in its judgment so adjust the equities between the

parties that unjust enrichment is avoided. *Id.*

With these fundamental principles enunciated, the court concluded that Eden must prevail.

Notably, the court reasoned that the work a personal manager does for his client is preparatory to the

performance contract. 149 Misc. 2d at 266, 563 N.Y.S.2d at 1003. Once a performance contract has

been signed, the personal manager is entitled to his percentage fee, subject only to the condition

subsequent that the client performs and earns his fee. *Id.* When the infant signs the performance

contract, it is with the understanding that the gross amount to be paid is not solely for him. *Id.* It is

the expectation of all parties to the contract that 15% of the gross amount belongs to the personal

manager. To the extent that the performer obtains that 15% for himself, he is unjustly enriched. *Id.*

Here, defendants assert that "the *Scott Eden* case does not abrogate well-settled law that claims for unjust enrichment . . . cannot lie where . . . there exists a valid written contract." Def.'s Mot. Dismiss 8.  This argument is strained considering that in *Scott Eden* the plaintiff prevailed in unjust enrichment despite the presence of a valid, written contract.  Defendants' first point of distinction is thus incorrect both factually and legally.

Second, defendants allege that, "[p]laintiff was responsible for securing one income generating opportunity for Taylor during his tenure as manager." Def.'s Mot Dismiss 9.  This statement disregards the numerous other opportunities Taylor realized due to plaintiff's efforts on Taylor's behalf, including the contracts with Big Machine Records and Creative Artists Agency.  Although these were signed after avoidance of the EPMA, they were the direct result of Dymtrow's efforts.  For example, Dymtrow's effort, vision, reputation, and contacts in the music, fashion, recording, television, and film industries enabled him to secure many opportunities for Artist.  See Memorandum of Law, *supra*, at p. 5 (summary of the opportunities procured).

Defendants also assert various other arguments, on public policy grounds, that are equally questionable.  Defendants contend that the EPMA would not be enforceable absent disaffirmance because it is of an "indeterminate duration."  First, defendants' public policy argument and their reliance upon *Metropolitan Model* are misplaced as analyzed in greater detail in **Section B**, *infra*, below.  Second, the contract was not for an indeterminate duration[3] in that its term was set to expire at the second album cycle.  Complaint, Exhibit A at ¶3.[4]  Third, defendants were represented by a

---

[3] Even if it were for an indeterminate duration, if a contract runs for a period longer than allowed by statute, then it simply means that the contract cannot be approved and the right to disaffirm is left intact; it does not mean that it is void *ab initio*.  *Prinze v. Jonas*, 38 N.Y.2d 570, 576, 345 N.E.2d 295, 299 (N.Y. 1976); *see also* N.Y. Art & Cult. Aff. § 35.03 (2)(d) (If the contract contains any covenant or condition which extends beyond such three years or, where the court finds that the infant is represented by qualified counsel as provided in this paragraph, seven years, the it may be approved if found to be reasonable and for such period as the court may determine).

[4] In fact, Taylor was more than adequately protected by the EPMA as negotiated and modified by her experienced entertainment lawyer over the course of a year of negotiations.  For example, the EPMA allowed

14

prominent and well respected entertainment lawyer who negotiated favorable terms for defendants

over the course of nearly a year. Complaint, ¶16; *see* N.Y. Arts & Cult. Aff. Law § 35.03.

**B.    DYMTROW adequately pleads HIS Breach of Contract CLAIMS AND DEFENDANTS' RELIANCE ON *METROPOLITAN* IS NOT DETERMINATIVE.**

### i. Defendants' Misstatement of the Law

Defendants rely entirely upon *Metropolitan Model Agency USA, Inc. v. Rayder*, 168 Misc. 2d

324, 643 N.Y.S. 2d 923 (Sup. Ct. N.Y. Co. 1996) and New York General Obligations Law § 3-107 to

support their assertion that plaintiff's claim for breach of contract against Taylor's parents must be

dismissed. As demonstrated in greater detail below, neither is applicable to this case.

Contrary to defendant's assertions, *Metropolitan Model* is not "directly on point," nor are

there any "striking" similarities between *Metropolitan Model* and this case currently before this court.

