# EXHIBIT A

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern District of New York

DANIEL DYMTROW,

Plaintiff,

V.

TAYLOR SWIFT, SCOTT SWIFT, SCOTT BORCHETTA, BIG MACHINE RECORDS, LLC, and ANDREA SWIFT

Defendants.

## SUMMONS IN A CIVIL ACTION

CASE NUMBER: 1:07-cv-11277 (RJS)

TO: (Name and address of Defendant)

See Attached Addendum

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Fernando M. Pinguelo, Esq.
Norris, McLaughlin & Marcus, P.A.
875 Third Avenue - 18th Floor
New York, NY 10022

an answer to the complaint which is served on you with this summons, within 20 days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

DEC 2 3 2008

DATE

(By) DEPUTY CLERK

ADDENDUM TO SUMMONS

IN THE MATTER OF
DANIEL DYMTROW V. TAYLOR SWIFT, SCOTT SWIFT, SCOTT BORCHETTA, BIG MACHINE RECORDS, LLC., AND ANDREA SWIFT
CASE NO.: 1:07-cv-11277 (RJS)

The following Defendants are to be served individually with Summons and Complaint:

1. Scott Borchetta
   c/o Big Machine Records
   1219 16th Avenue South
   Nashville, Tennessee

2. Big Machine Records
   1219 16th Avenue South
   Nashville, Tennessee

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | |
|---|---|
| Service of the Summons and complaint was made by me[1] | DATE |
| NAME OF SERVER (*PRINT*) | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on ____________________ ________________________________
Date *Signature of Server*

________________________________
*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

**NORRIS, McLAUGHLIN & MARCUS, P.A.**
Fernando M. Pinguelo, Esq. (FP6328)
875 Third Avenue
18th Floor
New York, NY 10022
Phone: (212) 808-0700
Fax: (212) 808-0844

**GUPTA LEGAL, PLLC**
Vivek Gupta, Esq. (VG-9794)
14 East 4th Street, Suite 803
New York, New York 10012
Phone: (917) 686-4954
Fax: (646) 356-6901
Attorneys for Plaintiff
Daniel Dymtrow

RECEIVED
DEC 23 2008
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **DANIEL DYMTROW,** | : | **CIVIL ACTION** |
| | : | |
| Plaintiff, | : | HON. RICHARD J. SULLIVAN, U.S.D.J. |
| | : | |
| -against- | : | CIVIL ACTION NO. 1:07-cv-11277 (RJS) |
| | : | |
| **TAYLOR SWIFT, SCOTT SWIFT, SCOTT BORCHETTA, BIG MACHINE RECORDS, LLC, and ANDREA SWIFT.** | : | **PLAINTIFF'S AMENDED COMPLAINT** |
| | : | **AND JURY DEMAND** |
| | : | |
| | : | |
| Defendants. | : | |

DANIEL DYMTROW, by his attorneys, Norris, McLaughlin & Marcus, P.A. and Gupta Legal, PLLC, for his Amended Complaint against TAYLOR SWIFT, SCOTT SWIFT, SCOTT BORCHETTA, BIG MACHINE RECORDS, LLC, and ANDREA SWIFT, alleges as follows:

## NATURE OF THE ACTION

1. Daniel Dymtrow is a music industry personal manager who identifies, develops, and creates opportunities for artists to succeed in the music industry.

2. In early 2003, Mr. Dymtrow agreed to manage then thirteen-year-old Taylor Swift ("Taylor") when her parents and she persuaded him to represent Taylor. Mr. Dymtrow entered into agreements with Taylor, Taylor's father Scott Swift, and Taylor's mother Andrea Swift (collectively, the "Swifts").

3. During the course of Mr. Dymtrow and the Swifts' two-and-a-half-year management relationship, Mr. Dymtrow devoted a significant amount of his time towards planning Taylor's career; helping to sharpen her talent and skills; exposing her to career-building prospects through magazine notoriety and publicity and live performances with established and famous singers; and assisting in the creation, development, and selection of opportunities that promoted and advanced Taylor's image and career or otherwise created a demand for Taylor, including a music development/recording contract, music publishing contract, endorsement contract, talent agent contract, and a recording contract.

4. Mr. Dymtrow entered into two written contracts with the Swifts for his services. First, Mr. Dymtrow entered into the Exclusive Personal Management Agreement ("EPMA") with Taylor; and second, Taylor's parents, defendants Scott Swift and Andrea Swift (collectively, "Parents"), executed a second, separate agreement with Mr. Dymtrow in which they guaranteed and/or assumed the performance of all of Taylor's services and obligations set forth in the EPMA (hereinafter referred to as the "Guarantee").

5. The Swifts repudiated their agreements with Mr. Dymtrow weeks before signing a record contract and talent agent agreement in an attempt to deny Mr. Dymtrow his bargained-for

compensation for payment of the reasonable value of his services. In fact, Mr. Dymtrow has been paid less than $10,000 for the entirety of what he did to build and launch Taylor's career.

6. In this action against the defendants for restitution, unjust enrichment, breach of contract and implied covenant of good faith and fair dealing, promissory estoppel and estoppel in pais, and tortious interference, Mr. Dymtrow seeks simply to recover payment for services he rendered in representing Taylor. The Swifts' refusal to pay Mr. Dymtrow's commissions due and owing and the tortious conduct of Taylor's record label's founder and president, Scott Borchetta, has led him to file this action against defendants to recover monies promised and owed to him, but never paid.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between Mr. Dymtrow and Defendants, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and is based on contractual agreements that were negotiated and agreed to in New York, signed by at least one party in New York, and because a substantial part of the events giving rise to Mr. Dymtrow's claims occurred in this judicial district. Moreover, the relevant parties agreed that any action or other proceeding arising out of the contracts at issue would be brought in courts located within the State of New York.

## PARTIES

9. Daniel Dymtrow resides in Los Angeles, California and is a citizen of that state. When Mr. Dymtrow entered into the EPMA and the Guarantee with the Swifts, he resided and operated in an office in New York City.

10. Upon information and belief, defendant Taylor Swift resides in Hendersonville, Tennessee and is a citizen of that state.

