**"EXHIBIT C"**

EXCLUSIVE SONGWRITER AGREEMENT

SONY/ATV SONGS LLC, doing business as
TREE PUBLISHING CO.
8 Music Square West
Nashville, Tennessee 37203

Dated: November 1, 2004

Ms. Taylor Swift
173 Inlet Drive
Hendersonville, Tennessee 37075

Dear Ms. Swift:

When you sign below under the words "CONSENTED AND AGREED TO," and we sign below under the words "Very truly yours," the following will constitute a binding agreement between you and us:

1. GRANT OF RIGHTS

1.1 You hereby grant, transfer and assign to us, throughout the world, in perpetuity, but subject to paragraphs 14 and 15 below, an undivided ninety percent (90%) interest in and to (i) all of the musical works heretofore created by you, alone or in collaboration with others including, but not limited to, the musical works identified on Exhibit 1.1 annexed hereto and made a part hereof, and (ii) all of the musical works created by you, alone or in collaboration with others, during the term of this agreement (all musical works encompassed within clauses (i) and (ii) of this sentence being hereinafter referred to collectively, to the extent of your authorship interest therein, as "Said Works,") all copyrights at any and all times secured or existing therein, all rights and interests under copyright of whatsoever nature or description therein and thereto, whether now or hereafter known or in existence, and all renewals, extensions and reversions of all copyrights therein. Without limiting the generality of the preceding sentence, it is specifically understood that the rights granted by you to us in respect of Said Works include, but are not limited to, the sole and exclusive rights, throughout the world, in perpetuity, but subject to paragraph 15 below, to exercise, license and administer all rights and interests of whatsoever kind or nature in respect of Said Works, and to collect any and all monies, royalties and fees derived from the exercise of all rights and interests therein, excluding only the so-called "writer's share" of royalties payable and becoming payable by performing rights societies on account of public performances of Said Works and, if applicable, other royalties then customarily paid directly to composers by performing rights societies ("Writer Performance Royalties").

1.2 You covenant to make and deliver to us completed manuscripts or recordings of each of Said Works created (i) during the Term of this agreement,

promptly after the creation thereof, and (ii) prior to the execution of this agreement, when you sign this agreement, and to simultaneously execute and deliver to us an assignment thereof in the form of Exhibit 1.2 annexed hereto and made a part hereof.

1.3 Notwithstanding the foregoing, we shall not, nor shall we authorize anyone else to (i) change the basic melody or fundamental character of Said Works (but we always shall have the right to authorize the translation of the lyrics of Said Works into languages other than English), (ii) synchronize a recording of Said Works with the visual images of "unrated" motion pictures or motion pictures rated "X" or "NC-17," (iii) use Said Works in advertisements for political candidates or causes, religious causes, or alcohol, tobacco or sensitive personal hygiene products, (iv) create dramatic works based upon the lyrics of Said Works, or (v) authorize the mechanical reproduction of any of Said Works on phonorecords in the United States in consideration of a royalty less than we customarily receive under the applicable circumstances, without your prior consent unless (x) we shall have been unable to communicate with you for the purpose of obtaining such consent after making a good faith effort to do so (such effort to include, but not be limited to, communication by written notice as provided in paragraph 13.7 below); or (y) we are able to communicate with you for such purpose, but we shall not have received your written response within ten (10) days after the day such communication shall have occurred.

1.4 Upon your request, we shall accede to the terms of a so-called "controlled composition" clause authorizing a phonorecord manufacturer to mechanically reproduce phonorecords of your recorded performances of Said Works in the United States for a royalty equal to seventy-five percent (75%) of the then current so-called "compulsory mechanical royalty" provided under regulations promulgated pursuant to the United States Copyright Law, and otherwise promote and exploit such phonorecords, provided that the terms of that clause are consistent with then current industry practices as they apply to a recording artist of your stature.

## 2. TERM

2.1 The term of this agreement (the "Term") shall be for an initial contract period which shall commence on the date of this agreement (the "Initial Contract Period").

2.2 You hereby grant us two (2) separate consecutive options to extend the Term for successive contract periods (each, an "Optional Contract Period"; in chronological order (if the corresponding option is exercised), the "First Optional Contract Period" and the "Second Optional Contract Period", each such option to be deemed to have been automatically exercised unless we send you written notice to the contrary not less than one (1) month prior to the last day of the then current contract period. Each Optional Contract Period shall commence, if at all, immediately upon the expiration of the preceding contract period.

2.3 Subject to paragraph 5.1 below, the Initial Contract Period and, if applicable, each Optional Contract Period, shall be for a duration of one (1) year.

3. COMPENSATION

3.1 You shall not be entitled to receive any compensation or remuneration from us other than as specifically provided in this agreement.

3.2 Conditioned upon your full and continuing compliance with all of the material terms, covenants and conditions on your part set forth in this agreement, and in reliance upon all of your warranties and representations set forth in this agreement, we shall pay or cause to be paid to you the following sums, all of which shall be in advance and on account of, and fully recoupable from, all royalties credited and to be credited to your account hereunder:

(a) $50,000. during the Initial Contract Period; and

(b) During each Optional Contract Period (but only if we exercise our option to extend the Term for the applicable Optional Contract Period), a sum equal to two-thirds (66-2/3%) of an amount computed by adding (x) the royalties credited to your account hereunder during the immediately preceding two (2) regular royalty accounting periods, and (y) our reasonable estimate of so-called "pipeline" monies; provided, however, that the amount payable to you pursuant to this paragraph during the First Optional Contract Period shall not be more than $100,000. nor less than $60,000.; and the amount payable to you during the Second Optional Contract Period shall not be more than $150,000. nor less than $70,000. As used herein, "pipeline monies" are monies that have accrued to Said Works but not yet been paid to us by foreign publishers (including our affiliates), collection societies and organizations, or record companies.