In *Metropolitan Model*, a contract was executed between the defendant Francesca Ryder, a model,

who was at the time of the agreement a minor, and plaintiff Metropolitan Model Agency. 168

Misc.2d at 325, 643 N.Y.S. 2d at 924. Simultaneously with the execution of the agreement, a

guarantee of performance was entered into between Ryder's parents and Metropolitan Model. *Id.*

The guarantee executed by Ryder's parents provided, in relevant part, that:

> The undersigned parent....jointly and severally, hereby unconditionally guarantee the full and timely discharge of all of said minor's obligations to you under said agreement. We further acknowledge and agree that in the event our minor child disavows her agreement with you or fails to perform as agreed, we shall be liable to you for any money damages sustained by you for which our minor child would be liable if she were an adult and said agreement ...were fully enforceable against her.

168 Misc. 2d at 325-26, 643 N.Y.S. 2d at 924-25.

Ryder did not re-execute the agreement on reaching the age of majority. 168 Misc. 2d at 326,

643 N.Y.S. 2d at 925. Several months after Ryder reached the age of majority, the Metropolitan

---

Artist to terminate the agreement if Dymtrow did not sign Artist to a major record label contract within eighteen months. Complaint, Exhibit A at ¶3(b). Notably, Dymtrow's efforts were so successful that he procured a record contract with RCA even before the EPMA was signed.

Model Agency received a letter from Ryder on the letterhead of Elite Model Management notifying

Metropolitan Model that Elite would be managing Ryder's affairs. *Id.* Metropolitan Model sued

Ryder's parents for breach of the guarantee asserting that the guarantee agreement required Ryder to

use Metropolitan Model as her exclusive agency. *Id.*

     The court began its analysis of the plaintiff's claims by noting the statute applicable to the

plaintiff's cause of action. *Id.* This statute held, in relevant part, that:

> 1. It shall be unlawful to employ…a minor as a model unless:
>    A child model work permit has been issued as hereinafter provided; and
>    Such employment, use or exhibition is in accordance with the rules and regulations
>    promulgated by the Commissioner of Education as hereinafter provided….

*Id.* (*citing* Arts and Cultural Affairs Law § 35.05).  Metropolitan Model never obtained the required

permit and Ryder's employment was not in accordance with the rules promulgated by the

Commissioner of Education. 168 Misc. 2d at 327, 643 N.Y.S. 2d at 925. The court observed that "a

contract which violates a State statute is void and unenforceable." 168 Misc. 2d at 326, 643 N.Y.S.

2d at 925. Because the minor's agreement was unlawful and void *ab initio*, the court refused to

enforce it. 168 Misc. 2d at 327, 643 N.Y.S. 2d at 926. It was because the guarantee was of an illegal

contract that the court ruled against its enforcement.

     There is no permit requirement under New York law for Taylor Swift as there was in

*Metropolitan Model*. The contract between Dymtrow and Taylor was not void-it was merely

voidable. In *Metropolitan Model,* the parents guaranteed an illegal contract that was void *ab initio*—

not so here.

     Defendants also argue that plaintiff's claim for breach of contract against Taylor's parents

must be dismissed based on New York General Obligations Law § 3-107. This law states that:

> Where a contract providing for performance or rendering of services by an infant is
> one which the supreme court or surrogate's court has jurisdiction to approve as
> provided in section 3-105 of this chapter, no parent or guardian of the infant with
> respect to whose services the contract is made shall, unless the contract is so approved,
> be liable on the contract either as a party or as a guarantor of its performance:

1. If the infant was a resident of the state at the time the contract was made or at the time of the event by reason of which liability is sought to be imposed, by reason of any disaffirmance, repudiation or breach of the contract or any term thereof, or any failure or refusal of the infant to perform, **or**

2. In any other case, by reason of any failure or refusal of the infant to **perform or render services required or permitted by the contract to be performed or rendered in this state** or any failure or refusal of the parent or guardian to cause such services to be rendered or performed.

New York General Obligations Law § 3-107 (emphasis added).

Defendants allege that Andrea and Scott Swift's contract falls within the "letter and intent" of § 3-107. Def.'s Mot. Dismiss 12. A simple reading of § 3-107 reveals the fallacy of defendants' argument. Neither Taylor nor her parents have ever been at any relevant time residents of the state of New York. Thus subsection  of § 3-107 is inapplicable. Defendants are thus left to manipulate subsection  to disavow the parent's guarantee.

By its plain wording, subsection  does not apply to the parent's guarantee. Taylor Swift has not failed or refused to perform or render services required or permitted by the contract to be performed or rendered in New York. Additionally, Taylor's parents have not failed or refused to cause Taylor's services to be rendered or performed in New York.