11. Upon information and belief, defendants Scott Swift and Andrea Swift reside in Hendersonville, Tennessee and are citizens of that state. Scott and Andrea Swift are Taylor's parents and were Taylor's legal guardians prior to her reaching the age of majority.

12. Upon information and belief, defendant Scott Borchetta resides in Brentwood, Tennessee and is a citizen of that state.

13. Upon information and belief, defendant Big Machine Records, LLC ("Big Machine Records") is a limited liability company duly formed under the laws of Delaware. Borchetta formed Big Machine Records in 2005, and at all times relevant served as its President and CEO. Upon information and belief, Big Machine Records is headquartered at 1219 16th Avenue South, Nashville, Tennessee and conducts business in New York.

## STATEMENT OF FACTS

### A. Background

14. Mr. Dymtrow is a music industry personal manager who specializes in managing artistic talent. He has worked in the music business for over ten years and has managed some of the biggest names in the business, including Britney Spears.

15. In or about September 2002, Mr. Dymtrow met Kelly Foster, Entertainment Director of the U.S. Tennis Open, while attending the U.S. Tennis Open. In or about October 2002, Foster called Mr. Dymtrow and asked him whether she could send Mr. Dymtrow a demo

music CD of an aspiring, thirteen-year-old singer named Taylor Swift. Mr. Dymtrow agreed, and after listening to Taylor's demo CD of "cover songs," arranged to meet with Taylor and her Parents at his office in New York City.

16. In or about January 2003, Taylor and her Parents met Mr. Dymtrow in New York in the hopes of convincing Mr. Dymtrow to sign Taylor as one of his represented clients. At the time, Mr. Dymtrow worked almost exclusively for Britney Spears.

17. Mr. Dymtrow interviewed Taylor, heard her sing and play guitar, discussed with her Parents their financial and moral commitment to Taylor's music career, and concluded that Taylor had the potential to become a young star in the music world with the proper guidance and management.

18. Taylor's Parents knew that Taylor needed an experienced manager in order to give Taylor access to record companies. In fact, Taylor and her Parents attempted previously to manage Taylor's career themselves. Taylor's Parents told Mr. Dymtrow that they had sent her demo music CD of cover songs to various recording labels and attempted to visit them on their own in the hopes of securing a meeting with some music industry executives. Taylor's Parents told Mr. Dymtrow that Taylor was rejected by every music label she and her Parents pursued on their own, and they were told that they needed to hire a respected manager if they expected Taylor to advance in the music business.

19. As a result, the Swifts actively sought Mr. Dymtrow's services. The Swifts assured Mr. Dymtrow on multiple occasions that if he were to sign Taylor to an exclusive management contract, they would pay Mr. Dymtrow his fee for services to manage Taylor and present her with opportunities. The Swifts also promised Mr. Dymtrow that they would reward him for his efforts, treat him fairly, and protect his economic interests in representing Taylor.

Mr. Dymtrow relied upon these promises and performed his obligations in accordance with the terms of the EPMA based on those promises.

**B. Exclusive Personal Management Agreement & Contract Between Mr. Dymtrow and Taylor's Parents Guaranteeing Taylor's Obligations.**

20. In or about February 2003, Mr. Dymtrow, Taylor, and her Parents met in New York to discuss the basic terms and parameters of an exclusive personal management agreement, and a separate contract with Taylor's Parents guaranteeing Taylor's obligations as detailed in the contract.

21. The Swifts retained the services of noted entertainment attorney Vivien Lewit, Esq. who reviewed and negotiated the EPMA on behalf of the Swifts over the course of more than a year.

22. The EPMA was signed by Mr. Dymtrow, Taylor, and Taylor's Parents on or about April 5, 2004; but the EPMA was made effective as of March 25, 2003. Annexed as **EXHIBIT "A"** is a true and correct copy of the EPMA.

23. The EPMA provided, in pertinent part, that Mr. Dymtrow would receive a 20% commission on Taylor's gross income as a result of or in connection with Taylor's activities in the entertainment industry during the term of the agreement. It also provided that Mr. Dymtrow would receive between 5% and 10% commission for his participation in Taylor's gross income earned, received, or credited after the term of the contract in connection with Taylor's services and activities rendered or products created during, or after the term pursuant to contracts (oral or written) entered into or "substantially negotiated" during the term, including all renewals and extensions.

24. In addition to the EPMA, Taylor's Parents also negotiated and signed an agreement with Mr. Dymtrow whereby Taylor's Parents agreed to guarantee, absolutely and

unconditionally, Taylor's obligations and services detailed in the EPMA. Annexed as **EXHIBIT "B"** is a true and correct copy of the Parents' Guarantee.

**C. Mr. Dymtrow's Significant Efforts to Sharpen Taylor's Talent, Manage Her Career, and Develop Opportunities That Furthered Taylor's Success.**

25. Immediately after verbally agreeing to enter into the EPMA with Taylor and the Guarantee with her Parents (about a year before the agreements were signed), Mr. Dymtrow began performing his services as agreed. He focused Taylor's attention on improving her skills, worked to create a unique image for Taylor that the public would accept, and developed and coordinate opportunities that furthered Taylor's career, including a music development/recording contract with RCA Records which was entered into by Taylor during the term of his agreements with the Swifts.

26. At the time, and throughout the relationship, defendant Scott Swift gave his "word" on a "handshake" to Mr. Dymtrow that he would protect Mr. Dymtrow and ensure his financial stability with Taylor; and that Mr. Dymtrow would be paid. Scott Swift's promises were made verbally and confirmed in writing to Mr. Dymtrow. Scott Swift assured Mr. Dymtrow that there would be no reason to doubt the Swifts' commitments to him. Andrea Swift made similar promises.

27. Relying on the Swift's agreements, Mr. Dymtrow focused his efforts on Taylor's behalf. He arranged for consultants to help Taylor improve her skills (singing/vocal training, stage performance, branding/imaging/marketing, styling, etc.), encouraged Taylor to write her own songs, educated Taylor and her Parents about marketing, branding, and imaging to help develop a satisfactory press kit to present to music industry executives and for press/media coverage, arranged for media coverage, identified and coordinated a national marketing and advertising campaign with Abercrombie & Fitch, and scheduled and attended meetings with

recording companies in New York and Nashville (including Arista Records Nashville, BNA Records Label, Capitol Records Nashville, Dreamworks Nashville, Jive Records, RCA Records ("RCA"), Warner Brothers Records, and Warner Brothers Nashville).