Save as otherwise expressly provided in this agreement, all payments (i) pursuant to clause (a) of this paragraph 3.2 shall be made in twelve (12) equal installments, on the first day of the first twelve (12) months of the applicable contract period; provided, however, that any such installment that shall have accrued prior to the Court Approval Date (as hereinafter defined) shall be paid promptly following the Court Approval Date; (ii) during the First Optional Contract Period shall be made in four (4) equal installments, on the first day of the first, fourth, seventh and tenth months of the First Optional Contract Period; and (iii) during the Second Optional Contract Period, shall be made in two (2) equal installments on the first day of the first and seventh months of the Second Optional Contract Period.

3.3 Conditioned upon your full and continuing compliance with all of the material terms, covenants and conditions on your part set forth in this agreement, and in reliance upon all of your warranties and representations set forth in this agreement, we shall credit to your account hereunder, as your interest shall appear, the following royalties in respect of Said Works:

(a) 75% of all net monies received by us, or credited to our account in recoupment of prior advances, from the sale of printed copies thereof, and from the recording thereof for phonorecords and audiovisual works, in the United States;

(b) 75% of all net monies received by us, or credited to our account in recoupment of prior advances, from the sale of printed copies thereof and from the recording thereof for phonorecords and audiovisual works, from publishers authorized by us outside the United States including, but not limited to, our affiliates;

(c) 50% of royalties paid to us on account of public performances of Said Works by performing rights societies that pay Writer Performance Royalties directly to writers and composers (it being understood that you shall collect Writer Performance Royalties directly); and

(d) 75% of all net monies received by us, or credited to our account in recoupment of prior advances, as a result of the exercise of rights in Said Works, from all other sources.

3.4 In the event we or any of our successors or assigns manufacture, sell and distribute, for our or their own account, printed copies of Said Works then, in lieu and instead of the royalty otherwise provided for such usage in paragraph 3.3 above, the royalty payable in respect thereof shall be fifteen percent (15%) of the wholesale selling price of each orchestration and other printed arrangement sold, paid for and not returned, and for the use thereof in songbooks, songsheets, folios or other similar publications, that proportion of fifteen percent (15%) of the wholesale selling price thereof as the number of uses of Said Works therein bears to the total number of royalty bearing musical works contained therein, plus an additional five percent (5%) of that price in respect of folios bearing on the cover your name and likeness, or the name and likeness of any recording group of which you are a member.

3.5 For the avoidance of doubt, it is specifically understood that for all Said Works created by you in collaboration with one or more other authors to whom we are obligated to account for royalties in respect of those Said Works, all royalties payable and becoming payable hereunder shall be apportioned between you and all such other authors, and you shall be paid your proportionate share thereof as your authorship interest shall appear.

3.6 As used herein, the words "net monies" shall mean all monies, royalties and fees received by us in the United States for our own use and benefit, or credited to our account in recoupment of prior advances, specifically allocated to Said Works, as a result of the exercise of rights therein, less the following:

(i) The amount of all monies paid and payable as royalties to all writers, publishers and other parties having an interest therein, excluding you; and

(ii) The amount of all reasonable and customary out-of-pocket costs and charges incurred or paid by us with respect to Said Works or which may be allocated (entirely or proportionately, as applicable) thereto including, but not limited to, for musical arrangements, fees of the Register of Copyrights, customary fees and charges of licensing and collection representatives and agencies and, subject to paragraph 11 below, monies retained by music publishers authorized by us to exercise rights in Said Works outside the United States including, but not limited to, our affiliates.

4. ROYALTY ACCOUNTING

4.1 Within ninety (90) days after the last day of each of our regular semi-annual accounting periods in which we receive in the United States monies, royalties or fees from the exercise of rights or interests in Said Works, or monies, royalties or fees derived from the exercise of rights or interests in Said Works are credited to our account in recoupment of prior advances, we shall render statements to you and make payment to you of any and all royalties shown to be due hereunder. Royalties payable to you for an accounting period, if any, shall not be applied in recoupment of advances paid after the last day of the applicable accounting period. All statements rendered hereunder shall be binding upon you, and all objections thereto shall be irrevocably waived, unless (i) we receive, within three (3) years after the date the applicable statement shall have been rendered (the "Objection Period,") written notice setting forth in detail the nature of your objections(s) to any such statement; and (ii) suit is instituted with respect to any statement within the applicable Objection Period. Accordingly, any applicable Statute of Limitations providing for a longer time period in which to institute suit hereby is irrevocably waived by you.

4.2 You shall have the right to appoint, at your sole expense, a Certified Public Accountant ("Your Accountant") to inspect only those of our books and records relating to Said Works, provided that such inspection occurs only once during any calendar year, only once with respect to any statement or accounting period, and upon not less than thirty (30) days prior written notice. All such inspections shall take place at our offices where such books and records are regularly kept, during regular business hours. For the avoidance of doubt, it is specifically understood that you have no right

to inspect any books and records (i) of our affiliates located outside the United States, or (ii) relating to any statement (or corresponding accounting period) for which the Objection Period has expired.

4.3 Your Accountant may not inspect our books and records pursuant to paragraph 4.2 above if she, he, or the firm of which she or he is a member, partner or employee then is conducting an inspection of our books and records, or the books and records of our affiliated music publishing entities, which inspection is not then closed (the "Open Audit"). As used herein, "closed" means that the inspection has been completed, a report setting forth the results of that inspection has been delivered to us, and each claim made in such report, if any, has been resolved to our satisfaction and to the satisfaction of the party or parties on whose behalf the inspection was made. If we notify you that Your Accountant is precluded from inspecting our books and records as a result of the application of the first sentence of this paragraph, then you may, if so disposed, by written notice to us, elect to "toll" the time period in which an inspection may be conducted pursuant to paragraph 4.2 above. The "tolling period" shall commence on the date we receive such notice from you, and shall end on the date we notify you that the Open Audit has been closed.