Aware that § 3-107 is not applicable, defendants engage in an *International Shoe* "minimum contacts" analysis to stick the proverbial square peg in a round hole by manipulating Andrea and Scott Swift's Guarantee to be governed by section 3-107. Defendants assert that plaintiff and the defendants met in New York, plaintiff resided in New York, and the agreement contains a choice of law provision stating that the EPMA is governed by the laws of New York.[5] Def.'s Mot. Dismiss 13. Based on these findings, defendants leap to the conclusion that "New York has a substantial interest and connection to this contract and the performance thereof." Def.'s Mot. Dismiss 13. Unfortunately

---

[5] Interestingly, when it suits defendants' argument, they rely on and argue as valid certain provisions of the EPMA that support their argument, such as the choice of law provision; yet they disavow other components of the agreement when they are not favorable to them.

for the defendants, a "minimum contacts" analysis is only relevant to issues of personal jurisdiction, not the applicability of section 3-107.

### ii. An Accurate Statement of the Elements of the Causes of Action and Their Factual Predicate.

That said, Dymtrow's complaint states a claim for breach of contract against the defendants. A plaintiff establishes a breach of contract action by demonstrating the existence of a contract between parties, performance by the plaintiff, breach by the defendant, and damages resulting from the breach. *Furia v. Furia*, 116 A.D. 2d 694, 695, 498 N.Y.S. 2d 12, 13 (2nd Dep't 1986). The terms of the agreement to which the parties assent must "be sufficiently specific so that what was promised can be ascertained." *Joseph Martin, Jr. Deli., Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249 (1980). Assent to the terms of a contract may be made by word, act, or conduct. *Maffea v. Ippolitio*, 247 A.D.2d 366, 367, 668 N.Y.S.2d 653, 654 (2nd Dep't 1998).

Here, Dymtrow clearly sets forth each element for his breach of contract causes of action. *See e.g.*, Complaint, ¶¶ 83-92 (setting forth each and every element of a breach of contract claim); *see also* Complaint, ¶¶ 1, 11, 12, 14, 21, 39-48, 60, 64- 68.

### C.    DYMTROW adequately pleads Promissory Estoppel.

#### i. Defendants' Misstatement of the Law

Defendants first argue that, "[i]n order to recover on a claim for promissory estoppel, the plaintiff must establish a substantial change in position resulting in unconscionable injury." Def.'s Mot Dismiss 13. This is an incorrect statement of law. Unconscionable injury is not required. A claim for promissory estoppel will lie in the absence of an unconscionable injury. A person claiming promissory estoppel must have suffered <u>either</u> unconscionable injury <u>or</u> prejudicially changed his or her position as a result of his or her reliance on a promise. 57 N.Y. Jur. 2d Estoppel § 53; *see also Tierney v. Capricorn Investors, L.P.*, 189 A.D.2d 629, 632, 592 N.Y.S.2d 700, 704 (1st Dep't 1993). It is thus irrelevant whether plaintiff has alleged an unconscionable injury, where as here,

18

plaintiff has alleged a prejudicial change in his position.  Complaint, ¶¶ 93-101 (setting forth each

and every element of a promissory estoppel claim); *see also* Complaint, ¶¶ 1, 37, 38, 39, 40-44, 46,

47, 48, 51, 55, 57, and 67.  In reliance of the promises of the Parents, Dymtrow spent two-and-one-

half years working for Taylor and this, in itself, is a substantial change in position.  See Dymtrow

Declaration, ¶¶5, 7-9.

Defendants next argue that "the New York public policy of preserving the ability of infants to

disaffirm improvident contracts…prevents the use of a promissory estoppel claim to circumvent that

policy."  Def.'s Mot. Dismiss 14-15.  Defendants support this argument by referencing their previous

discussion of *Metropolitan Model* and General Obligations Law §3-107.  As explained above, neither

*Metropolitan Model* nor § 3-107 are applicable to this case.  Also, whether the contract was

"improvident" is a fact question that cannot be the subject of a dispositive motion.

Defendants incorrectly cite *Shapira v. Charles Schwab & Co.*, 225 F. Supp 2d 414 (S.D.N.Y.