28. Through Mr. Dymtrow's reputation in the music business and access to top-level music executives, he was able to secure many opportunities for Taylor. In fact, due in significant part to her young age, not one major record label would even meet with Taylor before Mr. Dymtrow agreed to represent her. Mr. Dymtrow initiated meetings with prominent members of the entertainment industry on behalf of Taylor in order to promote her career.

29. By way of example, Mr. Dymtrow's effort, vision, reputation, and contacts in the music, fashion, recording, television, and film industries enabled him to identify and coordinate the following opportunities for Taylor:

a. In or about April 2003, Mr. Dymtrow secured a performance for Taylor at the Florida Musical Festival. Mr. Dymtrow arranged for Taylor to perform on the single VIP stage alongside established artists and before major record label executives who attended the musical festival.

b. Within just a few months of entering into the EPMA, Mr. Dymtrow scheduled several showcase performances for Taylor in New York City venues and exposed her to several record label executives and music industry professionals.

c. Within six months of meeting Taylor, Mr. Dymtrow arranged meetings with executives from Warner Brother Records and Jive Records in New York, introduced Taylor to these executives, and arranged for her to showcase her talent and perform for them in person.

d. In or about June 2003, Mr. Dymtrow scheduled meetings for Taylor with executives of record labels, agents, and music publishers in Nashville and accompanied Taylor during a week-long showcase of Taylor's talent.

e. As a direct result of Mr. Dymtrow's efforts, persistence, and follow-up with various executives at RCA on behalf of Taylor, RCA offered Taylor an artist development recording contract. After extensive negotiations between RCA and Mr. Dymtrow and Taylor's attorneys, Taylor entered into a contract with RCA.

f. Mr. Dymtrow contacted RCA's A&R Department and requested a list of all of the publishers whom RCA planned on having Taylor meet. Mr. Dymtrow requested this information so that he could determine which publishing company best suited Taylor and met the goals and expectations Mr. Dymtrow and Taylor had set for Taylor.

g. On or about July 21, 2003, Mr. Dymtrow and Taylor met with the President of EMI Music Publishing to evaluate and review potential publishing opportunities for Taylor.

h. Mr. Dymtrow arranged for Taylor to perform at many venues including "America's Camp" (also known as "Rudy Giuliani's Camp"), and "Britney Spears' Camp for the Performing Arts" for two consecutive years. These venues enabled Taylor to perform alongside recognized performers, and exposed Taylor to these performers' fan bases.

i. In or about October 2004, Mr. Dymtrow developed and coordinated Taylor's Exclusive Songwriter Agreement with Sony/ATV Publishing

("Publishing Agreement") which secured for Taylor publishing rights to her music compositions. The Publishing Agreement was made effective November 1, 2004, but signed by Taylor and her Parents on January 20, 2005 which was during the term of Mr. Dymtrow's agreements with the Swifts. Annexed as **EXHIBIT "C"** is a true and correct copy of the Publishing Agreement.

30. In most of the public performances that Mr. Dymtrow arranged for Taylor, Taylor was usually the only featured "rising star." In other words, Mr. Dymtrow secured for Taylor the opportunity to perform alongside established artists who were already recognized in the music business. This enabled Taylor to establish herself as a serious musician and credible songwriter, and to be exposed to the audiences of established talent; thereby accelerating Taylor's ability to develop her own fan base.

31. Mr. Dymtrow's efforts transcended the music industry and included exposing Taylor to the fashion, television, and film industries; and he created opportunities for Taylor that contributed to her success. By way of example, Mr. Dymtrow's effort, vision, reputation, and contacts in the entertainment industry enabled him to secure the following opportunities for Taylor:

a. On or about April 4, 2004, Mr. Dymtrow secured for Taylor her appearance in the national Abercrombie & Fitch ("A&F") advertising campaign entitled "Rising Stars." Mr. Dymtrow's efforts enabled Taylor to participate in the A&F campaign without an audition. Mr. Dymtrow coordinated Taylor's involvement with the campaign in a way that showcased Taylor as a singer/songwriter/musician. Taylor's photograph

and biography appeared in A&F's Fall 2004 magazine. In addition, Taylor's photograph hung as a mural on A&F store walls across the country.

b. Taylor's participation in the A&F Rising Stars advertising campaign was developed and coordinated by Mr. Dymtrow, and memorialized in the Talent Services Agreement with Abercrombie and Fitch Merchandising & Design Co. ("A&F Agreement"). The A&F Agreement was executed by Taylor and Andrea Swift on or about April 24, 2004. Annexed as **EXHIBIT "D"** is a true and correct copy of the A&F Agreement.

c. In or about June 2004, Mr. Dymtrow developed and coordinated an opportunity for Taylor with Maybelline Cosmetics for its "Chicks With Attitude" music compilation CD. Taylor was the only country music artist featured on the CD. And, Mr. Dymtrow was able to arrange with Maybelline Cosmetics for the CD to contain one of Taylor's original songs and her photograph.

d. Mr. Dymtrow scheduled two screen tests for Taylor – one with Nickelodeon television, and one for 20th Century Fox's film Flicka, starring Tim McGraw.

e. In August and in October 2004, Taylor appeared in Vanity Fair magazine; and appeared in other magazine and newspaper articles about her throughout the period that Mr. Dymtrow managed her.

f. On or about November 1, 2004, Mr. Dymtrow arranged for Good Morning America to feature Taylor on its "Nashville Dreams" television program.

Taylor was an unsigned artist who was featured along with established artists. "Nashville Dreams" also aired on Delta Airlines' in-flight entertainment.

**D. Mr. Dymtrows' Significant Efforts to Develop and Coordinate a Recording Contract with Big Machine Records and a Talent Representation Contract with Creative Artists Agency for Taylor.**

32. Mr. Dymtrow "shopped" Taylor to major record labels including Capitol Records, Universal Music Group, Curb Records, and Warner Brothers Nashville; and invited executives from these labels, as well as other entertainment executives and professionals, to attend Taylor's showcase at the Blue Bird Café.