5. MINIMUM SONG DELIVERY

5.1 You covenant that during each contract period of the Term you will create and deliver to us a minimum of ten (10) original musical works suitable, in the good faith opinion of our professional staff, for commercial exploitation ("Your Minimum Delivery Requirement"). A musical work of which you are not the sole author shall be applied in satisfaction of Your Minimum Delivery Requirement as a fraction of one musical work, the numerator of which is the percentage of your authorship interest therein and the denominator of which is one hundred (100). Upon your failure to fulfill Your Minimum Delivery Requirement during any contract period of the Term, that contract period automatically shall be extended for a period of time that will commence on the date Your Minimum Song Delivery should have been fulfilled and will expire on the last day of the month immediately following the month during which Your Minimum Delivery Requirement shall have been fulfilled (an "Extension Period") without, however, affecting or limiting any other rights or remedies we may have. Notwithstanding anything to the contrary herein contained, we shall have no obligation to pay you any sums pursuant to paragraph 3.2 above during an Extension Period. As used in this paragraph and in paragraph 9 below, "your authorship interest" means the percentage of monies, royalties or fees you (and we, through you) are entitled to receive from the exploitation of the applicable Said Work through (i) public performances, (ii) mechanical reproduction on phonorecords, (iii) "synchronization" with the visual images of audiovisual works, and (iv) reproduction of printed copies; provided, however, that if such percentage shall be different for any of the means of exploitation specified in clauses (i) through (iv) inclusive of this sentence, then your authorship interest shall mean the lowest such percentage.

6. USE OF YOUR NAME AND LIKENESS

6.1 We and our each and every successor, assign and licensee shall have the non-exclusive right, throughout the world, in perpetuity, to use and authorize others to use your name, photographs and likenesses of you, and biographical material relating to you in publicizing, advertising, exploiting, distributing and selling Said Works and our catalog of musical works.

6.2 Upon the condition that you supply us, at your expense, with photographs and likenesses of you and biographical material relating to you promptly following our request from time to time, we shall only use those photographs and likenesses of you and biographical material relating to you previously approved by you.

7. <u>YOUR OBLIGATIONS AND RESTRICTIONS; POWER OF ATTORNEY</u>

7.1 During the Term, but subject to paragraph 7.3 below, you shall not (a) create, acquire or dispose of any musical works or any rights or interests therein whatsoever ("<u>Musical Material</u>"), other than for and to us, or (b) engage in music publishing, directly or indirectly. Any purported assignment by you of any Musical Material created by you during the Term to anyone other than us, or any agreement entered into by you for the creation of Musical Material during the Term on a "work for hire" basis, or any purported acquisition by you of Musical Material during the Term, shall be void from inception.

7.2 You covenant to execute and deliver to us, promptly upon our request, any and all further documents for the purpose of perfecting and confirming in us, our successors, assigns and licensees, any and all rights and interests in and to Said Works and any and all copyrights therein, and you hereby nominate and appoint us, and our each and every successor, assign and licensee, and the officers and designees of each, your true and lawful attorney to make, execute and deliver any and all such documents in your name and on your behalf, this power being coupled with an interest and irrevocable for any cause or in any event; provided, however, that we shall not exercise the foregoing power of attorney unless we shall have sent the document to be executed to you and the same shall not have been returned to us, duly executed, within ten (10) days after the same shall have been sent by us. We shall promptly send you a copy of each document signed by us on your behalf pursuant to the foregoing power of attorney.

7.3 Notwithstanding anything to the contrary herein contained, we shall, upon your request, during the Term, authorize you to create musical works on a "for hire" basis solely for use in motion pictures and television programs, subject to the conditions that you and we jointly own not less than an undivided fifty percent (50%) interest in all copyrights in such musical works, together with the right to receive and retain all monies, royalties and fees derived from the commercial exploitation thereof, excluding only an amount of not more than fifty percent (50%) of the so-called "net publisher's share" of such monies, royalties and fees, and we have the exclusive right to administer our and your interest respective interests therein.

8. YOUR WARRANTIES AND INDEMNIFICATION OBLIGATION

8.1 You warrant and represent that, subject to paragraph 16 below, you have the full right, power and authority to enter into this agreement and to grant, transfer and assign to us all rights in Said Works as herein provided, free and clear of any and all adverse rights, interests, claims and encumbrances; that Said Works are and will be original and do not and will not violate, infringe, or unfairly compete with any common law or statutory rights of others; and that we will not be obligated for any payment or incur any liability in respect of Said Works, other than for the payments specified in this agreement.

8.2 You shall indemnify us and our each and every successor, assign and licensee, and our and their respective officers, directors, parents, affiliates, subsidiaries, agents and representatives (collectively, the "Indemnified Parties"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature (including, but not limited to, Litigation Costs, as hereinafter defined) whatsoever which may be imposed on, incurred by, or asserted against the Indemnified Parties by a third party in any way relating to or arising out of (i) your breach or alleged breach of this agreement, (ii) any claim inconsistent with any of your warranties and representations contained in this agreement, or (iii) Said Works.