2002) for the proposition that "New York law does not recognize promissory estoppel in the

employment context."  Def.'s Mot. Dismiss 15.  *Shapira* merely holds that "a prospective

employee…cannot sue an employer who reneges on a job offer or other employment promise on such

a theory."  225 F. Supp 2d at 419; *see also* 57 N.Y. Jur. 2d Estoppel § 51 (stating that no promissory

estoppel claim arises from a promise of employment inducing the promisee to leave his former

employment and forego the possibility of other employment).  Moreover, even if New York law were

to prohibit a claim for promissory estoppel in any employment context, such a rule of law would be

irrelevant here.  Plaintiff's promissory estoppel claim is asserted against <u>Andrea and Scott Swift only</u>.

There was no employment relationship between Dymtrow and Andrea and Scott Swift.  Any

employment relationship that may have existed[6] would have been between Dymtrow and Taylor

Swift.  Defendants "employment context" argument is thus completely misguided.

---

[6] Dymtrow does not concede that an employment relationship between him and Taylor existed.

### ii. An Accurate Statement of the Elements of the Causes of Action and Their Factual Predicate.

Dymtrow's complaint states a claim for promissory estoppel. The doctrine of promissory estoppel is intended to avoid the harsh results of allowing the promisor to repudiate, when the promisee has acted in reliance upon the promise. In order to assert a promissory estoppel claim, one must allege a clear and unambiguous promise; reasonable and foreseeable reliance by a party, and the party asserting the estoppel must be injured by his reliance. *King & Son v. De Santis Construction*, 97 Misc.2d 1063, 1066, 413 N.Y.S. 2d 78, 81 (Sup. Ct. NY Co. 1977).

Recovery under this theory is not dependent on the existence of a contract or the particulars of consideration in the classic sense. Promissory Estoppel arises out of a breached promise in circumstances under which it would be unfair to hold the promisor to the terms of his promise. *Lahr Constr. Corp. v. Kozel & Son, Inc.*, 168 Misc. 2d 759, 761-62, 640 N.Y.S. 2d 957, 959 (Sup. Ct. 1996). A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person, and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. *See id.*; *Restatement (Second) of Contracts* § 90.

Here, Dymtrow's complaint alleges every necessary element of a promissory estoppel claim. *See e.g.*, Complaint, ¶¶ 93-101 (setting forth each and every element of a promissory estoppel claim); *see also* Complaint, ¶¶ 1, 2, 11, 12, 14, 21, 22, 38, 39-45, 47, 48, 50, 68.

### D.    DYMTROW adequately pleads Estoppel in Pais.

Estoppel in pais is traditionally invoked to prevent the enforcement of rights which would ultimately work fraud or injustice if not invoked. *Christopher S. v. Ann Marie S.*, 173 Misc. 2d 824, 829, 662 N.Y.S. 2d 200, 203 (Fam. Ct. 1997). Equitable estoppel is a principle that is applied in the interest of fairness to preclude a party from <u>speaking against his own acts</u> which induced another, who reasonably relied on such words or conduct, and who would suffer injury if such conduct or

representations were allowed to stand. *Sandra S. v. Larry W.*, 175 Misc. 2d 122, 124, 667 N.Y.S. 2d 632, 634 (Fam. Ct. 1997).

The elements of equitable estoppel as to the party being estopped are:  an act constituting a concealment of facts or a false misrepresentation;  an intention or expectation that such acts will be relied upon;  actual or constructive knowledge of the true facts by the wrongdoer; and  reliance upon the misrepresentation which causes the innocent party to change its position to its substantial detriment. *Sterling v. Interlake Indus., Inc.*, 154 F.R.D. 579, 585 (E.D.N.Y. 1994).  There does not have to be an actual attempt to mislead. *Id.*  It is sufficient that the party being estopped knew or had reason to believe that their acts or inaction might prejudice the party asserting the estoppel. *Id.*

A party is equitably estopped from impeaching a transaction that he or she has considered to be valid. 57 N.Y. Jur. 2d Estoppel § 20.  Equitable estoppel applies even though the transaction was originally void or voidable. 57 N.Y. Jur. 2d Estoppel § 20. *Accord Feinstein v. Levy*, 121 A.D. 2d 499, 500, 503 N.Y.S. 2d 821, 822 (2d Dep't 1986); *Rothschild v. Title Guar. & Trust Co.*, 204 N.Y. 458, 464 (1912).  In fact, a person is not permitted to retain that part of an agreement which is beneficial to him and to repudiate that part which is to his disadvantage.  One may not accept the benefits of his own acts and refuse to be bound by these acts when they no longer seem favorable, especially where, by such acts, another person is injured. 57 N.Y. Jur. 2d Estoppel § 22.