33. In or about October 2004, Mr. Dymtrow called and also invited Borchetta (who was the Executive Vice-President for Universal Music Group at the time) to Taylor's Blue Bird Café showcase, and arranged to set up a meeting with Borchetta before the showcase. Upon information and belief, Borchetta heard Taylor's music for the first time after Mr. Dymtrow arranged for a demo to be sent to him.

34. On or about November 1, 2004, Mr. Dymtrow traveled to Nashville to visit major record labels and attended Taylor's showcase at the Blue Bird Café. Mr. Dymtrow met with executives at Warner Brothers Nashville and Capitol Records, and with Borchetta and others to update them on Taylor's career and to discuss Taylor's potential and marketability and the prospect of a new record contract.

35. In or about late 2004/early 2005, Borchetta told Mr. Dymtrow he was leaving his position at Universal Music Group to start his own independent record label, and that Borchetta wanted Taylor and Mr. Dymtrow to be part of his plans.

36. On or about January 26, 2005, Mr. Dymtrow again met with Borchetta to discuss Borchetta's continuing interest in Taylor and Mr. Dymtrow's ideas and plans for making Taylor a star and signing her to a second record contract.

37. On or about March 7, 2005, Borchetta issued a press release stating that he was leaving Universal Music Group to start his own record label.

38. At or about that time, Mr. Dymtrow began coordinating terms and conditions of a record contract with Borchetta who, based on Mr. Dymtrow's efforts on behalf of Taylor, expressed the desire to sign Taylor to his new record label and offer her a lucrative record contract with Borchetta's new label Big Machine Records. These discussions between Mr. Dymtrow and Borchetta continued over the course of the next several months.

39. Mr. Dymtrow worked closely with Borchetta to ensure that Taylor would get the most favorable record contract terms. On several occasions Mr. Dymtrow and Borchetta discussed the contract terms and conditions in detail.

40. Upon information and belief, between in or about May and July 2005 Borchetta began orchestrating, implementing, and/or participating in a plan to interfere with Mr. Dymtrow's agreements and opportunities with the Swifts and improperly remove Mr. Dymtrow from his role as manager for Taylor and replace him with Borchetta or Scott Swift as manager(s) for Taylor.

41. At all relevant times, Borchetta knew of the Swifts' contractual obligations to Mr. Dymtrow under the EPMA, Guarantee, and other promises made to Mr. Dymtrow by the Swifts Upon information and belief, Borchetta and Big Machine Records tortiously interfered with the performance of contractual obligations under agreements between the Swifts and Mr. Dymtrow.

42. Also, Borchetta and Big Machine Records tortiously interfered with Mr. Dymtrow's prospective economic opportunity by orchestrating, implementing, and/or participating in a plan improperly to remove Mr. Dymtrow from his role as manager for Taylor and replace Mr. Dymtrow with Borchetta and/or Scott Swift as manager(s) for Taylor.

43. On or about July 12, 2005, Scott Swift told Mr. Dymtrow that Scott Swift was terminating the professional relationship with Mr. Dymtrow. On or about August 1, 2005 Taylor, through her lawyer, sent a letter disaffirming the EPMA with Mr. Dymtrow.

44. Upon information and belief, Scott Swift and/or Borchetta held up the signing of the Big Machine Records record contract until after Taylor disaffirmed the EPMA with Mr. Dymtrow in order to deprive Mr. Dymtrow of his just compensation.

45. Upon information and belief, Taylor signed her record contract with Big Machine Records within a few weeks after Taylor disaffirmed the EPMA with Mr. Dymtrow.

46. Before the EPMA was disaffirmed, Mr. Dymtrow explored and pursued talent agency opportunities for Taylor, including opportunities with Creative Artists Agency's ("CAA") Nashville and Los Angeles offices.

47. In particular, Mr. Dymtrow explored opportunities to convince CAA to represent Taylor. To that end, Mr. Dymtrow met with CAA executives on several occasions; and with defendants' knowledge and encouragement, discussed CAA's representation of Taylor. These discussions occurred at or about the same time that Mr. Dymtrow was coordinating Taylor's record contract with Borchetta and Big Machine Records.

48. Mr. Dymtrow worked closely with CAA to ensure that CAA would agree to represent Taylor as her agent. Mr. Dymtrow and CAA executives discussed the contract terms and conditions.

49. In addition, Mr. Dymtrow arranged for CAA to give Taylor the exclusive Nancy Drew film script for Taylor to read for a possible role in the film.

50. In June 2005, CAA offered to sign Taylor as its client.

51. Upon information and belief, Scott Swift and/or Borchetta held up the signing of the CAA contract until after the EPMA was disaffirmed in order to deprive Mr. Dymtrow of his just compensation.

52. Upon information and belief, Taylor signed her talent contract with CAA within a few weeks after Taylor disaffirmed the EPMA with Mr. Dymtrow.

53. During the period of negotiations with Big Machine Records and CAA (and prior to the disaffirmation), the Swifts and Borchetta encouraged Mr. Dymtrow to continue to be in contact with Borchetta and CAA and to coordinate with them the best contract terms for Taylor. Defendants constantly assured Mr. Dymtrow (both verbally and in writing) that they recognized and appreciated his efforts on behalf of Taylor and that they would continue to support him and his efforts to maximize Taylor's potential and manage her career. The Swifts assured Mr. Dymtrow they would protect his interests and reward his efforts in accordance with the EPMA.

54. In fact, Scott Swift exemplified his promise of a long-term relationship with Mr. Dymtrow in several ways, including by seeking to procure an insurance policy on the life of Mr. Dymtrow for the benefit of the Swifts.

**E. Defendant Scott Swift's Interference With the EPMA Its Resultant Disaffirmance, and Economic Opportunities.**

55. Between in or about May and July 2005, Scott Swift began to systematically and wrongfully discredit Mr. Dymtrow's efforts on behalf of Taylor, and interfere with Mr. Dymtrow's management of Taylor, including threatening Taylor to disaffirm her EPMA with

Mr. Dymtrow, or else lose all economic support from him for her career, and by other unlawful conduct.