8.3 In the event that any claim or demand is made by a third party in respect of which the Indemnified Parties are entitled to be indemnified by you pursuant to paragraph 8.2 above (an "Adverse Claim") then, notwithstanding anything to the contrary herein contained, the Indemnified Parties shall have the right to withhold from any monies credited and to be credited to your account under this agreement an amount reasonably related to the value of the Adverse Claim including, but not limited to, Litigation Costs and, if your account is in a recouped position, deposit such amount in an interest bearing account until either an action shall have been brought by such claimant and the Adverse Claim shall have been finally adjudicated by a court of competent jurisdiction, or until a period of one (1) year shall have expired from the date we shall have received notice of the Adverse Claim if no action shall have been brought thereon during such one (1) year period and if no further communication shall have been received during such one (1) year period reasserting the applicable Adverse Claim, at which time the amount so withheld and deposited, and all accrued interest, if any, shall be credited to your account hereunder. We will (i) send you notice of any Adverse Claim and (ii) endeavor reasonably to afford you and your attorneys the opportunity to consult with the Indemnified Parties or their attorneys in connection with the conduct of the defense of any Adverse Claim or any action instituted with respect thereto, but any failure or alleged failure by the Indemnified Parties to fulfill their obligations pursuant to clause (ii) of this sentence shall not in any way limit your obligation to indemnify the Indemnified Parties or the rights of the Indemnified Parties hereunder. The Indemnified Parties shall have the right, in their sole and absolute discretion, to employ counsel in respect of any and all Adverse

Claims and to defend any and all actions and proceedings arising from or relating to any and all Adverse Claims as they, in their sole and absolute discretion, may deem advisable, and to compromise and settle all Adverse Claims before or after suit for such amounts and upon such terms as they, in their sole and absolute discretion, deem advisable, and be fully indemnified therefor by you. You may, if so disposed, participate in the defense of any and all Adverse Claims at your sole cost or expense, but by doing so you shall not limit in any way your obligation to indemnify the Indemnified Parties or the rights of the Indemnified Parties hereunder.

8.4 Upon the condition that, within thirty (30) days following the day the Indemnified Parties send you notice of an Adverse Claim, you post a bond in an amount reasonably related to the value of the Adverse Claim including, but not limited to, Litigation Costs, in a form and issued by a surety reasonably satisfactory to the Indemnified Parties, and such bond remains in full force and effect for so long as the applicable Adverse Claim is effect pending, then, notwithstanding anything to the contrary contained in paragraph 8.2 above, we shall not withhold any amount due you and you shall have twenty (20) days following the posting of such bond to retain counsel to represent the Indemnified Parties, but such counsel must be approved by us. Such approval shall not be unreasonably withheld. If the Indemnified Parties notify you that they do not approve the counsel you shall have retained to represent them, you shall have ten (10) days following the date such notice shall have been sent to retain different counsel to represent the Indemnified Parties. If you retain such counsel within that ten (10) or twenty (20) day period, as applicable, then you shall be solely responsible for all costs and fees incurred by such counsel, and for the defense or settlement of such Adverse Claim, but the Indemnified Parties shall have the right to retain different counsel, at their expense. If you do not retain such counsel within that ten (10) or twenty (20) day period, as applicable, and make all payments to such counsel as invoiced for so long as the applicable Adverse Claim is pending, the Indemnified Parties shall have the right to retain counsel to represent them in the action or proceeding at your expense. You shall not settle any Adverse Claim without the Indemnified Parties' prior consent, which shall not be unreasonably withheld.

8.5 "<u>Litigation Costs</u>" means the reasonable costs actually incurred by the Indemnified Parties, or which the Indemnified Parties reasonably anticipate will be incurred, in the defense of an Adverse Claim including, but not limited to, attorneys' fees, witness fees, deposition fees, travel expenses and court costs.

## 9. <u>DEMO COSTS AND PROMOTION COSTS</u>

9.1 Seventy-five percent (75%) of all costs incurred by us (i) in connection with the production of so-called "demonstration" recordings ("<u>Demos</u>," or a "<u>Demo</u>") of any of Said Works (including, but without limitation, the fair value of all studio facilities and personnel provided by us) and (ii) for the promotion of recordings of any of Said Works, (it being specifically understood that we have no obligation whatsoever to incur any of the costs identified in clauses (i) and (ii) of this sentence or reimburse you for such costs) shall be in advance and on account of all royalties credited and to be

credited to your account under this agreement; provided, however, that if the costs incurred by us in connection the production of any Demo of a Said Work created solely by you exceed our then current maximum cost therefor (or, with respect to any Said Works created by you in collaboration with one or more other authors, that portion of our then current maximum cost therefor corresponding to your authorship interest in the Said Work recorded on the applicable Demo; "Our Maximum Demo Cost") then, unless such excess costs shall have been incurred by those acting under our authority, or with our prior written consent, one hundred percent (100%) of such excess costs shall be in advance and on account of all royalties credited and to be credited to your account under this agreement; and, provided further, that we shall in no event be responsible for recording studio costs incurred in the production of Demos of Said Works unless (x) the studio is located on our premises, or (y) the use of a studio located outside our premises is approved in writing, in advance, by one of our officers duly authorized to approve the same on our behalf. Our Maximum Demo Cost for the production of one (1) Demo of a musical work created by you alone is $600. as of the date of this agreement. All Demos shall be deemed to be derivative works based upon Said Works, shall be owned by you and by us, jointly, as our respective interests in applicable Said Works shall appear, and may be exploited by us in any manner and upon any terms we believe to be suitable, subject to your written consent in each instance, which you shall not unreasonably withhold; save that, if your featured vocal performance is contained thereon, you may withhold your consent for any reason and, save further, that we shall not exploit any Demos of Said Works in a manner contrary to the terms contained in any exclusive recording agreement you may enter into, so long as you notify us of the applicable terms. Seventy-five percent (75%) of any net monies received by us from the commercial exploitation of any Demo shall be credited as royalties to your account hereunder.