Here, Dymtrow's complaint alleges every element of an estoppel in pais claim. *See e.g.,* Complaint at ¶¶38, 39, 45-47, 49, 50-52, 54-56, 60, 67, 75, 81, 97, 98.

Finally, defendants argue that: "Nowhere in the complaint is there an allegation that Taylor's parents *intended* that any false representation or concealment would be acted upon." Def.'s Mot. Dismiss 16-17 (emphasis in original).  However, "careless or culpable conduct is equivalent to an intent to deceive." 57 N.Y. Jur. 2d Estoppel § 10.  There is no requirement that there be an intent to deceive on the part of the party sought to be estopped.  The doctrine will be applied to prevent a party

from gaining an unconscionable advantage and it is immaterial that the party intended no wrong.

*Pub. Improvements, Inc. v. Bd. of Educ. of City of N.Y.*, 103 Misc. 2d 713, 717, 427 N.Y.S. 2d 156,

159 (Sup Ct. 1980).  An estoppel may arise under certain circumstances from silence or inaction or

from positive words or acts.  *Podolsky v. Narnoc Corp.*, 149 Misc. 2d 839, 841, 572 N.Y.S. 2d 618,

619 (Sup. Ct. 1991).

**E.      DYMTROW adequately pleads Tortious Interference.**

A person's business is property in the pursuit of which he is entitled to protection from

tortious interference by a third person.  *Sommer v. Kaufman*, 59 A.D. 2d 843, 843-44, 399 N.Y.S. 2d

7, 8 (1st Dep't 1977).  Interference with a business relationship not amounting to a contract is

actionable under certain circumstances.  *Id.*  The elements of a claim for tortious interference with

economic advantage are:  a prospective contractual relation or business with a third party;

defendants' interference with that relation;  defendant acted with the sole purpose of harming plaintiff

or used dishonest, unfair or improper means; and  injury to the plaintiff.  *G-I Holdings, Inc. v. Baron*

*& Budd*, 179 F. Supp. 2d 233, 253-54 (S.D.N.Y. 2001).

In a complaint for tortious interference with prospective business relations, there must be a

specific prospective relationship.  *Bus. Networks of N.Y., Inc. v. Complete Network Solutions, Inc.*,

265 A.D. 2d 194, 195, 696 N.Y.S. 2d 433, 435 (1st Dep't 1999).  In addition, a plaintiff must

demonstrate that "the defendant acted with the sole purpose of harming the plaintiff or that the

defendant used dishonest, unfair or improper or wrongful means."  *G-I Holdings, Inc.*, 179 F. Supp.

2d at 254; *see also Harden, S.P.A. v. Commodore Elec. Ltd.*, 90 A.D. 2d 733, 734, 455 N.Y.S. 2d

792, 794 (1st Dep't 1982).  The measure of damages is the loss suffered by the plaintiff, including the

opportunities for profits on business diverted from it through defendant's conduct.  *Duane Jones Co.*

*v. Burke*, 306 N.Y. 172, 197 (1954).

22

Here, Dymtrow's complaint alleges every element of a tortious interference claim. *See e.g.*, Complaint, ¶¶ 102-109 (setting forth each and every element of a tortious interference claim); *see also* Complaint, ¶¶ 38-45, 47-49, 50-56, 64, 68.

Defendants' reliance on *Lee v. Silver*, 262 A.D. 149, 28 N.Y.S. 2d 333 (1st Dep't 1941) is misplaced. In *Lee*, the infant's mother was sued under a theory that she maliciously induced her daughter to repudiate her contract with the plaintiff. 262 A.D. at 151, 28 N.Y.S. 2d at 335. *Lee* is distinguishable from this case because in *Lee* the infant's mother never signed a guarantee of the infant's contract and had no contractual obligation to the plaintiff. Here, Taylor Swift's parents did sign a Guarantee. *Lee* is also distinguishable in that the court carved out an exception to the rule against a person who maliciously induces (in *Lee* the mother "induced her daughter to repudiate and break the agreement") another to breach a contract by finding that public policy dictates that parents should have a right to <u>advise</u> their infant with regard to all matters. *Id.* We do not take issue with a parent's right to advise his or her infant. Rather, the allegations here focus on unlawful threats and misrepresentations made by Scott Swift to force Taylor to disaffirm the contract with Dymtrow. These threats fall far beyond the parental "advice" contemplated in *Lee*.