56. Scott Swift engaged in a concerted effort to create a division between Mr. Dymtrow and Taylor so as to deprive Mr. Dymtrow of the benefits of the EPMA with the intent to deprive Mr. Dymtrow of the compensation to which he was justly and equitably entitled.

57. Before termination, Scott Swift requested of Mr. Dymtrow and obtained Mr. Dymtrow's plans and goals for Taylor and contacts he was relying on to continue Taylor's success. Scott Swift did this to obtain leads from Mr. Dymtrow without compensating him for same.

58. For example, on or about July 5, 2005 (and prior to disaffirmation), Scott Swift demanded that Mr. Dymtrow immediately draft approximately nine (9) different business plans to chart the course of Taylor's career for the next few years.

59. On or about July 8, 2005, Mr. Dymtrow gave Scott Swift an outline of expected milestones for Taylor's career in response to Scott Swift's July 5th demand. That same day and at Scott Swift's insistence, Mr. Dymtrow discussed with Scott Swift a breakdown of the deal points that were discussed with Borchetta, and the ideal contract terms that Mr. Dymtrow thought would benefit Taylor.

60. Upon information and belief, Scott Swift intended that Mr. Dymtrow would be terminated as manager and denied the benefits of Mr. Dymtrow's agreements with Taylor. Moreover, Scott Swift used Mr. Dymtrow's efforts to further negotiate on behalf of Taylor opportunities coordinated by Mr. Dymtrow.

61. Upon information and belief, defendant Scott Swift used all of the information provided by Mr. Dymtrow to defendants' economic advantage.

62. On or about July 11, 2005, Mr. Dymtrow and Borchetta scheduled meeting times for Mr. Dymtrow's trip to Nashville the following day for what Mr. Dymtrow thought was to further discuss and finalize the terms of the Big Machine Records record contract.

63. Mr. Dymtrow arrived in Nashville the following day and was driven to the Swift's home, as was typical. Mr. Dymtrow had several meetings scheduled during the trip, including meetings with Borchetta, CAA, and Sony/ATV.

64. Despite Mr. Dymtrow's scheduled meeting with Sony/ATV, Scott Swift informed Mr. Dymtrow that Mr. Dymtrow was not permitted to attend the Sony/ATV meeting. Scott Swift and Taylor then attended the meeting with Sony/ATV. After Scott Swift and Taylor returned from their meeting with Sony/ATV, Mr. Dymtrow questioned Scott Swift as to why he was not permitted to attend the meeting that he had scheduled; and Scott Swift, in the presence of Andrea Swift (Taylor was in her bedroom at the time), told Mr. Dymtrow that Scott Swift was terminating their professional relationship with Mr. Dymtrow. Upon information and belief, Borchetta was involved with the plan to terminate Mr. Dymtrow's relationship with the Swifts.

65. Scott Swift said the termination would be temporary for the next few months. Scott Swift explained to Mr. Dymtrow that Scott Swift would assume the role of manager of Taylor from that point on and handle the management duties for Taylor, and that Taylor would seek Mr. Dymtrow's services in the future as needed.

66. Scott Swift explained that the reason for the termination was because the Swifts had expected that Mr. Dymtrow would move to Nashville to be close to Taylor; and since Mr. Dymtrow would not do that, Scott Swift needed to terminate Mr. Dymtrow's services.

67. After his termination, Andrea Swift and Taylor asked Mr. Dymtrow to have dinner with them so that they could explain what had just happened. During the drive to the

restaurant, Taylor informed Mr. Dymtrow that she did not want to terminate her relationship with Mr. Dymtrow but that her father threatened her and that she would have to "choose between [her] father and [Mr. Dymtrow]."

68. Andrea Swift confirmed what Taylor told Mr. Dymtrow. Both Taylor and Andrea Swift blamed Scott Swift for forcing the termination of Mr. Dymtrow upon them.

69. Sometime in or about this time, Taylor confided in Mr. Dymtrow that Scott Swift and Borchetta met alone on a few occasions without notifying Mr. Dymtrow.

70. On or about August 1, 2005 Taylor, through her lawyer, sent a letter disaffirming the EPMA with Mr. Dymtrow.

71. Upon information and belief, defendants intended to gain the benefit of Mr. Dymtrow's services without compensating him in accordance with the EPMA.

72. At no time did defendants offer to compensate Mr. Dymtrow for unpaid services he rendered to Taylor, despite demands for same made by Mr. Dymtrow.

73. Scott Swift wrongfully interfered with Taylor's professional relationship with Mr. Dymtrow.

74. Although Big Machine Records has assigned a "manager" to Taylor, upon information and belief, defendant Scott Swift and/or Borchetta remain Taylor's *de facto* exclusive personal managers to this day.

75. Upon information and belief, Taylor does not pay an industry-standard 20% exclusive personal manager commission to a personal manager.

E. **Borchetta's and Big Machine Records' Interference With the EPMA, the Parents' Guarantee, oral and written promises made to Mr. Dymtrow by the Swifts, and Economic Opportunities.**

76. Between in or about May and July 2005, Borchetta began to systematically and wrongfully discredit Mr. Dymtrow's efforts on behalf of Taylor, and interfere with Mr. Dymtrow's management of Taylor.

77. Borchetta engaged in a concerted effort to create a division between Mr. Dymtrow and the Swifts so as to deprive Mr. Dymtrow of the benefits of the EPMA, the Parents' Guarantee, and of oral and written promises made to him by the Swifts, with the intent to deprive Mr. Dymtrow of the compensation to which he was justly and equitably entitled.

78. Upon information and belief, defendant Borchetta used all of the information about Taylor provided by Mr. Dymtrow to Borchetta's and Big Machine Records' economic advantage.

79. On or about July 11, 2005, Mr. Dymtrow and Borchetta scheduled meeting times for Mr. Dymtrow's trip to Nashville the following day for what Mr. Dymtrow thought was to further discuss and finalize the terms of the Big Machine Records record contract and to conduct several meetings with CAA and Sony/ATV.