10. RIGHT OF ASSIGNMENT

10.1 We shall have the right to assign Said Works, this agreement and any and all rights acquired by us hereunder to any subsidiary, affiliate or controlling corporation, to any person, firm or entity owning or acquiring a substantial portion of our stock or assets, or to any partnership or other venture in which we participate, and such rights may be assigned by any assignee, subject to the same limitations.

11. FOREIGN PUBLISHING

11.1 We shall have the right to authorize music publishers, including our affiliates, to exercise any and all rights and interests in Said Works in one or more countries outside the United States (the country or countries in which a music publisher is so authorized being hereinafter referred to as the "Authorized Territory"); provided, however, that no such music publisher shall retain more than the following amounts: (i) twenty percent (20%) of the so-called "publisher's share" of royalties paid on account of public performances of Said Works in the Authorized Territory, (ii) fifteen (15%) of the so-called "mechanical" copyright royalties paid for the manufacture and distribution in the Authorized Territory of phonorecords containing recordings of Said Works produced

outside the Authorized Territory; or (iii) twenty percent (20%) of all other monies, royalties and fees paid for the exercise of rights in Said Works in the Authorized Territory.

12. CHOICE OF LAW AND VENUE

12.1 This agreement shall be deemed to have been made in the State of Tennessee and shall be construed under the laws of the State of Tennessee applicable to agreements made and wholly performed therein. Any legal action or proceeding arising from or relating to this agreement must be brought in the federal or state courts located in Davidson County, Tennessee (the "Nashville Courts") and not in any other court or jurisdiction. You irrevocably waive any objection that you may now or hereafter have to the venue of any such action or proceeding in the Nashville Courts or that such action or proceeding was brought in an inconvenient court and covenant not to plead or claim the same. Service of process in any such action or proceeding may be made in the manner specified in this agreement for notices hereunder, or in any other manner permitted by law.

13. MISCELLANEOUS

13.1 It is specifically understood and agreed that Said Works and your services as a creator of musical works are unique, exceptional and extraordinary and cannot be replaced, and that in the event of the violation by you of any of the material terms, covenants or conditions of this agreement, we and all other parties in interest through us shall be entitled to injunctive relief in addition to all other rights and remedies. (The preceding sentence will not be construed to preclude you from opposing any application for such relief based upon the contest of other facts alleged by us in support of the application.)

13.2 The waiver by you or us, or by any other party in interest through you or us, of any of the terms or provisions of this agreement in any one or more instances shall not thereafter be deemed a waiver thereof, the same to thereafter remain and continue in full force and effect.

13.3 We shall have the right, but not the obligation, to enforce all claims and to commence and prosecute legal proceedings against third parties based upon alleged infringements or other violations by third parties of any rights in Said Works. You and we shall jointly be entitled to a share of the net sums, if any, actually received by us for our own use and benefit from the resolution of any such claims and legal proceedings in an amount equal to your and our proportionate royalty interests, and your share thereof shall be credited to your account as royalties hereunder. "Net sums" shall mean the monies actually received by us, less our actual out-of-pocket costs including, but not limited to, Litigation Costs. If we elect not to commence legal proceedings on any such claims, you may do so, at your sole cost and expense, and retain all sums recovered thereby, provided that you indemnify us from any and all loss or damage we may suffer (including, but not limited to, Litigation Costs) by reason thereof.

13.4 Descriptive headings used in this agreement are for convenience only and shall not control or affect the meaning or construction of any provision of this agreement.

13.5 This agreement constitutes the entire agreement between you and us and may not be amended or modified except in a writing executed by you and by an officer duly authorized to execute such writing on our behalf.

13.6 Neither party shall be entitled to terminate the Term or recover damages by reason of any material breach or any claimed material breach of this agreement by the other party unless the party seeking such relief shall first have delivered written notice to the other party, specifying in detail the nature of the breach or claimed breach, and the party receiving that notice shall have failed to remedy the breach within thirty (30) days following its or his receipt of that notice; save that the preceding clause shall not apply to your obligations under paragraphs 5.1 and 7.1 above. You hereby irrevocably waive your right to seek the rescission of this agreement.

13.7 All notices hereunder shall be in writing and shall be given by registered or certified mail or overnight courier (such as Federal Express), at the addresses shown above, or such other address or addresses as may be designated by either party. Notices to us must be addressed to our President, and a copy of each such notice must be sent to Stuart Prager, Esq., Clark and Prager, 10 East 40th Street, Suite 3100, New York, New York 10016. Notices shall be deemed given when mailed, except that notice of change of address shall be effective only from the date of its receipt. We shall endeavor to give copies of all notices to your attorney, Vivien Lewitt, Esq., but our inadvertent failure to do so in any instance shall not constitute a breach of this agreement nor invalidate or limit the effectiveness of this notice

13.8 YOU ACKNOWLEDGE AND CONFIRM THAT WE HAVE ADVISED YOU TO RETAIN INDEPENDENT COUNSEL, SELECTED BY YOU, TO REPRESENT YOU IN CONNECTION WITH YOUR EXECUTION OF THIS AGREEMENT.

13.9 This agreement shall not be binding upon us unless and until it shall have been executed by you and by an officer duly authorized to execute this agreement on our behalf.

13.10 In the event that you die or become permanently disabled before the date the Term otherwise would expire, the Term shall be deemed to have expired on the date of your death or disability.

13.11 Upon the expiration of the Term, all of the terms and conditions of this agreement shall remain in full force and effect for the duration of copyright in Said Works, and all renewals and extensions thereof, excluding only (i) your and our respective obligations under paragraphs 1.2, 3.2 and 5.1 above; and (ii) as otherwise provided by operation of law.