*Cohen v. Brunswick Record Corp.*, 31 Misc.2d 525, 221 N.Y.S. 2d 893 (NY Cty 1961), is also distinguishable for similar reasons. In *Cohen*, the court held that wrongful and malicious conduct for the purpose of inducing an infant to disaffirm a voidable contract was not actionable under a tortious interference claim. 31 Misc.2d at 526, 221 N.Y.S. 2d at 895. Here, the allegations asserted by Dymtrow focus on <u>threats</u> and misrepresentations made by Scott Swift to force Taylor to disaffirm the contract with Dymtrow. These threats fall far beyond the conduct alleged in *Cohen*. This analysis is supported by the *Cohen* court's statement that:

> The result would be different were the gravamen of the complaint the fraud or misrepresentation of the third party in inducing such disaffirmance as was held in *Rice v. Manley*. There the third party fraudulently misrepresented certain facts in inducing one of the contracting parties to walk away from his contractual obligations. The actionable wrong was

23

the fraud and misrepresentation and not the act of inducement.  This is not the situation herein, since nowhere in plaintiff's complaint is there an allegation of fraud or misrepresentation.

31 Misc.2d 527, 221 N.Y.S. 2d 896.

Finally, *E.R. Squibb & Sons v. Ira J. Shapiro, Inc.* is distinguishable for much the same reasons.  In *E.R. Squibb & Sons,* the court found that persuading one to exercise a lawful right does not amount to actionable conduct.  64 N.Y.S. 2d 368, 369-70 (Sup. Ct. 1945).  Here, Scott Swift made <u>threats</u> and misrepresentations to force Taylor to disaffirm the contract with Dymtrow.  Knowing of the imminent termination but nevertheless milking Dymtrow for information was also unconscionable.

**F.    DYMTROW adequately pleads HIS Breach of Implied Covenant of Good Faith and Fair Dealing CLAIMS.**

**i.  Defendants' Misstatement of the Law**

Defendants assert for the umpteenth time that *Metropolitan Model* holds that "any parental agreement used to circumvent New York's public policy of protecting minors from their own improvidence is void."  Def.'s Mot. Dismiss 21.  *Metropolitan Model* reaches no such conclusion. *Metropolitan Model* simply holds that when a minor's contract is unlawful and void *ab initio*, no cause of action can stand based on a parental guarantee of the minor's contract which is also void *ab initio*.  *Metropolitan Model*, 168 Misc. 2d at 327, 643 N.Y.S. 2d at 926.

Second, defendants once again assert that "parental guarantees of unapproved entertainment contracts <u>connected</u> in any way with New York are void under General Obligations Law § 3-107." Def.'s Mot. Dismiss 21 (emphasis added).  This too is a misstatement of law.  Section 3-107 voids a parental guarantee of an infant contract <u>only if</u> one of the two conditions expressly stated in the rule is satisfied.  As established above, neither condition is satisfied here and § 3-107 is not applicable.

**ii.  An Accurate Statement of the Elements of the Causes of Action and Their Factual Predicate.**

The implied covenant of good faith and fair dealing in the course of performance embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y. 2d 144, 153 (2002). While the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship, they do encompass any promises which a reasonable person would be justified in understanding were included. *Id.* It is the law that in every contract that there is an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part. *Wieder v. Skala*, 80 N.Y. 2d 628, 637 (1992). We submit that this obligation also applies to Scott Swift's failure to tell Dymtrow that the Artist would be avoiding the EMPA when he was eliciting information about concerning Dymtrow's future plans.

Good faith and fair dealing are required of all parties to a contract. *Lowe v. Feldman*, 11 Misc. 2d 8, 11, 168 N.Y.S. 2d 674, 680 (Sup. Ct. NY Co. 1957). Where one in good faith has acted upon an agreement, the other party may not repudiate it. *Id.* The obligation of good faith and fair dealing calls for fulfillment, without searching for excuses, however plausible they may be, for nonperformance. *Id.* Contracts are made to be enforced, not to be broken at the whim or caprice of a party thereto. *Id.* Here, Dymtrow's complaint alleges each and every element of a breach of the covenant of good faith and fair dealing claim. *See e.g.*, Complaint, ¶¶ 110-114.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss Dymtrow's Complaint must be denied in its entirety.

Respectfully submitted,

_____/S_____
Fernando M. Pinguelo, Esq. (FP6328)
**NORRIS, MCLAUGHLIN & MARCUS**
875 Third Avenue
18th Floor
New York, NY 10022

25