80. Upon information and belief, between in or about May and July 2005, Borchetta began to systematically and wrongfully discredit Mr. Dymtrow's efforts on behalf of Taylor, and interfere with Mr. Dymtrow's management of Taylor and Mr. Dymtrow's agreements with the Swifts.

81. Upon information and belief, Borchetta intended to gain the benefit of Mr. Dymtrow's services without compensating him.

82. Borchetta wrongfully interfered with Taylor's professional relationship with Mr. Dymtrow.

## AS FOR THE FIRST CAUSE OF ACTION
**(Taylor Swift, Scott Swift, and Andrea Swift)**
**(Unjust Enrichment – Quasi Contract – Quantum Meruit – Restitution)**

83. Mr. Dymtrow incorporates by reference all paragraphs of this Amended Complaint, as if fully set forth herein.

84. A professional relationship existed between Taylor and Mr. Dymtrow and Parents and Mr. Dymtrow, whereby Mr. Dymtrow was to perform managerial services for Taylor and Parents in exchange for compensation in accordance with the terms of the EPMA and Guarantee.

85. From in or about early 2003 to in or about July 2005, Mr. Dymtrow performed managerial services for Taylor and Parents in accordance with the terms of the EPMA and in reliance of the Parent's Guarantee, for their benefit, with the mutual understanding that Mr. Dymtrow would be compensated for his work. At the time that the services were performed and provided by Mr. Dymtrow, defendants knew that Mr. Dymtrow was performing such services and encouraged such performance, and that he expected to be paid for same.

86. Over the course of a two-and-one-half-year period, the Swifts encouraged Mr. Dymtrow to continue to engage in significant efforts to further the career and reputation of Taylor and repeatedly told him that he would be justly compensated in accordance with the terms of the EPMA and the Parents' Guarantee for those efforts and that his interests under the EPMA and the Parents' Guarantee would be protected.

87. Defendants have benefited and been enriched from Mr. Dymtrow's efforts in furtherance of Taylor's career and fame, and the circumstances make it unjust, in equity and in

good conscience, for the defendants to profit from the use of Mr. Dymtrow's efforts without just compensation.

88. Mr. Dymtrow advised, guided, supervised, negotiated, and assisted in the creation, development, and selection of opportunities and helped coordinate agreements entered into by Taylor before Taylor terminated her management relationship with him, including the Sony/ATV publishing contract and the music development/recording contract with RCA Records.

89. Also, Mr. Dymtrow was the efficient producing cause of various agreements entered into by Taylor after Taylor terminated his management relationship with her, including the Big Machine Records contract and the CAA Agent contract.

90. While Taylor may have had a right to disaffirm the EPMA, Mr. Dymtrow is entitled to the benefit of his efforts, and defendants can not be unjustly enriched. Mr. Dymtrow is entitled to restitution from defendants for the benefits they derived from Dymtrow's efforts before Taylor disaffirmed her contract with Mr. Dymtrow. Mr. Dymtrow is entitled to the reasonable value of services as set forth in the EPMA. Mr. Dymtrow is entitled to quantum meruit.

91. Mr. Dymtrow fully performed any and all of his obligations under various oral and written agreements and was the efficient producing cause of Taylor's various agreements.

92. Defendants have failed to compensate Mr. Dymtrow for the reasonable value of his services, despite demand for payment of same or to provide restitution.

93. Had Mr. Dymtrow not been occupied with efforts to promote and advance Taylor and her Parents, he would have directed those efforts, time, and energy profitably on behalf of other clients.

94. As a direct and proximate result of Defendants' conduct, Mr. Dymtrow has been damaged and he is entitled to quantum meruit reasonably due for his services.

**AS FOR THE SECOND CAUSE OF ACTION**
**(Andrea Swift and Scott Swift)**
**(Breach of Contracts)**

95. Mr. Dymtrow incorporates by reference all paragraphs of this Amended Complaint as if fully set forth herein.

96. Defendants Andrea Swift and Scott Swift negotiated and entered into a valid and binding contract with Mr. Dymtrow wherein they agreed to guarantee, absolutely and unconditionally, the performance by Taylor of all of Taylor's obligations as expected and as set forth in the EPMA, to indemnify and hold Mr. Dymtrow harmless from any act, error, or omission of Taylor in the performance of Taylor's services under the EPMA, and to assume all financial obligations Taylor owed and would have owed to Mr. Dymtrow under the agreements.

97. In addition, defendants Andrea Swift and Scott Swift made verbal promises to Mr. Dymtrow that they would protect Mr. Dymtrow and ensure his financial stability with Taylor; and that Mr. Dymtrow would be paid for his services.

98. In exchange for defendants Andrea Swift's and Scott Swift's Guarantee and other promises that they would compensate Dymtrow for his services as agreed and as set forth in the EPMA, Mr. Dymtrow agreed to act as Taylor's manager and engage in efforts to advance Taylor's career, including the use of Mr. Dymtrow's proprietary business contacts and connections to secure for Taylor the many opportunities to promote her image and music that Mr. Dymtrow secured for her.

99. The Parents' Guarantee and other promises constitute binding contracts supported by good and valuable consideration.

100. Mr. Dymtrow advised, guided, supervised, negotiated, and assisted in the creation, development, and selection of opportunities and helped coordinate agreements entered into by Taylor before Taylor terminated her management relationship with him, including the Sony/ATV publishing contract and the music development/recording contract with RCA Records.

101. Also, Mr. Dymtrow was the efficient producing cause of various agreements entered into by Taylor after Taylor terminated his management relationship with her, including the Big Machine Records contract and the CAA Agent contract.

102. Upon information and belief, within a few weeks of disaffirming the EPMA, Taylor executed a record contract with Big Machine Records, a contract with CAA, and other contracts each of which were initiated by and coordinated through Mr. Dymtrow, with materially similar terms.

103. Despite Mr. Dymtrow demands, Defendants thereafter failed and refused to pay Mr. Dymtrow his percentage gross income of these contracts, and these commission fees are due and owing to Mr. Dymtrow.

104. In 2005, defendants purported to terminate the EPMA and Parents' Guarantee without paying Mr. Dymtrow his percentage of other monies due and owing to him. Defendants' purported termination constituted a separate material breach of the Parents' agreements.