13.12 When you sign this agreement, and as a condition hereof, you shall execute and deliver to us an assignment in the form of Exhibit 13.12 annexed hereto and made a part of hereof, and a letter of direction in the form of Exhibit 13.12A annexed hereto and made a part of hereof.

14. CO-PUBLISHING

14.1 Upon the expiration of the Term, an undivided forty percent (40%) interest (the "Forty Percent Interest") in and to Said Works shall automatically and immediately revert to and be fully vested in you. Notwithstanding the preceding sentence, at any time following the expiration of the Term, we shall, upon receipt of your written request, promptly execute and record in the United States Copyright Office a document, substantially in the form of Exhibit 1.2 hereto, assigning to you the Forty Percent (40%) Interest.

14.2 It is specifically understood that the royalties payable and becoming payable to you pursuant to paragraphs 3 above shall not change as a result of the operation of paragraph 14.1 above, and that we shall retain the sole and exclusive right, throughout the world and in perpetuity, to exercise and license all rights and interests of whatsoever nature in respect of Said Works and to collect any and all income derived therefrom or accruing thereto, subject only to paragraph 15 below.

15. CO-ADMINISTRATION UPON POST-TERM RECOUPMENT

15.1 If at any time after the expiration of the Term we render a royalty accounting statement to you reflecting our recoupment of all advances paid to you or on your behalf pursuant to this agreement ("Advances"), or you repay to us the entire unrecouped balance of all Advances (either such event being referred to as "Post-Term Recoupment"), you shall have the option to administer your interest in Said Works in the manner described in paragraph 15.2 below, and collect directly, for your own account, fifty percent (50%) of the so-called "publisher's share" of royalties paid on account of public performances of Said Works occurring after the Effective Date (as hereinafter defined) and seventy-five percent (75%) of all other monies, royalties and fees first accruing to Said Works after the Effective Date. This option may be exercised after your right matures, by delivering written notice thereof to us. As used herein, the "Effective Date" shall mean the first day of our next succeeding regular royalty accounting period following our receipt of such written notice, provided that such notice shall have been received by us at least sixty (60) days before the last day of our then current semi-annual royalty accounting period.

15.2 If you exercise your option pursuant to paragraph 15.1 above then, commencing on the Effective Date, all rights and interests in Said Works, including under all copyrights therein throughout the world, shall be administered in the following manner:

(i) You and we each shall have the right to administer and retain third party administrators to administer our respective rights in Said Works throughout the world. Each such administrator shall be notified by the party retaining such administrator of your and our respective rights Said Works.

(ii) Neither you nor we shall enter into licenses and agreements for the exploitation, performance, recording, synchronization, printing, publication or other use of the interest of the other party in Said Works, save upon first obtaining the prior written consent of the other party, which consent shall not be unreasonably withheld. Any license or agreement entered into contrary to the preceding sentence shall be void from inception.

(iii) If any party shall receive any monies, royalties or fees in respect of Said Works properly payable to the other party, the recipient shall promptly remit such monies, royalties or fees to the other party, and deliver to the other party copies of any accounting statements, licenses or other documents that accompanied the funds received.

(iv) You and we shall each bear our own costs of copyright registration and the preparation of manuscripts and promotional material, unless otherwise agreed in advance, in writing.

(v) You and we each shall have the right to inspect each other's books and records relating to Said Works, such inspection to be made during regular business hours upon at least thirty (30) days prior written notice, and in no event more than once during any calendar year. Any such inspection by you shall be subject to paragraphs 4.2 and 4.3 above.

(vi) Should you or we commence any action or proceeding against an unrelated third party or parties for the infringement of copyright or other violation of your or our rights in Said Works, then the party commencing such action or proceeding shall promptly notify the other party. In such event, the party so notified (the "Notified Party") shall have the right, but not the obligation, to participate in such action or proceeding. In the event that the Notified Party elects to participate in such action or proceeding, the Notified Party shall pay the costs thereof (including attorneys' fees) in proportion to the Notified Party's

financial interest in Said Works at issue, and receive that same proportion of any sums recovered in such action or proceeding. In the event that the Notified Party elects not to participate in such action or proceeding, the Notified Party shall have no obligation to pay any costs thereof and no right or interest whatsoever in any sum recovered therein.

(vii) Subject to paragraph 15.4 below, you and we each shall have the right to assign our respective rights in Said Works, provided that the assignee consents in writing to be bound by all of the terms of this paragraph 15.2, and any assignment to an assignee by you without such written consent shall be void from inception.

15.3 If you exercise your option pursuant to paragraph 15.2 above, then we shall have no obligation to make any payment to you whatsoever in respect of any royalties or fees accruing Said Works on or after the Effective Date, subject to paragraph 15.2(iv) above.

15.4 During the Term, and for a period of three (3) years following the expiration of the Term, you shall not grant, transfer, or assign any of your contingent or vested rights in any Said Works including, but not limited to, rights of administration anywhere in the world, unless you shall have first delivered to us a written statement setting forth your intention to do so and you shall have negotiated with us in good faith, for a period of 30 days following our receipt of such statement (the "Negotiation Period"), the terms and conditions pursuant to which we may acquire such rights; save that the preceding clause shall not apply to any membership, affiliation or representation agreement with a performing or mechanical rights society, to any transfer of rights by operation of law, or to any mortgage of your rights in Said Works. If no agreement shall be reached by you and us as to such terms and conditions within the Negotiation Period, then you may, within 30 days following the expiration of the Negotiation Period, present us with a written statement offering to sell, transfer or assign such rights on financial terms and conditions specified therein, provided that such terms and conditions may be performed by us in the same manner as other music publishers. If we do not notify you within 15 days following our receipt of such offer (the "Offer Response Date") of our acceptance thereof, then, and only then, you may grant, transfer and assign such rights to another upon those terms and conditions, or more valuable terms and conditions; provided that such sale, transfer or assignment is completed within 120 days following the Offer Response Date, and a true and complete copy of the agreement of sale, transfer or assignment is promptly delivered to us within said 120 day period. Upon your failure to fulfill both of the conditions set forth in the preceding sentence, your right to grant, transfer or assign such rights shall terminate, but may be revived if you re-submit the terms and conditions to us for our acceptance or rejection as provided herein. If we notify you of our acceptance of any such offer prior to the Offer Response Date, you and we shall expeditiously prepare and execute an appropriate agreement. In the event