105. Mr. Dymtrow has complied with his obligations under the EPMA, the Parents' Guarantee, and other promises the Parents made to him.

106. As a result of Defendants Andrea Swift and Scott Swift's breaches of the Parent's Guarantee and other promises the Parents made to him, Mr. Dymtrow has been damaged in an amount to be determined at trial, plus interest.

**AS FOR THE THIRD CAUSE OF ACTION**
**(Andrea Swift and Scott Swift)**
**(Promissory Estoppel and Estoppel in Pais)**

107. Mr. Dymtrow incorporates by reference all paragraphs of this Amended Complaint as if fully set forth herein.

108. Defendants Andrea Swift and Scott Swift clearly and unambiguously promised, in words and in action, to guarantee that Taylor would perform as expected and as set forth in the EPMA; and never to engage in any course of conduct that would encourage and/or suggest to Taylor that she should disaffirm the EPMA.

109. Defendants Andrea Swift and Scott Swift promised Mr. Dymtrow that they would protect Mr. Dymtrow's economic interests and guarantee that Taylor would perform as expected and set forth in the EPMA, and assume all financial obligations Taylor owed and would have owed to Mr. Dymtrow under the agreements.

110. Defendants Andrea Swift and Scott Swift reemphasized their promises to guarantee that Taylor would perform as expected and set forth in the EPMA; and promised to never engage in any course of conduct that would encourage and/or suggest to Taylor that she should disaffirm the EPMA.

111. Defendants Andrea Swift and Scott Swift's statements and actions, including the foregoing statements and actions, have led Mr. Dymtrow to believe that they promised to guarantee that Taylor would perform as expected and set forth in the EPMA; and to never engage in any course of conduct that would encourage and/or suggest to Taylor that she should disaffirm the EPMA, and led Mr. Dymtrow to conduct his business and efforts on the basis of such belief.

112. Defendants Andrea Swift and Scott Swift falsely represented and/or concealed their relationship with Borchetta and their efforts to work with Borchetta to deny Mr. Dymtrow's rights and compensation under the agreements Mr. Dymtrow had with the Swifts.

113. Defendants Andrea Swift and Scott Swift intended that their false representations and/or concealment would be acted upon by Mr. Dymtrow.

114. Mr. Dymtrow reasonably relied in good faith on defendants Andrea Swift and Scott Swift's promises and conduct; and in such a manner as to change his position for the worse, including by expending substantial efforts over nearly two-and-one-half years in building, managing, and maintaining Taylor's career and success.

115. Mr. Dymtrow suffered unconscionable injury and/or a substantial change in his circumstances as a result of Andrea's and Scott Swift's promises and conduct.

116. The application and attendant consequences of the preclusion caused detriment to a wholly innocent person.

117. The Parents are thereby precluded from asserting rights which might have otherwise existed at law and in equity.

118. The Parents' breach of their promises while obtaining the benefits of Mr. Dymtrow's efforts should equitably estop them from denying to Mr. Dymtrow the benefit of his efforts. Mr. Dymtrow is entitled to the benefit of his bargain based on estoppel theories.

**AS FOR THE FOURTH CAUSE OF ACTION**
**(Scott Swift, Scott Borchetta, and Andrea Swift)**
**(Tortious Interference)**

119. Mr. Dymtrow incorporates by reference all paragraphs of this Amended Complaint as if fully set forth herein.

120. Mr. Dymtrow had an ongoing business relationship with Taylor and advised, guided, supervised, negotiated, and assisted in the creation, development, and selection of opportunities that promoted and advanced Taylor's image and career or otherwise created a demand for Taylor.

121. Defendants Scott and Andrea Swift and Borchetta were at all relevant times aware of such relationships and opportunities.

122. Defendants Scott's and Andrea Swift's and Borchetta's activities and inducements of Taylor to disaffirm her EPMA had been undertaken intentionally, willfully, and/or with malice or through the use of dishonest, unfair, or improper means. These actions, including threats by Scott Swift of ending all economic support of Taylor and by other unlawful conduct, are illegal and have wrongfully interfered and continue to interfere with Mr. Dymtrow's business relationships and opportunities related to Taylor.

123. Defendants Scott and Andrea Swift and Borchetta were well aware that harm to Mr. Dymtrow would proximately result from their actions.

124. Defendants Scott and Andrea Swift and Borchetta intentionally procured Taylor's breach of the EPMA by encouraging and inducing Taylor's refusal to perform under the EPMA, or otherwise terminate or breach the EPMA.

125. Defendants Scott's and Andrea Swift's and Borchetta's actions were done to harm Mr. Dymtrow and/or were done by dishonest or unfair means. Their actions were willful, malicious and/or fraudulent.

126. Mr. Dymtrow has been damaged as a direct result of Defendants Scott's and Andrea Swift's and Borchetta's tortious conduct in an amount to be proved at trial, exclusive of interest and punitive damages.

127. Taylor would not have disaffirmed the EPMA as she did were it not for Defendants Scott's and Andrea Swift's and Borchetta's willful and wrongful interference.

**AS FOR THE FIFTH CAUSE OF ACTION**
**(Scott Borchetta and Big Machine Records)**
**(Tortious Interference)**

128. Mr. Dymtrow incorporates by reference all paragraphs of this Amended Complaint as if fully set forth herein.

129. Mr. Dymtrow had an ongoing business relationship and agreements with Scott and Andrea Swift whereby he advised, guided, supervised, negotiated, and assisted in the creation, development, and selection of opportunities that promoted and advanced Taylor's image and career or otherwise created a demand for Taylor.

130. Defendants Borchetta and Big Machine Records were at all relevant times aware of such relationships, opportunities, and agreements.

131. Defendants Borchetta's and Big Machine Records' activities, interference, and inducements of Scott and Andrea Swift to repudiate their agreements with Mr. Dymtrow had been undertaken intentionally, willfully, and/or with malice or through the use of dishonest, unfair, or improper means.

132. These actions wrongfully interfered and continue to interfere with Mr. Dymtrow's agreements, business relationships, and opportunities related to Taylor and her Parents.

133. Defendants Borchetta and Big Machine Records were well aware that harm to Mr. Dymtrow would proximately result from their actions.