that you and we are unable to agree on the contents of an appropriate agreement, the matter shall be submitted to a single arbitrator selected by you and us (or, if you and we cannot agree on an arbitrator, to a single arbitrator selected by the American Arbitration Association in Nashville) to determine and, if necessary, draft the contents of such an agreement. You and we shall each be responsible for one-half (50%) of the fee of such arbitrator. We shall have the right to obtain an injunction or an order of specific performance enforcing the provisions of this paragraph. Any purported grant, transfer, or assignment of any of your contingent or vested rights in any Said Works, other than in accordance with this paragraph, shall be void from inception.

16. COURT APPROVAL

16.1 You warrant and represent that you are a minor under the laws of the State of Tennessee. Immediately upon the execution of this agreement by all parties, we shall cause an application to be filed pursuant to the provisions of Tennessee Code Annotated, Section 29-31-101, et seq. (the "Application") seeking to have your legal disabilities as a minor removed for the limited purpose of entering into and approving this agreement and performing hereunder. Our obligations to perform under this agreement are contingent upon receipt of a valid order of the appropriate court granting such Application and your ratifying this agreement pursuant to such order (the date on which we receive such order and ratification being referred to in this agreement as the "Court Approval Date"). We shall be solely responsible for employing an attorney to prosecute the Application. Seventy-five percent (75%) of the reasonable costs and legal fees incurred by us in connection with the prosecution of the Application shall be deemed to be Advances hereunder.

17. UNEXPLOITED EXHIBIT 1.1 SAID WORKS

17.1 As used herein, the "Exhibit 1.1 Said Works" shall mean only the Said Works identified on Exhibit 1.1 hereto.

17.2 At any time following the last day of the Term we shall, upon your written request ("Your Reassignment Request"), reassign to you all of our rights in only those Exhibit 1.1 Said Works ("Unexploited Exhibit 1.1 Said Works") which shall not have theretofore been recorded and commercially released on phonorecords in the United States by a major record label ("Released"); provided, however, that if, at the time Your Reassignment Request shall be made, any of the Unexploited Exhibit 1.1 Said Works shall have been placed "on hold," as that term is customarily understood in the music publishing industry in Nashville by or on behalf of a recording artist who records for a major record company (a "Recording Artist"), then, with respect to such Unexploited Exhibit 1.1 Said Works only (the "Unexploited Exhibit 1.1 Said Works On Hold"), Your Reassignment Request shall not be effective until one (1) year following our receipt of Your Reassignment Request (the "On Hold Reassignment Date"), and shall not be valid with respect to those of the Unexploited Exhibit 1.1 Said Works On Hold that shall have been Released prior to the On Hold Reassignment Date; subject, however, to paragraph 17.3 below.



SP

17.3 As used herein, "Recorded But Unreleased Exhibit 1.1 Said Works" shall mean those Unexploited Exhibit A Said Works which, on the day we shall receive Your Reassignment Request, (i) have been recorded by a Recording Artist ("Recorded") but have not yet been Released, or (ii) have not yet been Recorded, then are Recorded before the On Hold Reassignment Date, but have not yet been Released before the On Hold Reassignment Date.

17.4 With respect to those Recorded But Unreleased Exhibit 1.1 Said Works referred to in clause (i) of paragraph 17.3 above, Your Reassignment Request shall not be effective until one (1) year after the On Hold Reassignment Date, and shall not be valid with respect to those of the Recorded But Unreleased Exhibit 1.1 Said Works that shall have been Released prior to the On Hold Reassignment Date.

17.5 With respect to those Recorded But Unreleased Exhibit 1.1 Said Works referred to in clause (ii) of paragraph 17.3 above, Your Reassignment Request shall not be effective until one (1) year after the On Hold Reassignment Date (the "Extended On Hold Reassignment Date"), and shall not be valid with respect to those of the Recorded But Unreleased Exhibit 1.1 Said Works that shall have been Released prior to the Extended On Hold Reassignment Date.

Very truly yours,

SONY/ATV SONGS LLC, doing business as TREE PUBLISHING CO.

By: ______________________

CONSENTED AND AGREED TO:

______________________
TAYLOR SWIFT

## ACKNOWLEDGMENT

STATE OF TENNESSEE )
) ss.:
COUNTY OF SUMNER )

On the 17th day of JANUARY, 2005, before me personally came Taylor Swift to me known, who, by me duly sworn, did depose and say that she is the party described in and who executed the foregoing instrument.

NOTARY PUBLIC AT LARGE SUMNER CO., TENN. MY COMM. EXP. 3/25/07

[signature]
Notary Public

My taxpayer identification number (social security number or employer identification number) is ______________. Under the penalties of perjury, I certify that this information is true, correct, and complete.