134. Defendants Borchetta and Big Machine Records intentionally procured Taylor's Parents' breach of the Guarantee and other promises to Mr. Dymtrow by encouraging and inducing Taylor's Parents refusal to perform under these agreements, or otherwise terminate or breach these agreements.

135. Defendants Borchetta's and Big Machine Records' actions were done to harm Mr. Dymtrow and/or were done by dishonest or unfair means. Their actions were willful, malicious and/or fraudulent.

136. Mr. Dymtrow has been damaged as a direct result of Defendants Borchetta's and Big Machine Records' tortious conduct in an amount to be proved at trial, exclusive of interest and punitive damages.

137. Taylor's Parents would not have refused to perform under these agreements, or would have not otherwise terminated or breached these agreements as they did were it not for Defendants Borchetta's and Big Machine Records' conduct and willful and wrongful interference.

**AS FOR THE SIXTH CAUSE OF ACTION**
**(Scott Borchetta and Big Machine Records)**
**(Unjust Enrichment)**

138. Mr. Dymtrow incorporates by reference all paragraphs of this Amended Complaint, as if fully set forth herein.

139. From in or about early 2003 to in or about July 2005, Mr. Dymtrow performed managerial services for Taylor in accordance with the terms of the EPMA. At the time that the services were performed and provided by Mr. Dymtrow, Borchetta and Big Machine Records knew that Mr. Dymtrow was performing such services.

140. Mr. Dymtrow introduced Borchetta to the Swifts and negotiated for the Swifts before Borchetta left Universal.

141. Borchetta dealt with and recognized Mr. Dymtrow as Taylor's manager when Mr. Dymtrow introduced Borchetta to the Swifts.

142. Borchetta and the Swifts then conspired to have Taylor disaffirm the EMPA and have the Swifts bypass Mr. Dymtrow and their obligations to Mr. Dymtrow in signing the Big Machine record contract.

143. Borchetta and the Swifts then diverted the compensation from which Mr. Dymtrow would have been entitled.

144. Defendants have benefited and been enriched from Mr. Dymtrow's efforts in furtherance of Taylor's career and fame, and the circumstances make it unjust, in equity and in good conscience, for the defendants to profit from the use of Mr. Dymtrow's efforts without just compensation.

145. Mr. Dymtrow advised, guided, supervised, negotiated, and assisted in the creation, development, and selection of opportunities and helped coordinate agreements entered into by Taylor before Taylor terminated her management relationship with him, including the Sony/ATV publishing contract and the music development/recording contract with RCA Records.

146. Also, Mr. Dymtrow was the efficient producing cause of various agreements entered into by Taylor after Taylor terminated his management relationship with her, including the Big Machine Records contract and the CAA Agent contract.

147. While Taylor may have had a right to disaffirm the EPMA, Mr. Dymtrow is entitled to the benefit of his efforts, and defendants can not be unjustly enriched. Mr. Dymtrow is entitled to restitution from defendants for the benefits they derived from Dymtrow's efforts before Taylor disaffirmed her contract with Mr. Dymtrow. Mr. Dymtrow is entitled to the reasonable value of services as set forth in the EPMA.

148. As a direct and proximate result of Defendants' conduct, they have been unjustly enriched.

**AS FOR THE SEVENTH CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Scott Swift and Andrea Swift)**

149. Mr. Dymtrow incorporates by reference all paragraphs of this Amended Complaint as if fully set forth herein.

150. The Parents' Guarantee and other promises the Parents made to Mr. Dymtrow were valid and enforceable contracts.

151. The covenant of good faith and fair dealing is implied in every contract.

152. The covenant of good faith and fair dealing inherent in the Parents' Guarantee and other promises the Parents made to Mr. Dymtrow barred Andrea and Scott Swift from threatening, encouraging, and/or inducing Taylor's refusal to work with Mr. Dymtrow and her disaffirmation of the EPMA.

153. By reason of the Parents wrongful acts and conduct, including encouraging and inducing Taylor's refusal to work with Mr. Dymtrow, Andrea and Scott Swift breached that covenant, and therefore committed a material breach of the Parents' Guarantee and other promises they made to Mr. Dymtrow.

154. Andrea and Scott Swift breached the covenant of good faith and fair dealing and unfairly frustrated the agreed common purposes of the EPMA, the Parents' Guarantee, and other promises made to Mr. Dymtrow, disappointed Mr. Dymtrow's reasonable expectations from those agreements; and thereby deprived Mr. Dymtrow of the benefits of those agreements.

155. As a result of the Parent's breaches of the implied covenant of good faith and fair dealing, Mr. Dymtrow has been damaged in an amount to be determined at trial, plus interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff DANIEL DYMTROW demands judgment against defendants TAYLOR SWIFT, SCOTT SWIFT, SCOTT BORCHETTA, BIG MACHINE RECORDS, LLC, and ANDREA SWIFT, jointly and severally, as follows:

1. For compensatory, consequential, and incidental damages against all defendants according to proofs at trial and interest;

2. For punitive damages against Scott Swift, Andrea Swift, Scott Borchetta, and Big Machine Records, LLC in an amount to be determined at trial;

3. For an accounting of any and all Taylor Swift's past and future gross income from any and all contracts entered into or negotiated during the term of Mr. Dymtrow's Exclusive Personal Management Agreement with Taylor Swift;

4. For reasonable attorneys' fees and costs of suit incurred in connection with this commencement and prosecution of this action; and

5. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Mr. Dymtrow hereby respectfully requests that this action be tried before a jury.

Dated: New York, New York
December 22, 2008

NORRIS, McLAUGHLIN & MARCUS, P.A.

By [signature]
Fernando M. Pinguelo, Esq. (FP6328)
875 Third Avenue
18th Floor
New York, NY 10022
Telephone: (212) 808-0700
Facsimile: (212) 808-0844

Vivek V. Gupta, Esq. (VG-9794)
GUPTA LEGAL, PLLC
14 E. 4th Street, Suite 803
New York, New York 10012
Telephone: (917) 686-4954
Facsimile: (646) 356-6901
Attorneys for Plaintiff
Daniel Dymtrow

Dated: December 22, 2008
New York, New York