[signature]
TAYLOR SWIFT

## INDUCEMENT

The undersigned parents of the Taylor Swift (the "Writer's Parents") hereby execute this Inducement for the purpose of approving and consenting to the Taylor Swift entering into this agreement, and agree to act consistently with the provisions and purposes of this agreement. Writer's Parents further agree to join in and support the application to be filed pursuant to the provisions of Tennessee Code Annotated, Section 29-31-101, et seq. (the "Application") seeking to have Taylor Swift's legal disabilities as a minor removed for the limited purpose of entering into and approving this agreement and performing thereunder, and to cooperate with the prosecution of the Application.

[signature]

[signature]

Exhibit 1.1

Taylor Swift Schedule A Songs

1. I'm Only Me When I'm with You (T. Swift, Angelo, Orrall)
2. Lucky You (T. Swift)
3. American Boy (T. Swift)
4. Closest To A Cowboy (T. Swift, S. Vaughn)
5. Crazier (T. Swift, Orrall)
6. Cross My Heart (T. Swift)
7. Didn't They (T. Swift)
8. Don't Hate Me for Loving You (T. Swift)
9. Firefly (T. Swift, C. Harrington, M. Pierce)
10. I Don't Want to Lose Your Face (T. Swift)
11. Honey Baby (T. Swift)
12. In the Pouring Rain (T. Swift)
13. Mandolin (T. Swift)
14. Invisible (T. Swift, R. E Orrall)
15. Bein With My Baby (T. Swift, B. Beavers)
16. A Place In This World (T. Swift, Orrall, Angelo)
17. What Do You Say? (T. Swift, Orrall, Angelo)
18. Beautiful Eyes (T. Swift)
19. Brand New World (T. Swift)
20. Angelina (T. Swift)
21. For You (T. Swift)
22. Someone Loves You (T. Swift)
23. I Heart ? (T. Swift)
24. Live for the Little Things (T. Swift)
25. Me & Britney (T. Swift, S. Vaughn)
26. Teardrops On My Guitar (T. Swift, L. Rose)
27. Songs About You (T. Swift, V. Shaw, S. Buxton)

SP

Exhibit 1.2

ASSIGNMENT:

For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby grants, transfers and assigns to Sony/ATV Songs LLC, doing business asTree Publishing Co., and its successors and assigns, throughout the world, in perpetuity, the authorship interest of the undersigned in the musical work entitled __________________________, all copyrights therein, all renewals, extensions and reversions thereof, and all rights under copyright therein of whatsoever kind or nature including, but not limited to, the sole and exclusive rights to exercise, license and administer all rights therein and thereto, and to collect all monies, royalties and fees of whatsoever kind or nature derived from the exercise of rights therein, excluding only the so-called "writer's share" of royalties paid by performing rights societies on account of public performances thereof.

IN WITNESS WHEREOF, the undersigned has executed this instrument this 20th day of January, 2005.

[signature]
TAYLOR SWIFT

ACKNOWLEDGMENT

STATE OF Tennessee )
) ss.:
COUNTY OF Sumner )

On the 20th day of Jan., 2005, before me personally came Taylor Swift, who, by me duly sworn, did depose and say that she is the party described in and who executed the foregoing instrument.

[signature]
Notary Public

My comm. expires March 25/07





30

## Exhibit 13.12

## ASSIGNMENT:

For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby grants, transfers and assigns Sony/ATV Songs LLC, doing business as Tree Publishing Co. ("Assignee".) and its successors and assigns, throughout the world, in perpetuity, an undivided ninety percent (90%) interest in and to (i) all of the musical works heretofore created by the undersigned, alone or in collaboration with others including, but not limited to, the musical works identified on Schedule A annexed hereto, and (ii) all of the musical works created by the undersigned, alone or in collaboration with others, during the term of the Exclusive Songwriter Agreement between the undersigned and Assignee dated November 1, 2004 (all of the musical works encompassed within clause (i) and (ii) of this sentence being hereinafter referred to, collectively, as "Said Works"), all copyrights in Said Works, all renewals, extensions and reversions of all copyrights in Said Works, and all rights under copyright in Said Works of whatsoever kind or nature including, but not limited to, the sole and exclusive rights to exercise, license and administer all rights in and to Said Works, and to collect all monies, royalties and fees of whatsoever kind or nature derived from the exercise of rights therein, excluding only the so-called "writer's share" of royalties paid by performing rights societies on account of public performances thereof.

IN WITNESS WHEREOF, the undersigned has executed this instrument this 20th day of January, 2005.

TAYLOR SWIFT

## ACKNOWLEDGMENT

STATE OF Tennessee )
) ss.:
COUNTY OF Sumner )

On the 20th day of January, 2005, before me personally came Taylor Swift, to me known, who, by me duly sworn, did depose and say that she is the party described in and who executed the foregoing instrument.

Notary Public

My comm. expire March 27/05

**Exhibit 13.12A**

November 1, 2004

Publisher Relations Department
BMI
10 Music Square East
Nashville, Tennessee 37203

To Whom It May Concern:

This is to advise BMI that we have entered into an agreement with another BMI publisher for the administration of our catalog, and that BMI's records should be marked to reflect the agreement as follows:

1. Name of BMI publisher acting as our Administrator:

   Sony/ATV Songs LLC, doing business as Tree Publishing Co.

2. Effective date of agreement:

   Immediately, including all royalties now payable or which hereafter become payable, regardless of when performance took place.

3. Checks for all our BMI royalties, both domestic and foreign, should be made payable to this Administrator and should be sent together with statements and all other correspondence to the Administrator at its address on BMI's records.

We understand that BMI cannot mark its records at this time so as to indicate the termination date of the administration agreement and that, therefore, the above information will continue to be reflected on BMI's records until such time as we or the Administrator notifies BMI that the administration agreement is about to terminate.

Very truly yours,

Taylor Swift, an Officer